Aaron Zigler (#327318)
    amz@kellerlenkner.com
Ashley Keller (*pro hac vice forthcoming*)
    ack@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

Warren Postman (*pro hac vice forthcoming*)
    wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POSTMATES INC., | ) |
| | ) Case No:  2:20-cv-02783-PSG |
| *Plaintiff,* | ) |
| | ) |
| vs. | ) **DEFENDANTS' OPPOSITION TO** |
| | ) **POSTMATES'S *EX PARTE*** |
| 10,356 INDIVIDUALS, | ) **APPLICATION FOR** |
| | ) **TEMPORARY RESTRAINING** |
| *Defendants.* | ) **ORDER** |
| | ) |
| | ) **Judge:**   Hon. Philip S. Gutierrez |
| | ) |
| | ) |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................. 4

II.     BACKGROUND ................................................................................ 8

        A.    Postmates Requires Couriers to Sign a Broad Arbitration Clause............ 8

        B.    Postmates Refuses to Arbitrate with More Than 5,000 Couriers, but Is
              Ordered to Arbitrate by the Federal Court in *Adams v. Postmates*........... 8

        C.    Postmates Still Refuses to Arbitrate with the *Adams* Couriers and Faces
              Potential Contempt Sanctions. .............................................................11

        D.    Defendants in This Action Initiate Arbitration Against Postmates. ........13

        E.    Postmates Preemptively Sues Its Couriers to Bar Them from Proceeding
              with Arbitrations in the Manner Approved in *Adams.* ...........................14

III.    LEGAL STANDARD...........................................................................16

IV.     ARGUMENT......................................................................................16

        A.    Postmates's TRO Request Should Be Denied Because It Is Based on a
              Deadline Postmates Has Known About for More Than Six Weeks. .......17

        B.    Postmates's Underlying Claims Have No Hope of Success...................19

              1.    Postmates's Arguments Do Not Create Federal Jurisdiction. ..........19

              2.    Postmates's "De Facto Class Arbitration" Argument Is Patently
                    Meritless. .......................................................................21

              3.    SB 707 Cannot Be Preempted by the FAA Because It Promotes
                    Enforcement of Arbitration Agreements. .........................................23

              4.    Postmates's Contracts Clause Argument Is Frivolous .....................24

        C.    Postmates Has Not Even Alleged Irreparable Injury. .............................25

        D.    The Balance of Equities and the Public Interest Cut Strongly Against a
              TRO................................................................................................27

E.    Postmates's Inexcusably Tardy and Patently Meritless *Ex Parte* TRO Application Warrants Sanctions. ............................................................29

V.    CONCLUSION .......................................................................................29

# **TABLE OF AUTHORITIES**

*Abernathy v. S. Cal. Edison*,
  885 F.2d 525 (9th Cir. 1989)...........................................................................22

*Am. Soc'y of Journalists & Authors, Inc. v. Becerra*,
  No. 19-cv-10645-PSG-KSX (C.D. Cal. Jan. 3, 2020) ..................................1, 14

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)........................................................................................18

*Blair v. Rent-A-Center, Inc.*,
  No. 17-17221, 2019 WL 2701333 (9th Cir. June 28, 2019) ...........................19

*Bronson v. Kinzie*,
  42 U.S. 311 (1843)..........................................................................................20

*Bushley v. Credit Suisse First Boston*,
  360 F.3d 1149 (9th Cir. 2004)................................................................2, 16, 24

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*,
  181 F. Supp. 2d 1111 (E.D. Cal. 2001) ...........................................................12

*Camping Constr. Co. v. Dist. Council of Iron Workers*,
  915 F.2d 1333 (9th Cir. 1990)..........................................................................22

*In re Cintas Corp. Overtime Pay Arbitration Litig.*,
  No. C06-1781-SBA, 2009 WL 1766595 (N.D. Cal. June 22, 2009).....22, 23, 24

*Dynamex Operations W. v. Superior Court*,
  416 P.3d 1 (2018), *reh'g denied* (June 20, 2018) ...........................................24

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr.*
  *for S. Cal.*,
  463 U.S. 1 (1983).....................................................................................2, 16, 17

*Graphic Commc'ns. Union, Chi. Paper Handlers' & Electrotypers'*
  *Local No. 2 v. Chi. Tribune Co.*, 779 F.2d 13 (7th Cir. 1985) ..............22, 23, 24

*Jimenez v. Menzies Aviation Inc*,
  No. 15-CV-02392-WHO, 2015 WL 5591722 (N.D. Cal. Sept. 23,
  2015) .............................................................................................................24

*LL Liquor, Inc. v. Montana*,
  912 F.3d 533 (9th Cir. 2018) ...........................................................................17

*Mission Power Engineering Co. v. Continental Casualty Co.*,
  883 F. Supp. 488 (C.D. Cal. 1995) ...............................................................2, 13

*Sakkab v. Luxottica Retail N.A., Inc.*,
  803 F.3d 425 (9th Cir. 2015) ...........................................................................19

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018) ....................................................................................21

*Vaccaro v. Sparks*,
  No. SACV 11-00164, 2011 WL 318039 (C.D. Cal. Jan. 28, 2011) .................13

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) ...........................................................................................16

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior
  Univ.*, 489 U.S. 468 (1989) ..............................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................................13, 21

*Winns v. Postmates Inc.*,
  No. CGC-17-562282 (Cal. Super. Ct. Jan. 23, 2018) ..................................5, 25

**Statutes**

9 U.S.C. § 2 .............................................................................................................3, 19

28 U.S.C. § 1331 ...........................................................................................................2

California Code of Civil Procedure 1281.97 ...............................................1, 10, 11

California Code of Civil Procedure § 1281.97 ..............................................................1
  §§ 1281.97 through 1281.99 ..........................................................................20

S.B. 707, 2019-2020 Reg. Sess. (Cal. 2019) ...............................................*passim*

## I.   INTRODUCTION

In its "Notice of Motion and Motion for Preliminary Injunction by April 15, 2020," Postmates conceded that it "does not believe that seeking a temporary restraining order would be appropriate in this case."   ECF No. 8 at 3.   Now, Postmates seeks the extraordinary relief that it told the Court just days ago would be inappropriate.   Postmates's *ex parte* TRO application is frivolous, and the company should be sanctioned for knowingly burdening Defendants and the Court with a fire drill that is inexcusably tardy, devoid of jurisdiction, and has no chance of success. *See* Hon. Philip S. Gutierrez, *Important Notice*, available at https://kl.link/2x6McP2 (last accessed on April 9, 2020) (citing *Mission Power Engineering Co. v. Continental Casualty Co.*, 883 F. Supp. 488 (C.D. Cal. 1995)).

Defendants are Postmates couriers who primarily deliver food to Postmates's customers from local restaurants.   Postmates sued its own couriers—many of whom are still bravely working in the middle of a pandemic—because Defendants have each filed an individual demand for arbitration with the American Arbitration Association ("AAA") asserting that Postmates misclassifies them as independent contractors.   For arbitration to proceed, Postmates must pay its share of AAA's administrative fees.   On February 24, 2020, AAA notified the parties of the March 16 deadline for Postmates to meet that contractual commitment, and AAA repeatedly warned that this deadline would not be extended.   Postmates did not pay the fees it owes.   On April 15, 2020, the company will be 30 days past due, which comes with stiff consequences under California Code of Civil Procedure § 1281.97 ("SB 707").

For more than six weeks, Postmates has known of the April 15 date that is the subject of its *ex parte* application.   Yet Postmates inexcusably waited more than four weeks to file its complaint in this action and then waited two more weeks before filing this *ex parte* application.   Any "emergency" here is a product of Postmates's tactical decision to saunter into court at the eleventh hour.   That alone dooms the

motion.  *See Am. Soc'y of Journalists & Authors, Inc. v. Becerra*, No. 19-cv-10645-PSG-KSX, Order at 3, ECF No. 30 (C.D. Cal. Jan. 3, 2020) ("*ASJA*") ("Plaintiffs' unexplained delay indicates that they fail *Mission Power* because *ex parte* relief is an extraordinary remedy and Plaintiffs have not explained 'the necessity for bypassing regular motion procedures,' or that they are 'without fault' in creating the crisis requiring *ex parte* relief.") (quoting *Mission Power*, 883 F. Supp. at 492).

Aside from its inexcusable delay, Postmates's underlying arguments for a TRO are patently meritless in four separate respects.

*First*, this Court lacks subject-matter jurisdiction even to consider Postmates's arguments.  It is black letter law that the Declaratory Judgment Act ("DJA") does not independently confer jurisdiction.  A case cannot "arise under" the DJA for purposes of 28 U.S.C. § 1331.  *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 16 (1983).  Here, Postmates alleges only that (1) Defendants have violated their agreement to arbitrate disputes individually with Postmates; (2) if Defendants were to bring a claim against Postmates under SB 707, Postmates would show that the claim is preempted by the Federal Arbitration Act ("FAA"); and (3) if Defendants were to bring claims against Postmates under SB 707, Postmates would purportedly show that application of SB 707 violates the Contracts Clause.  The first of those arguments raises a pure question of state law.  And the second and third arguments rest on preemption, which is a federal <u>defense</u> to a <u>hypothetical</u> action by Defendants.  Federal defenses do not confer federal-question jurisdiction even in real actions, to say nothing of imaginary ones.

*Second*, even if the Court could consider the merits, Postmates's arguments are frivolous.  Postmates's first argument—that Defendants have impermissibly filed a "de facto class arbitration"—has been decisively rejected by another federal court.  In *Adams v. Postmates*, Judge Armstrong in the Northern District of California (where Postmates is based) already decided that Postmates must arbitrate

with thousands of couriers whose demands were filed in the same manner as Defendants'.  *See* 414 F. Supp. 3d 1246 (N.D. Cal. 2019) (*Adams I*).  Indeed, in rejecting Postmates's bid for a stay pending appeal, the *Adams* court held that Postmates's arguments to the contrary are "meritless" and do not even present a "substantial case for relief on the merits."  *See Adams v. Postmates, Inc.*, No. 19-cv-3042 SBA, 2020 WL 1066980, at *4–5 (N.D. Cal. Mar. 5, 2020) (*Adams II*).  Postmates filed this action in this Court in a desperate act of forum shopping to avoid the same inevitable result before Judge Armstrong.

Postmates's next argument—that the FAA preempts SB 707—ignores the plain text of the FAA and common sense.  By its express terms, the FAA preempts only laws that prevent agreements to arbitrate from being "valid, irrevocable, and enforceable."  9 U.S.C. § 2.  SB 707 obviously does not prevent any arbitration agreement from being "valid, irrevocable, and enforceable."  To the contrary, it imposes penalties on parties that breach arbitration agreements, thereby promoting arbitration.  And Postmates's last argument—that SB 707 violates the Contract Clause—flies in the face of centuries of precedent holding that States are free to impose additional remedies for the breach of existing contracts.

*Third*, Postmates has not even alleged, let alone established, that it would suffer irreparable harm in the absence of a TRO.  Although Postmates claims that it might be forced to pay its arbitration filing fees, a careful review of its submission reveals that Postmates has not actually represented to the Court that it will pay a single dollar in the absence of a TRO.  That is not an accidental omission; Postmates has obstinately refused to comply with AAA's fee requirements and payment deadlines for months, even after a federal court ordered it to arbitrate with its couriers and ordered it to show cause why it should not be held in contempt for its continued refusal to pay its filing fees.  There is no basis in the record to conclude that Postmates will actually pay any filing fees if it does not get the emergency relief it

PROPOSED] ORDER GRANTING MOTION TO HOLD POSTMATES IN CONTEMPT
CASE NO. CASE NO. 19-3042

seeks.  And even if Postmates were to unequivocally state that it will pay its filing fees absent a TRO, the Ninth Circuit has repeatedly made clear that the costs of arbitration are not irreparable injury as a matter of law.

Unwilling to assert that it would actually pay any filing fees absent injunctive relief, Postmates is left with the assertion that, after it refuses to pay its share of AAA filing fees, a court could find Postmates in breach of its arbitration agreement.  And Postmates could in turn face penalties for that breach under SB 707.  But the only way a court could impose such penalties on Postmates would be if the court rejected Postmates's arguments that such remedies are preempted by federal law.  Stated conversely, if Postmates is likely to succeed on its arguments that SB 707 remedies are unlawful, then Postmates is necessarily unlikely to suffer any injury at all. Postmates cannot be likely to succeed on its arguments and likely to be injured.

*Fourth*, the balance of equities and public interest cut strongly against a TRO. A federal court has already ruled that arbitration demands filed against Postmates in the same manner as Defendants' demands were properly filed.  Yet Postmates has steadfastly refused to proceed with arbitration with its couriers, even though it wrote the agreement requiring couriers to arbitrate their claims.  In so doing, Postmates has effectively attempted to eliminate all access to justice for its couriers.  That result harms low-wage workers seeking to vindicate their right to a minimum wage.  It also is contrary to the strong federal policy favoring arbitration embodied in the FAA, as well as the important state interest California has in allowing low-wage workers to enforce worker-protection laws.  Indeed, SB 707 was enacted specifically to address the harms caused by companies like Postmates that cynically use arbitration agreements to close the courthouse doors to workers while simultaneously refusing to allow those workers to commence arbitration.

Each of the above flaws independently warrants denial of Postmates's motion. Taken as a whole, Postmates's motion is worthy of sanctions.  After waiting weeks

to seek any judicial relief, Postmates has required Defendants to respond to a patently meritless *ex parte* application in less than 20 hours, and it asks this Court to jump its meritless request to the front of the line in the middle of a global pandemic, when judicial resources are particularly scarce.  Postmates's conduct is inexcusable.

## II.   BACKGROUND

This matter is not the first time Postmates has attempted to avoid its clear obligations to arbitrate with its couriers.  To the contrary, and as explained below, this case is a desperate, last-ditch effort by Postmates to avoid arbitration even though its arguments have been repeatedly rejected elsewhere.

**A.   Postmates Requires Couriers to Sign a Broad Arbitration Clause.**

Since at least 2015, Postmates has required its couriers to sign a Fleet Agreement that contains an arbitration provision.  *See* Postmates's Mot. to Compel Arbitration at 12–13, *Winns v. Postmates Inc.*, No. CGC-17-562282 (Cal. Super. Ct. Jan. 23, 2018), Postman Decl., Ex. D.  Each Fleet Agreement contains a "Mutual Arbitration Provision" ("MAP") through which Postmates and the courier "mutually agree to resolve any disputes between them exclusively through final and binding arbitration instead of filing a lawsuit in court."  2019 Fleet Agreement § 10A (effective Apr. 3, 2019), Andres Decl., Ex. A.  The MAP contains a broad delegation clause, which requires that disputes "relating to the interpretation, applicability, enforceability, or formation" of the arbitration agreement must also be submitted to the arbitrator."  *Id.* § 10A.ii.   The MAP also provides that each Petitioner's arbitration "shall be governed by the AAA['s] [Commercial Arbitration] Rules."  *Id.* § 10B.vi.  The Commercial Rules authorize AAA to "require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee."  Commercial Rule 56(a).[1]

**B.   Postmates Refuses to Arbitrate with More Than 5,000 Couriers, but Is**

---

[1] Available at https://kl.link/34saC1E (last accessed on April 9, 2020).

**Ordered to Arbitrate by the Federal Court in *Adams v. Postmates*.**

Postmates's TRO application is the latest in a year-long string of delay tactics that have deprived thousands of Postmates couriers of their right to seek relief in arbitration.   This saga began in March 2019, when Defendants' counsel first informed Postmates that they represented thousands of Postmates couriers who intended to file individual arbitration demands against the company.  *See* Evangelis Decl., Ex. A.  That initial communication acknowledged that the Fleet Agreement "requires individual arbitration," and it stated that counsel intended to "serve individual demands for arbitrations" that would result in the empanelment of an individual arbitration for each courier.   *Id.*   After unfruitful discussions with Postmates's outside counsel, Defendants' counsel formally initiated arbitration by serving arbitration demands on AAA and Postmates on April 22 and May 13, 2019, on behalf of approximately 5,700 couriers (the "*Adams* Claimants").[2]  *See* Evangelis Decl., Exs. B–D.  AAA determined that the *Adams* Claimants' demands met AAA's filing requirements, and AAA directed Postmates to pay its share of the filing fees by May 31, 2019 for the first set of demands, and June 6, 2019 for the second set of demands.  *See* Postman Decl., Exs. A–B.

Deploying what would become a familiar tactic, Postmates ignored AAA's payment determination for three weeks.  Only on the night of AAA's May 31 filing-fee deadline—some five weeks after the *Adams* Claimants had filed their initial demands—did Postmates object for the first time to the form, substance, and service of the demands.  *See* Evangelis Decl., Ex. E.  AAA rejected each objection as inconsistent with AAA rules.  *Id.*, Ex. F. But notwithstanding AAA's administrative determinations that the *Adams* Claimants' demands met AAA's filing requirements,

---

[2] Several hundred of these couriers worked in Illinois, rather than California. Postmates has treated the Illinois couriers no differently than it has treated the *Adams* Claimants; it refused to pay the filing fees necessary for their arbitrations to proceed, accusing them of seeking improper class arbitration.  *See* TRO Mot. at 6.  These couriers moved to compel arbitration in the Northern District of Illinois and await that court's decision.  *See id.*

Postmates continued to refuse to proceed with the *Adams* Claimants' arbitrations. *See* Evangelis Decl. Exs. G, H at 25–27. Having not received Postmates's share of filing fees necessary for a single claimant's arbitration to proceed, administratively closed the *Adams* Claimants' arbitrations. *See* Evangelis Decl., Ex. H at 25.

On June 3, 2019, the *Adams* Claimants filed a motion to compel arbitration against Postmates. *Adams I*, 414 F. Supp. 3d at 1250. Postmates opposed the motion to compel on the ground that the *Adams* Claimants sought "de facto class arbitration." *Id*. at 1248. On October 22, 2019, the court ordered the parties "to arbitrate Petitioners' misclassification claims . . . in accordance with the Mandatory Arbitration Provision contained in the applicable Fleet Agreement." *Id*. 1256. Applying the Fleet Agreement's delegation clause, the court ordered that Postmates must arbitrate not only the claimants' misclassification claims, but also its own arguments regarding "the sufficiency of Petitioners' arbitration demands and how the arbitration should be conducted." *Id.* at 1255–56. The court also noted that even if it "were to construe the exception to the delegation clause in the manner urged by Postmates, the outcome of the instant motions would be same." *Id.* at 1254.

The court further emphasized that the Fleet Agreement "specifies that the AAA Commercial Arbitration Rules shall govern any arbitration between the parties," and that "[t]hose Rules include provisions regarding the payment of arbitration fees, see AAA Comm. Arb. Rules, Rule R-53 (Administrative Fees), id. R-56 (Deposits)." *Id.* at 1255. Relying on the Fleet Agreement's incorporation of the AAA Commercial Rules, the court concluded that the "payment of arbitration fees . . . is . . . to be decided by the arbitrator." *Id.*

Although Postmates in *Adams* repeatedly asserted that Defendants' counsel was improperly using the costs of individual arbitration to leverage a settlement, the court saw through that baseless smear. As the court explained:

> Throughout its various briefs, Postmates expends considerable energy accusing Petitioners of using the cost of the arbitration process as a

means of coercing Postmates into settling their claims expeditiously. However, under the Fleet Agreement drafted by Postmates which its couriers are required to sign, Petitioners had no option other than to submit their misclassification claims in the form of an arbitration demand—which is precisely what they did. Since the Fleet Agreement bars class actions, each demand must be submitted on an individual basis. Thus, the possibility that Postmates may now be required to submit a sizeable arbitration fee in response to each individual arbitration demand is a direct result of the mandatory arbitration clause and class action waiver that Postmates has imposed upon each of its couriers.

*Id.* at 1252 n.2.

## C.   Postmates Still Refuses to Arbitrate with the *Adams* Couriers and Faces Potential Contempt Sanctions.

After the court ordered the parties to arbitrate, the *Adams* Claimants refiled their individual demands for arbitration as instructed by AAA. Evangelis Decl., Ex. H at 24. Each Claimant requested that AAA "administer a separate, individual arbitration for him or her pursuant to the AAA Commercial Rules," and stated that he or she would "abide by AAA's determination of the fees and other filing requirements necessary to commence individual arbitrations." *Id.* Defendants' counsel paid each Claimant's portion of the filing fee or submitted a hardship-based fee waiver on his or her behalf. *Id.* at 22. On October 29, 2019, AAA acknowledged receipt of the refiled demands, determined that the *Adams* Claimants had met all of their filing obligations, and directed Postmates to pay the arbitration fees it owed by November 19, 2019. *Id.*

Once again, Postmates refused to pay the fees it owed under the Fleet Agreement. On November 20, 2019, Postmates emailed AAA and Defendants' counsel to assert that it was "ready, willing, and able to conduct truly individualized arbitrations." *See id.* at 19. But Postmates then asked AAA and the claimants to agree to the opposite: to put the overwhelming majority of the claimants' demands on hold while commencing arbitrations for just "fifty randomly-selected claimants." *Id.* The *Adams* Claimants responded that they "do not consent to depart from or

1    delay the individual arbitration process that is required by the parties' contract and

2    AAA rules." *Id.* at 18.  On November 22, 2019, AAA confirmed that it "must adhere

3    to its Commercial Rules and Employment/Workplace Fee Schedule and

4    Respondent's fees remain due by November 25, 2019." *Id.* at 17.  On November 26,

5    2019, AAA administratively closed Petitioners' arbitrations due to Postmates's

6    refusal to comply with AAA's fee determinations. *Id.* at 13.

7          Left with no choice but to seek further relief from the *Adams* court, the *Adams*

8    Claimants moved for an order to show cause why Postmates should not be held in

9    contempt for violating the court's order to arbitrate.  *See Adams II*, 2020 WL

10   1066980, at *3, n.4.  On December 3, 2019, the Court ordered Postmates to show

11   cause why contempt sanctions should not issue.  *Id.*  Briefing on that order is

12   complete, and the parties are awaiting the court's decision.  *Id.*

13         On December 11, 2019—more than seven weeks after the *Adams* court

14   ordered Postmates to arbitrate—Postmates filed a motion to stay the *Adams* decision

15   pending its appeal to the Ninth Circuit. *Id.* at *2–3.  Among other issues, Postmates's

16   stay motion asserted that the company intends to present on appeal the issue of

17   whether the *Adams* court should have conclusively decided whether the *Adams*

18   Claimants seek improper class arbitration. *Id.* at *4.  In denying Postmates's motion

19   for a stay, the *Adams* court held that "Postmates' contention regarding the Class

20   Action Waiver is meritless."  *Id.*  It noted that "the Fleet Agreement unequivocally

21   delegates to the arbitrator the exclusive authority to determine compliance with the

22   Mutual Arbitration Provision."  *Id.*  It further held that Postmates would not suffer

23   irreparable harm in the absence of a stay, because regardless of the outcome of

24   Postmates's appeal, Postmates will ultimately be required to arbitrate the claimants'

25   arbitration demands and pay the fees necessary to do so.  *Id.* at *5.  Finally—

26   rejecting the very argument Postmates makes here—the *Adams* court held that "[t]he

27   mere fact that Petitioners filed over 5,000 demands within a short span of time does

28

1    not transform those individual demands into a de facto class arbitration." *Id.* at *6.

2    Having refused to pay the filing fees necessary to proceed with the *Adams*

3    Claimants' arbitrations for nearly a year, blowing several AAA deadlines in the

4    process; having unsuccessfully spent countless hours arguing before AAA and in

5    court why those arbitrations should not proceed; and having failed to further delay

6    the arbitrations pending a Ninth Circuit appeal, Postmates ultimately deigned to pay

7    the filing fees necessary for just 50 of the 5,700 initial arbitration demands to

8    proceed. *See* Evangelis Decl., Ex. H at 2–9. The remaining *Adams* Claimants are

9    no closer to beginning their arbitrations than they were when they first filed their

10   demands, nearly one year ago. And as Postmates concedes, its couriers have now

11   been reduced to advancing the company's share of arbitration filing fees, just to

12   proceed with their claims. *See* TRO Mot. at 20 n.3.

13   **D.      Defendants in This Action Initiate Arbitration Against Postmates.**

14   Defendants in this action filed their demands for arbitration with the AAA on

15   February 15, 2020. Evangelis Decl., Ex. T at 8–9, ECF No. 17-24 (confirming

16   "AAA's receipt on February 15, 2020 of ten thousand three hundred and fifty-six

17   (10,356) <u>individual</u> demands for arbitration" (emphasis added)). Defendants'

18   demands followed the same format as the those of the Adams Claimants, *compare*

19   Postman Decl., Ex. C *with* Evangelis Decl., Ex. S, ECF No. 17-23[3]—a format that

20   AAA and Judge Armstrong have repeatedly held to be proper. *See* Evangelis Decl.,

21   Ex. H at 25–26, ECF No. 17-2; *Adams I*, 414 F. Supp. 3d at 1252, n.2 ("[U]nder the

22   Fleet Agreement drafted by Postmates which its couriers are required to sign,

23   Petitioners had no option other than to submit their misclassification claims in the

24   form of an arbitration demand—which is precisely what they did."); *Adams II*, 2020

25   WL 1066980, at *6 ("Petitioners did what they are contractually required to do:

26   _____

27   [3] Postmates failed to redact the personal identifying information of the three defendants it chose for example demands, exposing publicly their home addresses,

28   phone numbers, and email addresses in violation of Local Rule 5.2-1.

1    submit individual arbitration demands to the arbitrator.  The mere fact that

2    Petitioners filed over 5,000 demands within a short span of time does not transform

3    those individual demands into a de facto class arbitration, as Postmates posits.").

4         It is therefore unsurprising that on February 24, 2020, AAA determined that

5    each Petitioner had met his or her individual filing requirements.  Evangelis Decl.,

6    Ex. T at 8–9, ECF No. 17-24.  As a result, under the applicable fee schedule,

7    Postmates was obligated to pay $4,689,600 by March 16, 2020.  *Id*.  AAA

8    emphasized that "AAA will not grant extensions to this payment deadline," and that

9    because the arbitrations were "subject to California Code of Civil Procedure 1281.97

10   and 1281.98" that "payment must be received by April 15, 2020"—thirty days after

11   the March 16 deadline—"or the AAA may close the parties' cases."  *Id*.

12   **E.     Postmates Preemptively Sues Its Couriers to Bar Them from**

13          **Proceeding with Arbitrations in the Manner Approved in *Adams*.**

14        Instead of paying the filing fees due on March 25, Postmates decided on that

15   day to initiate this action—in other words, to sue its own couriers for doing nothing

16   more than complying with the contract Postmates drafted.  Compl., ECF No. 1.  The

17   next day, Postmates wrote "to inform AAA that Postmates has sought juridical

18   intervention with respect to the 10,356 purported arbitration demands, to request that

19   AAA suspend administration of these matters for 60-days while Postmates seeks a

20   stay of arbitration in court."  Evangelis Decl., Ex. T at 7–8, ECF No. 17-24.  The

21   purported basis for Postmates's request was AAA Employment Rule 1, which states:

22        If, within 30 days after the AAA's commencement of administration, a
23        party seeks judicial intervention with respect to a pending arbitration
          and provides the AAA with documentation that judicial intervention
24        has been sought, the AAA will suspend administration for 60 days to
          permit the party to obtain a stay of arbitration from the court.

25   *Available at* https://kl.link/34q8sze (last accessed on April 9, 2020).  But as

26   Defendants explained in response, Postmates's request ignored the requirements of

27   Rule 1 in two separate ways.  Evangelis Decl., Ex. T at 5–7, ECF No. 17-24.  First,

28

under Rule 1, a party may seek a stay only of a "pending arbitration" and only after the "commencement of administration." *Id*. These predicates do not occur unless and until both sides submit their initial filing fee. *Id*. Accordingly, where parties have sought such a stay, AAA has ruled that, before any party can seek a stay:

> all filing requirements, including payment of the filing fees from both parties, must be met. [Where] these filing requirements have not been met[,] administration of the[] cases has not commenced.

*Id.* (quoting *In re: CenturyLink Sales Practices & Sec. Litig*., No. 0:17-md-02795 (D. Minn. Jan. 10, 2020) (Ex. X to ECF No. 512)). Under that standard, Postmates could not seek a stay because it had not submitted its filing fees, which means "administration of these cases has not commenced." *Id*.

Second, even if administration had commenced on February 24, 2020 as Postmates incorrectly claimed, Rule 1 still would not be satisfied because Postmates inexplicably failed to provide AAA with documentation of its judicial intervention within 30 days of that date. *Id*. On March 27, AAA ruled that Postmates's request for a stay was improper. *Id*. at 3–4. As AAA explained:

> In order for a party to invoke rule R-1 of the Employment Arbitration Rules, all filing requirements must be met which includes payment of the filing fees by both parties. At this time, these filing requirements have not been met so administration of these cases has not commenced. Specifically, we have not yet received Respondent's share of the filing fees.

*Id*. AAA then reminded Postmates yet again that it faced an immovable deadline of April 15, 2020, after which Defendants' arbitrations would be closed:

> Please be reminded that these matters are subject to California Code of Civil Procedure 1281.97 and 1281.98. As such, payment must be received by April 15, 2020 or the AAA may close these cases. The AAA will not grant any extensions to this payment deadline.

*Id*. After learning that AAA would not stay the pending arbitrations, Postmates waited a full week before filing its procedurally improper "Motion for Preliminary Injunction by April 15, 2020," which it noticed for May 4. ECF No. 8; *see also* Minute Order, ECF No. 14 (striking the motion for improperly seeking relief by

1    April 15 when the motion was noticed for May 4 and for noticing the motion for a

2    hearing date closed on the Court's calendar).  In that motion, Postmates explicitly

3    admitted that it "does not believe that seeking a temporary restraining order would

4    be appropriate in this case." Prelim. Injunction Mot. at 3, ECF No. 8.  Just days after

5    representing to this Court that a TRO would be inappropriate in this case, Postmates

6    filed its *ex parte* application seeking a TRO.  TRO Mot., ECF No. 17.

7                              **III.   LEGAL STANDARD**

8              An application for a temporary restraining order must satisfy the same legal

9    standard governing the issuance of a preliminary injunction.  *See Cal. Indep. Sys.*

10   *Operator Corp. v. Reliant Energy Servs., Inc*., 181 F. Supp. 2d 1111, 1126 (E.D.

11   Cal. 2001).  To obtain a TRO, a party must demonstrate that "he is likely to succeed

12   on the merits, that he is likely to suffer irreparable harm without preliminary relief,

13   that the balance of equities tips in his favor, and that an injunction is in the public

14   interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  An

15   application for TRO "involves the invocation of a drastic remedy which a court of

16   equity ordinarily does not grant, unless a very strong showing is made of a necessity

17   and desirability of such action." *Vaccaro v. Sparks*, No. SACV 11-00164, 2011 WL

18   318039, at *1 (C.D. Cal. Jan. 28, 2011) (quoting *Youngstown Sheet & Tube Co. v.*

19   *Sawyer*, 103 F. Supp. 978, 980 (D.D.C. 1952)).  In addition, to obtain *ex parte* relief,

20   a movant must establish that "it is without fault in creating the crisis that requires *ex*

21   *parte* relief, or that the crisis occurred as a result of excusable neglect." *Mission*

22   *Power,* 883 F. Supp. at 492.

23                              **IV.   ARGUMENT**

24             Postmates's *ex parte* application for a TRO fails at every turn.  Postmates

25   inexcusably waited weeks to file its application—manufacturing an emergency in

26   the middle of a global pandemic, based on a deadline it has known about since

27   February 24, 2020.  Postmates's underlying claims do not give rise to federal

28

1    jurisdiction and therefore could not justify relief from this Court.  Postmates's merits
2    arguments are borderline frivolous at best.  And Postmates has not even alleged, let
3    alone established, that it will suffer irreparable harm absent an injunction.  Each of
4    those flaws independently requires that Postmates's e*x parte* application be denied.

5    **A.     Postmates's TRO Request Should Be Denied Because It Is Based on a**
6    **        Deadline Postmates Has Known About for More Than Six Weeks.**

7        Postmates demanded that Defendants respond to its *ex parte* application in
8    less than 24 hours—and it asks this Court to allow it to jump in front of all matters
9    calling for the Court's limited resources in the middle of a pandemic—because it
10   claims it needs a ruling before April 15.  But Postmates has known about the April
11   15 deadline since February 24, when AAA informed Postmates that the deadline for
12   payment was March 26, 2020 and "no extensions" would be granted.  Evangelis
13   Decl., Ex. T at 9–10, ECF No. 17-24.  AAA also reminded Postmates that SB 707
14   expressly imposes penalties 30 days after a party fails to pay by a deadline set by an
15   arbitral body such as AAA, which in this case would be April 15.  *Id.*  Indeed, part
16   of Postmates's complaint about SB 707 is that it so rigidly imposes those penalties.
17   *See* TRO Mot. at 14–20.  Postmates cannot simultaneously complain that SB 707
18   rigidly inflicts grave harm and assert that it was entitled to sit on its hands in the face
19   of an unmovable AAA deadline.

20       This Court recently addressed a similar situation in *ASJA*.  In that case, the
21   Plaintiffs sought a TRO declaring that a recently enacted California law, AB5,
22   violated the United States Constitution.  *ASJA*, ECF No. No. 30 at 2.  Although AB5
23   was enacted on September 18, 2019, the Plaintiffs waited until December 17, 2019—
24   two weeks before the law's January 1 effective date—to file suit.  *Id.*  Just as here,
25   the *ASJA* plaintiffs initially filed a preliminary injunction motion, which would have
26   been decided after the law's effective date.  *Id.*  Then, just as here, the Plaintiffs'
27   changed course and file an *ex parte* TRO.  *Id.*

28

1   This Court held that the plaintiffs' delay, by itself, warranted denial of the

2   TRO application.  As the Court explained:

3       Plaintiffs' unexplained delay indicates that they fail *Mission Power*
        because *ex parte* relief is an extraordinary remedy and Plaintiffs have
4       not explained "the necessity for bypassing regular motion procedures,"
        or that they are "without fault" in creating the crisis requiring ex parte
5       relief. *See Mission Power Eng'g Co.*, 883 F. Supp. at 492.

6       Moreover, because Plaintiffs must demonstrate immediate threatened
        injury, delay in seeking temporary relief "may tip the scales against the
7       issuance of a TRO." *Sanchez v. Sanchez*, No. 10-1628, 2010 WL
        4790179, at *5 (S.D. Cal. Nov. 17, 2010). Such delay "implie[s] a lack
8       of urgency and irreparable harm." *Williford v. Ocwen Loan Servicing
        LLC*, No. CV 09-06464, 2011 WL 13187265, at *3 (C.D. Cal. July 15,
9       2011) . . . . Plaintiffs' delay belies their claim that there is an emergency.

10  The same conclusion is warranted here.  Postmates waited four weeks after learning

11  of an immovable deadline before filing suit and then waited another two weeks after

12  filing suit before seeking a TRO.  Had Postmates properly noticed a preliminary

13  injunction motion at any point prior to March 16, the motion could have been heard

14  under the normal motions schedule.  Postmates should not be allowed to take weeks

15  to act and then expect Defendants and this Court to react in a matter of hours.

16      That Postmates asked AAA to suspend the arbitrations is no excuse for delay.

17  First, it was unnecessary for Postmates to wait until March 26 to file the complaint

18  that it believed would trigger a stay.  Postmates could have filed the same complaint

19  in late February and asked AAA to stay the arbitrations then.  If it had done so, it

20  would have learned in February or early March that, under AAA Rules, a party may

21  not seek an administrative suspension of proceedings until after it has paid filing

22  fees.  That would have given Postmates plenty of time to file a proper preliminary

23  injunction motion to be noticed before April 15.  Moreover, even if AAA had not

24  promptly closed Defendants' arbitrations, that would not have tolled the time period

25  under SB 707.  SB 707 requires Postmates to pay the filing fees within 30 days of

26  the March 16 deadline; nothing in AAA's rules can alter Postmates's obligation.

27      Similarly, that Postmates improperly noticed its request for relief as a

28

PROPOSED] ORDER GRANTING MOTION TO HOLD POSTMATES IN CONTEMPT
CASE NO. CASE NO. 19-3042

1   "Preliminary Injunction for April 15, 2020" with a notice date of May 4, when the
2   Court's calendar was closed, is not the basis for emergency relief.  Just as Postmates
3   should have known that filing this lawsuit did not entitle it to a stay of SB 707 from
4   AAA, Postmates should have known that it was improper to notice a motion seeking
5   relief by April 15 for a date three weeks later, when the Court's calendar was closed.
6   Simply put, the fact that Postmates engaged in two meritless litigation gambits
7   before engaging in the instant frivolous one does not excuse its failure to file a
8   properly noticed preliminary injunction motion with enough time for the Court to
9   act in the ordinary course.

10   **B.     Postmates's Underlying Claims Have No Hope of Success.**

11   **1.     Postmates's Arguments Do Not Create Federal Jurisdiction.**

12   Postmates Amended Complaint asserts federal question jurisdiction, but fails
13   to identify any claim that raises a federal questions.  The DJA does not, by itself,
14   confer federal jurisdiction.  "'[I]f, but for the availability of the declaratory judgment
15   procedure, the federal claim would arise only as a defense to a state created action,
16   jurisdiction is lacking.'"  *Franchise Tax Bd. of State of Cal. v. Constr. Laborers*
17   *Vacation Tr. for S. California*, 463 U.S. 1, 16 (1983) (quoting 10A C. Wright, A.
18   Miller & M. Kane, Federal Practice and Procedure § 2767, at 744–745 (2d ed.
19   1983)).  To establish jurisdiction in this case, Postmates must identify a claim it
20   could bring in federal court against Defendants absent the DJA.  But to the extent
21   Postmates raises any arguments based on federal law, those arguments merely
22   anticipate federal-law defenses by Postmates to disputes that have not yet occurred.

23   First, Postmates's argument that Claimants are violating the terms of the
24   parties' arbitration agreement by engaging in a "de facto class arbitration" rests
25   purely on an interpretation of its arbitration agreement, which is governed by state
26   contract law.  It is well established that the Federal Arbitration Act ("FAA") does
27   not gives federal courts jurisdiction to hear motions to compel simply because they

28

1    are enforcing a contract to arbitrate; rather, the FAA allows federal courts to review

2    arbitration agreements only to the extent a party (a) invokes Section 4 of the FAA

3    and (b) does so in a controversy where the underlying claims are federal.  *See Vaden*

4    *v. Discover Bank*, 556 U.S. 49, 59-63 (2009) ("The text of § 4 drives our conclusion

5    that a federal court should determine its jurisdiction by 'looking through' a § 4

6    petition to the parties' underlying substantive controversy.").  But Postmates has not

7    filed a motion to compel arbitration or invoked Section 4 of the FAA in any way in

8    this action.  Rather, Postmates simply asserts a claim that Defendants have violated

9    a contract to arbitrate.   If merely asserting one's rights under an arbitration

10   agreement conferred federal jurisdiction, *Vaden* would have been decided the

11   opposite way.

12        Postmates's argument is also not ripe.  If Postmates refuses to pay its filing

13   fees by April 15—which is not only possible, but likely—no arbitrations will occur

14   at all.  Instead, Defendants' arbitrations will be administratively closed, and absent

15   judicial intervention, Postmates will not face arbitrations of any kind.  Federal courts

16   cannot adjudicate, let alone issue a TRO regarding, whether Postmates's contract

17   forbids hypothetical arbitrations that are not occurring and have no chance of

18   occurring absent a future motion to compel by Defendants and a future court order.

19        Second, Postmates's argument that the FAA preempts SB 707 is purely a

20   federal-law defense to a potential action that Defendants might eventually bring

21   under state law.  Postmates is not arguing that, separately from the DJA, the Federal

22   Arbitration Act gives Postmates any claim against Defendants.    Thus, the

23   preemption argument does not support federal-court jurisdiction.  *Franchise Tax*

24   *Bd.*, 463 U.S. at 16.  And again, because Postmates raises only a federal-law defense

25   to a potential action by Defendants, Postmates's argument also is not

26   ripe.  Defendants have not yet filed an action under SB 707.  And they cannot file

27   such an action unless Postmates fails to pay its filing fees.  If Postmates fails to pay

28

1   its filing fees and Defendants bring such an action, Postmates can raise its

2   preemption defense then; but that contingent possibility does not create a ripe

3   controversy over which a federal court has jurisdiction now.

4        Finally, Postmates cannot establish jurisdiction by invoking the Contracts

5   Clause of the United States Constitution.  Although Postmates tries to dress up its

6   argument as a "claim" under the Contracts Clause, that is a sham.  The Contracts

7   Clause regulates only the States and can be violated only by state action.  *LL Liquor,*

8   *Inc. v. Montana*, 912 F.3d 533, 537 (9th Cir. 2018) ("The Contracts Clause provides

9   that '[n]o state shall ... pass any ... Law impairing the Obligation of Contracts,'

10  thereby 'restrict[ing] the power of States to disrupt contractual arrangements.'"

11  (quoting U.S. Const. art. I, § 10, cl. and *Sveen v.* Melin, 138 S.Ct. 1815, 1821

12  (2018))).  Claimants obviously are not state actors, so they cannot be the <u>defendant</u>

13  in a cause of action brought to enforce the Contracts Clause.  The only way

14  Postmates could raise the Contracts Clause in a dispute with Defendants would be if

15  Defendants sought remedies under SB 707 and Postmates argued, <u>as a defense</u>, that

16  judicial application of SB 707 would conflict with the Contracts

17  Clause.  Postmates's attempt to anticipate that federal-law defense does not create

18  federal jurisdiction.

19        **2.    Postmates's "De Facto Class Arbitration" Argument Is**

20             **Patently Meritless.**

21        Postmates attempts to relitigate here (on an emergency basis no less) an issue

22  that has already been decided against Postmates after the benefit of several rounds

23  of briefing: whether individual couriers are engaged in "de fact class arbitration"

24  when they are represented by the same counsel and file individual demands for

25  arbitration with similar allegations at the same time against the same respondent.[4]

26        [4] In fact, in *Adams*, Postmates's "*de facto* class" argument was the subject of
    four separate fully briefed motions: a motion to compel arbitration, a cross-motion
27  to compel arbitration, a motion for an order to show cause why Postmates should

28

PROPOSED] ORDER GRANTING MOTION TO HOLD POSTMATES IN CONTEMPT
CASE NO. CASE NO. 19-3042

In *Adams*, Postmates moved for a stay pending its appeal of the order compelling arbitration, arguing that it was likely to persuade the Ninth Circuit that the *Adams* Claimants were engaged in *de facto* class arbitration. *Adams II*, 2020 WL 1066980, at *1. The standard for a stay is similar tolike that necessary for emergency relief. *Compare id.* at *3 (standard for a stay) *with* TRO Mot. at 11, ECF No. 17-1 (standard for emergency relief). And in denying Postmates's motion to stay, Judge Armstrongthe court clearly and decisively rejected the "class arbitration" argument on two independent grounds: (1) the argument must be decided in arbitration pursuant to the delegation clause Postmates drafted; and (2) Plaintiffs did everything required by the contract to seek individual arbitration. 2020 WL 1066980, at *3–6. Further, the court ruled not only that Postmates was wrong, but also that Postmates had not raised even a substantial question. *Id.* at *5.

The *Adams* court was right: Postmates's "class arbitration" argument does not raise a substantial question. As the Supreme Court has observed—in the very cases upon which Postmates relies, *see* TRO Mot. at 11–13—"[c]lasswide arbitration includes absent parties." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347–48 (2011) (emphasis added); *see also Sakkab v. Luxottica Retail N.A., Inc.*, 803 F.3d 425, 435 (9th Cir. 2015); *Blair v. Rent-A-Center, Inc.*, No. 17-17221, 2019 WL 2701333, at *3–9 (9th Cir. June 28, 2019) (holding that complexity does not create class arbitration; class arbitration requires representative litigation). Here, each Defendant filed an individual demand for arbitration in his or her own name. Evangelis Decl., Ex. S, ECF No. 17-23. No Defendant purports to resolve claims on behalf of absent parties. *Id.*

In short, Postmates is highly unlikely to succeed on the merits of its "*de facto* class arbitration" argument.

---

not be held in civil contempt, and a motion to stay pending appeal. Postmates lost three of those motions, and the *Adams* court issued an order to show cause and is now considering whether to hold Postmates in contempt.

### 3. SB 707 Cannot Be Preempted by the FAA Because It Promotes Enforcement of Arbitration Agreements.

Postmates's preemption argument similarly does not withstand scrutiny. SB 707 does not render a contract to arbitrate unenforceable in any way, and it <u>furthers</u>, rather than undermines, the policies of the FAA by ensuring rigorous enforcement of arbitration agreements.

The FAA does not "reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989). Rather, the preemptive effect of the FAA flows from the statute's command that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. State statutes that prevent arbitration agreements from being "valid, irrevocable, and enforceable" conflict with, and are preempted by, the FAA unless they fall within the so-called "saving clause." *See Sakkab*, 803 F.3d at 431–32. The saving clause allows state laws to render arbitration agreements invalid so long as they apply equally to "any contract"—in other words, so long as they are not uniquely hostile to arbitration. *See id.* at 431–40.

SB 707 does not even plausibly prevent any arbitration agreement from being "valid, irrevocable, and enforceable." To the contrary, its whole purpose is to ensure that agreements to arbitrate <u>are</u> enforced. Thus, there is no conflict between SB 707 and the FAA, and no cause to analyze whether SB 707 fits within the "saving clause." Stated differently, the FAA says nothing about state laws unless they render an agreement to arbitrate invalid, revocable, or unenforceable.

Moreover, even if one ignored the text of the FAA, it is absurd to suggest that a statute that <u>promotes</u> compliance with arbitration agreements is <u>hostile</u> to their

enforcement or stands as an obstacle to the FAA's objectives.[5]  For instance, many states have analogs to Sections 4 of the FAA.  *E.g.* Cal. Civ. Proc. Code. § 1281.2.  Yet no court has ever held that a state that makes it even <u>easier</u> than the FAA to grant a motion to compel has somehow undermined the strong federal policy favoring arbitration.

### 4.   Postmates's Contracts Clause Argument Is Frivolous

As already noted, Postmates can raise the Contract Clause only as a potential defense to liability under SB 707.  That theory does not establish federal jurisdiction.  It is also frivolous.

SB 707 (now codified at California Code of Civil Procedure sections 1281.97 through 1281.99) imposes remedies for the <u>breach</u> of an arbitration agreement; it does not alter the agreement itself.  For nearly 200 years, Supreme Court precedent has held that a law merely adjusting remedies for a breach of contract does not violate the Contracts Clause.  *See, e.g.*, *Bronson v. Kinzie*, 42 U.S. 311, 315–16 (1843) ("If the laws of the state passed afterwards had done nothing more than change the remedy upon contracts of this description, they would be liable to no constitutional objection. . . . Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract.").  Just two Terms ago, the Supreme Court reaffirmed the meaning of the Contracts Clause, holding that a state law is constitutional unless it works a "substantial impairment of a contractual relationship" <u>and</u>, if that threshold is met, the law is not drawn in an "appropriate and reasonable way to advance a significant and legitimate public purpose."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821–

---

[5] Postmates also cannot argue that SB 707 is inconsistent with the arbitration agreement.  The arbitration agreement does not purport to limit remedies that otherwise would be available to the parties; to the contrary, the arbitration agreement provides that the parties incorporates AAA rules, which in turn require that Defendants have access to all available remedies.  *See* Employment Due Process Protocol (stating that AAA will administer an employment arbitration only if the arbitrator is "empowered to award whatever relief would be available in court under the law"), available at https://kl.link/34nLEjP (last accessed on April 9, 2020).

1    22 (2018) (citations and internal quotation marks omitted).

2          Applying that framework, there is no basis for Postmates to argue that SB 707

3    violates the Contracts Clause.   SB 707 does not alter Postmates's or Claimants'

4    rights under the Fleet Agreement; it alters the contractual remedies available to

5    Claimants for Postmates's breach of that agreement.   *See Sveen*, 138 S. Ct. at 1822

6    (rejecting a Contracts Clause argument because, in part, the law "support[ed], rather

7    than impair[ed], the contractual scheme" at issue).   The Fleet Agreement does not

8    contain a limitation-of-remedies clause, so SB 707 works no impairment—let alone

9    a substantial one—of the parties' agreement.   And a remedial scheme that sanctions

10   companies that violate arbitration agreements obviously has a rational relationship

11   to the State of California's legitimate interest in ensuring that companies do not

12   violate their arbitration agreements with California workers.

13   C.     **Postmates Has Not Even Alleged Irreparable Injury.**

14         Postmates identifies two potential irreparable injuries: (1) paying the filing

15   fees it owes to proceed with Defendants' arbitrations, or (2) refusing to pay those

16   fees, and thus subjecting itself to SB 707 remedies.   But Postmates has not shown

17   that either of those injuries is more likely than not, as required to secure temporary

18   relief.   *See Winter*, 555 U.S. at 22

19         As to filing fees, Postmates easily could have submitted a declaration saying

20   under penalty of perjury that, absent relief, it will pay all the filing fees it owes to

21   proceed with Defendants' arbitrations.   But Postmates has not done so.   That is not

22   surprising, given that Postmates's conduct to date shows that Postmates has no

23   intention of paying the fees.   *See Adams II*, 2020 WL 1066980, at *3, n.4 (noting

24   that even after being compelled to arbitration with the *Adams* Claimants, Postmates

25   has not paid the fees necessary to commence the vast majority of most those

26   arbitrations).

27         Regardless, a party is not irreparably harmed by undergoing what it believes

28

to be "unnecessary" or improper arbitration proceedings.  *See Camping Constr. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1349 (9th Cir. 1990) ("The district court's principal error lies in its assumption that unnecessarily undergoing arbitration proceedings constitutes irreparable injury.  That is simply not the case."); *see also Abernathy v. S. Cal. Edison*, 885 F.2d 525, 529 (9th Cir. 1989) ("[I]t seems clear that an order compelling arbitration does not ordinarily harm the losing party irreparably.").  Likewise, a party is not irreparably harmed by facing the costs and expenses associated with arbitration.  *See In re Cintas Corp. Overtime Pay Arbitration Litig.*, No. C06-1781-SBA, 2009 WL 1766595, at *5 (N.D. Cal. June 22, 2009) ("[A]ny additional cost resulting from the Respondents' involvement in the pending arbitration, as a matter of law, does not constitute irreparable harm." (citing *Graphic Commc'ns. Union, Chi. Paper Handlers' & Electrotypers' Local No. 2 v. Chi. Tribune Co.*, 779 F.2d 13 (7th Cir. 1985))).

Finally, Postmates has never attempted to show how prevailing on its "class arbitration" argument would ultimately reduce its filing fees.  As Judge Armstrong noted in *Adams*, Postmates concedes that its couriers must arbitrate their wage-and-hour claims under the Fleet Agreement and AAA's rules.  *Adams II*, 2020 WL 1066980 at *5.  Accordingly, the court found that regardless of whether Postmates succeeds in forcing the *Adams* Claimants to refile their demands as "truly individual" demands (whatever that would mean), the company will face the same individual filing fees: It is "precisely because the couriers must file individual arbitration demands that Postmates must pay $10 million." *Id.* at *5–6, n.9.  "It strains credulity for Postmates to argue that the amount of filing fees due constitute irreparable harm when that 'harm' is entirely of its own making." *Id.* at *6.

As to the "severe penalties" Postmates claims it may face under SB 707 if it does not pay the filing fees it owes, Postmates cannot face those penalties until (1) Defendants file a motion to compel arbitration and (2) a court imposes SB 707

penalties.  In connection with any such motion to compel, Postmates may raise, in its defense, the SB 707 arguments it raises in this action.  Thus, the only world in which Postmates could be "injured" by SB 707 is a world in which another court rejected its arguments and imposes SB 707 penalties.  Stated conversely, if Postmates is likely to succeed on the merits of its SB 707 arguments, as it claims, then it is by definition <u>unlikely</u> to suffer any injury from SB 707, because a court of competent jurisdiction will decline to impose SB 707 penalties when the issue is ripe for decision.  There is no state of the world in which Postmates can simultaneously be likely to succeed and likely to suffer injury.  Postmates's request for relief is tautologically frivolous.

### D.	The Balance of Equities and the Public Interest Cut Strongly Against a TRO.

The balance of equities cuts strongly against granting a TRO.  As described above, after foisting on Defendants an arbitration agreement that bars them from seeking redress in court, Postmates has spent months attempting to deny Defendants access to justice in arbitration based on arguments that a federal court has already held to be meritless.  On the other side of the balance, Defendants have a well-recognized and compelling interest in obtaining prompt arbitration of their claims.  As the *Adams* Court noted in rejecting Postmates's attempt to delay arbitration, "[i]t is beyond cavil that the goal of arbitration is to provide an expeditious and efficient alternative to litigation."  2020 WL 1066980 at *6.  "As a result, further delay . . . inures to Petitioners' detriment."  *Id.*

For similar reasons, the public interest strongly tips in favor of denying Postmates's application.  The FAA reflects "Congress's intent to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible."  *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1153 (9th Cir. 2004) (internal quotation marks omitted).  That purpose and intent would be

1  undermined by granting a stay pending appeal. *See In re Cintas Corp. Overtime Pay*

2  *Arbitration Litig.*, 2009 WL 1766595, at *5 (declining to stay arbitration because it

3  would be "antithetical to the spirit and intent of the arbitration process").

4      A stay also would undermine two strong public interests embodied in

5  California law. First, California has a strong public interest in enforcing its wage-

6  and-hour laws, especially where, as here, an employer misclassifies its workers to

7  circumvent those laws. *See Jimenez v. Menzies Aviation Inc*, No. 15-CV-02392-

8  WHO, 2015 WL 5591722, at *4 (N.D. Cal. Sept. 23, 2015); *Dynamex Operations*

9  *W. v. Superior Court*, 416 P.3d 1, 4–5 (2018), *reh'g denied* (June 20, 2018) ("Under

10  both California and federal law, the question whether an individual worker should

11  properly be classified as an employee or, instead, as an independent contractor has

12  considerable significance for workers, businesses, and the public generally.").

13      Second, the California Legislature recently enacted a statute to codify the law

14  governing remedies for a breach of an arbitration agreement. *See* S.B. 707, 2019–

15  2020 Reg. Sess. (Cal. 2019), available at https://kl.link/2RprQal (last accessed on

16  April 9, 2020). As codified by Senate Bill 707, California law allows a party to an

17  arbitration agreement to require specific performance of a breaching party, including

18  an order that the breaching party pay the fees necessary to proceed with arbitration.

19  *Id.* Tellingly, the impetus for Senate Bill 707 was the exact tactic Postmates engaged

20  in here: "Some employers have been refusing to pay fees and costs required to

21  initiate arbitration, effectively placing their employees in procedural limbo. This

22  bill is intended to affirm that these practices constitute material breach of an

23  employment or consumer arbitration agreement and provide procedures for

24  employees or consumers to pursue in order to have their claims heard in the event of

25  such a breach." California Senate Judiciary Committee Hearing on S.B. 707, 2019–

26  2020 Reg. Sess. (Cal. 2019) (Executive Summary), available at Available at

27  https://kl.link/2JTv6Ha (last accessed on April 9, 2020). Staying Petitioners'

28

arbitrations would frustrate these important public interests.

E.     **Postmates's Inexcusably Tardy and Patently Meritless *Ex Parte* TRO Application Warrants Sanctions.**

This Court's Standing Orders appropriately warn parties:

> *Ex parte* applications are solely for extraordinary relief and should be used with discretion. Sanctions may be imposed for misuse of ex parte applications. *See Mission Power Engineering Co. v Continental Casualty Co.*, 883 F. Supp. 488 (C.D. Cal. 1995).

*Standing Orders,* ¶10.

Postmates's motion is based on an immovable deadline that Postmates has known about since February 24.  Postmates waited until March 25 to file suit and waited another 13 days to file this application, on the evening of Passover (which undersigned counsel was celebrating) and in the middle of a global pandemic.  The motion is based on arguments that obviously do not confer federal jurisdiction.  And Postmates's arguments have been either roundly rejected by another federal court in Postmates's home venue or are ones that, if likely to succeed, would necessarily eliminate any injury to Postmates.  And all of these contortions are being made in a desperate attempt to avoid the costs of an arbitration process that Postmates drafted and foisted on its couriers.

While no single one of these facts may warrant sanctions in isolation, their combined effect places this motion beyond the pale.  Postmates has burdened Defendants' counsel and, more importantly, this Court with an inexcusably tardy, unnecessary, and patently meritless *ex parte* TRO application over which the Court plainly lacks jurisdiction.   Defendants respectfully submit that sanctions are warranted.

## V.   CONCLUSION

For the foregoing reasons, Postmates's motion for a stay should be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: April 9, 2020

Warren Postman (*pro hac vice forthcoming*)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

Respectfully submitted,
/s/ Aaron Zigler
Aaron Zigler (#327318)
  amz@kellerlenkner.com
Ashley Keller (*pro hac vice forthcoming*)
  ack@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

*Attorneys for Defendants*

PROPOSED] ORDER GRANTING MOTION TO HOLD POSTMATES IN CONTEMPT
CASE NO. CASE NO. 19-3042