THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
  dmanthripragada@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:   213.229.7000
Facsimile:   213.229.7520

MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
SHAUN A. MATHUR, SBN 311029
  smathur@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone:  949.451.3800
Facsimile:   949.451.4220

Attorneys for Plaintiff POSTMATES INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POSTMATES INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>10,356 INDIVIDUALS,<br><br>              Defendants. | CASE NO. 2:20-cv-02783-PSG-JEM<br><br>**POSTMATES' OPPOSITION TO CROSS-PETITIONERS' MOTION TO COMPEL ARBITRATION**<br><br>*[Declarations of Dhananjay S. Manthripragada, Jerica Sunga, and Caitlin Modlin filed concurrently herewith]* |
| GREENWOOD, et al.,<br><br>              Cross-Petitioners,<br><br>    v.<br><br>POSTMATES INC.,<br><br>              Cross-Respondent. | **Hearing:**<br>Date:       July 20, 2020<br>Time:       1:30 p.m.<br>Judge:     Hon. Philip S. Gutierrez |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ..................................................................................... 3

    A.    Postmates' Platform Connects Customers, Merchants, and Couriers ....... 3

    B.    Independent Couriers Agree to Resolve Disputes in Individual Arbitration .................................................................................................... 3

    C.    The 2019 Cross-Petitioners File Non-Individual Arbitration Demands ...................................................................................................... 5

    D.    The 10,356 Defendants File Thousands of Boilerplate Arbitration Demands at Once, and AAA Administers the Demands on a Non-Individual Basis ............................................................................................ 5

III. ARGUMENT ............................................................................................................ 7

    A.    Hundreds of Cross-Petitioners Lack an Agreement to Arbitrate and the 2019 Cross-Petitioners Are Not Properly Joined ................................. 8

        1.    Hundreds of Cross-Petitioners Lack an Agreement to Arbitrate .......................................................................................... 8

        2.    The 2019 Cross-Petitioners Are Not Properly Joined .................... 9

    B.    Cross-Petitioners Seek Non-Individual Arbitration in Violation of the Mutual Arbitration Provision ............................................................. 10

        1.    The Court Must Decide Whether Cross-Petitioners Seek Non-Individual Arbitration ........................................................... 11

        2.    Cross-Petitioners Seek to Arbitrate on a Non-Individual Basis ............................................................................................... 14

    C.    SB 707 Is Preempted and Unconstitutional ........................................... 20

        1.    SB 707 Is Preempted by the Federal Arbitration Act .................. 20

        2.    SB 707 Violates the Federal and State Contracts Clauses ........... 23

IV. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Postmates, Inc.*,
    414 F. Supp. 3d 1246 (N.D. Cal. 2019).......................................................11, 13, 19

*Adv. Thermal Sci. Corp. v. Applied Materials Inc.*,
    2009 WL 10671187 (C.D. Cal. Oct. 2, 2009) ..........................................................13

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008)..................................................................................................14

*Allemeier v. Zyppah, Inc.*,
    2018 WL 6038340 (C.D. Cal. Sept. 21, 2018) ........................................................19

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)..................................................................................................25

*Alt. Mut. Ins. Co. v. C.I.R.*,
    523 U.S. 382 (1988)..................................................................................................17

*Alvarez v. T-Mobile USA, Inc.*,
    822 F. Supp. 2d 1081 (E.D. Cal. 2011) ......................................................................9

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..................................................................................................18

*AT&T Mobility LLC v. Bernardi*,
    2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) ........................................................19

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011).................................................1, 14, 15, 16, 17, 18, 19, 20, 21

*Blair v. Rent-A-Ctr., Inc.*,
    928 F.3d 819 (9th Cir. 2019) ....................................................................................20

*Brandwein v. Butler*,
    218 Cal. App. 4th 1485 (2013) .................................................................................11

*Brown v. Dillard's, Inc.*,
    430 F.3d 1004 (9th Cir. 2005) .............................................................................21, 25

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Brown v. Grimes*,
192 Cal. App. 4th 265 (2011) ................................................................21, 25

*Chamber of Commerce of the U.S. v. Becerra*,
2020 WL 605877 (E.D. Cal. Feb. 7, 2020) ...........................................21, 22

*Coughlin v. Rogers*,
130 F.3d 1348 (9th Cir. 1997) ......................................................................10

*Enos v. Picacho Gold Mining Co.*,
56 Cal. App. 2d 765 (1943) ...........................................................................13

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018)........................................2, 14, 16, 18, 20, 21, 23

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)...........................................................2, 11, 12, 14

*Gen. Motors Corp. v. Romein*,
503 U.S. 181 (1992)......................................................................................24

*Gilliam v. Nev. Power Co.*,
488 F.3d 1189 (9th Cir. 2007) ......................................................................13

*Halloran v. Davis*,
2013 WL 12153551 (C.D. Cal. 2013) ...........................................................19

*Hemphill v. Wright Family, LLC*,
234 Cal. App. 4th 911 (2015) .......................................................................13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019).............................................................................7, 8

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002)........................................................................................19

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
137 S. Ct. 1421 (2017).........................................................20, 21, 22, 25

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019)...........................................................2, 8, 11, 15, 16, 19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*London Mkt. Insurers v. Superior Court,*
  146 Cal. App. 4th 648 (2007) ..................................................................... 13

*Maynard v. BTI Grp., Inc.,*
  216 Cal. App. 4th 984 (2013) ..................................................................... 12

*Mayo v. Dean Witter Reynolds, Inc.,*
  258 F. Supp. 2d 1097 (N.D. Cal. 2003) ...................................................... 21

*Moore v. Cooper,*
  127 F.R.D. 422 (D.D.C. 1989) ...................................................................... 9

*Moss v. Spartanburg Cty. Sch. Dist. No. 7,*
  2010 WL 2136642 (D.S.C. May 25, 2010) ................................................... 9

*Murray v. Under Armour Inc.,*
  2019 WL 9044608 (C.D. Cal. Feb. 11, 2019) ............................................... 8

*Nixon v. Guzzetta,*
  272 F.R.D. 260 (D.D.C. 2011) ................................................................. 9, 10

*In re Pangang Grp. Co.,*
  901 F.3d 1046 (9th Cir. 2018) ................................................................... 14

*Retsloff v. Smith,*
  79 Cal. App. 443 (1926) ............................................................................ 12

*RUI One Corp. v. City of Berkeley,*
  371 F.3d 1137 (9th Cir. 2004) ................................................................... 24

*S. Cal. Gas Co. v. City of Santa Ana,*
  336 F.3d 885 (9th Cir. 2003) ..................................................................... 24

*Sveen v. Melin,*
  138 S. Ct. 1815 (2018) .......................................................................... 24, 25

**Statutes**

9 U.S.C. § 2 ................................................................................................ 8, 20

9 U.S.C. § 4 .................................................................................... 2, 7, 9, 14

# TABLE OF AUTHORITIES
(continued)

Page(s)

Cal. Civ. Code § 1638 .................................................................................. 11

Cal. Civ. Code § 1641 .................................................................................. 12

Cal. Code Civ. Proc. § 1281.97 ............................................................ 20, 21, 23, 24

Cal. Code Civ. Proc. § 1281.99 ..................................................................... 20, 22

Cal. Code Civ. Proc. § 1858 .......................................................................... 12

Cal. Labor Code § 2699 ............................................................................... 18

**Other Authorities**

AAA, 2018 Annual Report 11 (May 2019),
    https://tinyurl.com/ycgdwq2r ................................................................. 17

Cal. Assemb. Jud. Comm., SB 707 (June 18, 2019),
    https://tinyurl.com/y8zburq8 ................................................................. 24

Cal. Sen. Rules Comm., Off. of Sen. Floor Analyses, Third Reading of
    Sen. Bill No. 707, 2019–2020 Reg. Sess. (2019) .......................................... 25

CPR International Institute for Conflict Prevention & Resolution
    (Nov. 4, 2019), https://tinyurl.com/ry3rznb ............................................... 17

FedArb, Framework for Series of Mass Employment Arbitration
    Proceedings, https://tinyurl.com/yay3ktlc ................................................. 17

Press Release, Sen. Bob Wieckowski, "After forcing workers and
    consumers into forced arbitration, companies are delaying hearings,
    leaving victims with no avenue for justice" (Apr. 23, 2019),
    https://tinyurl.com/ycmj6lqm ................................................................. 22

Press Release, Sen. Bob Wieckowski, "SB 707 assists California workers,
    consumers when companies withhold payment to delay arbitration"
    (June 18, 2019), https://tinyurl.com/ycq469rc ........................................... 22

Press Release, Sen. Bob Wieckowski, "Wieckowski, Hertzberg's SB 707
    would stop companies from gaming the rules in arbitration" (Sept. 11,
    2019), https://tinyurl.com/yah7cte7 ......................................................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

**Rules**

AAA Employment Arb. Rules, R-43 ................................................................ 21

Fed. R. Civ. Proc. 20 ............................................................................... 9, 10

**Treatises**

11 Williston on Contracts § 31:6 (4th ed. 2003) ........................................ 13

7 Wright & Miller, Federal Practice and Procedure, § 1657 (3d ed. 2002) ............. 9, 10

**Constitutional Provisions**

Cal. Const. art I, § 9 .................................................................................. 24

U.S. Const. art I, § 10 ............................................................................... 24

# I. INTRODUCTION

The 5,290 Cross-Petitioners who have moved to compel arbitration have for months attempted to arbitrate in a manner that violates the Federal Arbitration Act ("FAA") and the individual arbitration requirement in the Fleet Agreement's Mutual Arbitration Provision.[1]   The Mutual Arbitration Provision provides that all disputes between a courier and Postmates must be resolved exclusively in individual arbitration—not on any classwide, collective, representative, or otherwise non-individual basis—yet at every turn, Cross-Petitioners have sought to circumvent the individual arbitration requirement.

The 2020 Cross-Petitioners, along with the other 5,423 Defendants, waited months so that they could collectively file more than 10,000 boilerplate demands at the same time in a single transaction.   They then insisted that their arbitrations be administered collectively and proceed at the same time, in some cases before the same arbitrator.   Defendants also demanded that Postmates pay over $4 million in up-front filing fees before any one arbitration could commence—even though more than 1,300 Defendants never agreed to arbitrate their disputes with Postmates, and more than 600 Defendants never completed a delivery using Postmates' platform or released their claims in a prior settlement.   The 2019 Cross-Petitioners also sought to arbitrate their claims in a manner that flouts the individual arbitration requirement (along with an additional 893 claimants who are not part of this case).   That Cross-Petitioners insisted that their cases proceed in lockstep, even when so many are patently meritless, confirms that their tactic is designed to use simultaneous arbitration demands as leverage to exert maximum settlement pressure—a hallmark of non-individual arbitration.   *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011).

Cross-Petitioners' mass arbitration tactic represents the latest of the many

---

[1]   Of the 5,290 Cross-Petitioners, 4,933 are Defendants in this case and filed arbitration demands against Postmates in February 2020  ("2020 Cross-Petitioners"), and 357 are non-parties who filed demands in September 2019 ("2019 Cross-Petitioners").

"devices and formulas" litigants have tried to use to circumvent individual arbitration agreements. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018). But the Supreme Court has repeatedly held that "federal courts [must] enforce arbitration agreements according to their terms—including terms providing for individualized proceedings," *id.* at 1619—and that courts may not compel parties that signed individual arbitration agreements to arbitrate in *any* manner that "fundamental[ly] differ[s]" from the "individualized form of arbitration" envisioned by the FAA in "the absence of the parties' consent," *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415–16 (2019).

Cross-Petitioners' Motion should be denied for three reasons. *First*, 233 Cross-Petitioners fail to establish that they ever entered into an agreement to arbitrate with Postmates—they either never accepted the Fleet Agreement, or they accepted the Fleet Agreement but opted out of arbitration. The Court should deny the Motion as to those individuals. The Court also should deny the Motion as to the 2019 Cross-Petitioners who filed non-individual arbitration demands against Postmates in September 2019, but are not Defendants in this case and are ineligible for permissive joinder under Rule 20(a).

*Second*, as to the Cross-Petitioners who *do* have an agreement to arbitrate, the Motion should be denied because they seek to arbitrate in a manner that is not the one "provided for in [their] agreement[s]." 9 U.S.C. § 4. Whether Cross-Petitioners seek non-individual arbitration is a question for the Court, not an arbitrator, because the Mutual Arbitration Provision's delegation clause expressly carves out any dispute relating to the Class Action Waiver—including its individual arbitration requirement. That the parties dispute their intent to delegate this question alone weighs against delegation. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995).

*Third*, the Court should deny the 2020 Cross-Petitioners' request for "costs and reasonable attorneys' fees" under SB 707, Dkt. 43 ¶ 33; Dkt. 44 at 25, because SB 707 is both preempted and unconstitutional. SB 707 provides that any party who drafts an arbitration agreement shall be in "material breach" of the agreement if it does not pay arbitration fees within 30 days of the due date, regardless of the reason for nonpayment,

and even if the non-drafting party materially breaches the agreement or fails to prove the existence of an agreement to arbitrate.  By rewriting and singling out arbitration agreements for disfavored treatment, SB 707 runs afoul of and is thus preempted by the FAA.  SB 707 also violates the state and federal Contracts Clauses because it substantially interferes with contracting parties' reasonable expectations and reaches far beyond its stated purpose of reining in abuses of mandatory arbitration.

## II.  FACTUAL BACKGROUND

### A. Postmates' Platform Connects Customers, Merchants, and Couriers

Postmates operates an online marketplace and mobile platform through which consumers connect with local merchants and, if consumers request delivery, independent couriers to facilitate the purchase, fulfillment, and, when applicable, local delivery of products from merchants to consumers.  Modlin Decl. ¶ 3.  When consumers place orders through Postmates' platform, they can decide whether to pick up the order or have it delivered.  *Id.*  If a consumer chooses delivery, couriers receive a notification and can choose whether to pick up and deliver the goods.  *Id.* ¶ 4.

### B. Independent Couriers Agree to Resolve Disputes in Individual Arbitration

Anyone can sign up to be a courier.  Modlin Decl. ¶ 5.  But before couriers can access Postmates' platform, they must accept Postmates' Fleet Agreement, which is presented to them during an online registration process.  *Id.*  The Fleet Agreement governs the relationship between Postmates and couriers, and expressly provides that couriers are "independent contractor[s]."  *Id.* ¶ 6, Ex. A at §§ 1A, 2A.[2]

The Fleet Agreement contains a Mutual Arbitration Provision that "is governed exclusively by the [FAA]."  *Id.* ¶ 6, Ex. A § 10A(i).  "Arbitration is ***not a mandatory condition*** of [couriers'] contractual relationship with Postmates, as couriers may opt out of arbitration by submitting an opt-out notice within 30 days of accepting the Fleet

---

[2]  Citations are to the 2019 Fleet Agreement, which is the version the majority of Petitioners allege to have signed.  *See* Dkt. 46 ¶ 9, *available at* https://kl.link/2LTZjGN. The 2019 Fleet Agreement is materially similar to other versions of the agreement unless otherwise noted.

Agreement.  *Id.*, § 10B(ix) (emphasis added).  Couriers who do not opt out "agree to resolve any disputes" with Postmates "exclusively through final and binding arbitration."  *Id.*, § 10A(i).  The Mutual Arbitration Provision contains Class Action and Representative Action Waivers.  *Id.*, § 10B(ii)–(iii).  The Class Action Waiver states:

> **CLASS ACTION WAIVER—PLEASE READ.**  Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in *individual arbitration*.  The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a class and/or collective action, or to participate in any class and/or collective action, and an arbitrator shall not have any authority to hear or arbitrate any class and/or collective action ("Class Action Waiver").

*Id.*, § 10B(ii) (emphasis added); *see also id.*, § 10B(iii) (Representative Action Waiver).

The Mutual Arbitration Provision also contains a delegation clause:

> Only an arbitrator . . . shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision, including without limitation any dispute concerning arbitrability.  However, as stated in Section 10B.iv below, the preceding clause *shall not apply to any dispute relating to or arising out of the Class Action Waiver and Representative Action Waiver*, which must proceed in a court of competent jurisdiction and cannot be heard or arbitrated by an arbitrator.

*Id.*, § 10(A)(ii) (emphasis added).  Section 10B(iv), in turn, provides that:

> [A]ny claim that all or part of this Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, void, or voidable shall be determined only by a court of competent jurisdiction and not by an arbitrator.  *As stated above*, all other disputes regarding interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision shall be determined exclusively by an arbitrator.

*Id.*, § 10B(iv) (emphasis added).  Thus, an arbitrator must resolve all disputes relating to the interpretation, applicability, enforceability, or formation of the Mutual Arbitration Provision, *except that* a court must resolve *all disputes* relating to the Class and Representative Action Waivers—including their individual arbitration requirement and claims alleging that either Waiver is unenforceable, unconscionable, void, or voidable.  *See also* Modlin Decl. ¶ 11 (Postmates' intent at the time of drafting was to carve out from the delegation clause all disputes arising out of or relating to the Waivers).

### C. The 2019 Cross-Petitioners File Non-Individual Arbitration Demands

On September 24, 2019, 1,250 claimants—357 of which are Cross-Petitioners—simultaneously filed with the American Arbitration Association ("AAA") near-identical arbitration demands against Postmates. Manthripragada Decl. ¶ 16, Ex. L. The demands offered generic statements of claimants' claims, and claimants insisted that AAA assess all filing fees up front and commence all arbitrations at the same time. *Id.* ¶¶ 16, 22. Postmates proposed that fifty randomly selected arbitrations proceed at a time on a rolling basis, but the 2019 Cross-Petitioners rejected Postmates' proposal. *Id.* ¶¶ 21, 22.

### D. The 10,356 Defendants File Thousands of Boilerplate Arbitration Demands at Once, and AAA Administers the Demands on a Non-Individual Basis

On February 15, 2020, the Defendants in this action simultaneously submitted 10,356 arbitration demands against Postmates to AAA. Manthripragada Decl. ¶ 42. Defendants' counsel at Keller Lenkner notified Postmates about these demands in a single email, which contained a link to a Dropbox folder containing 10,356 demands and three versions of the Fleet Agreement, titled Exhibits A, B, and C. *Id.* ¶ 43. Each of the demands referenced one of the exhibits in the Dropbox folder, but no Defendant provided any proof that they actually accepted the Fleet Agreement and did not opt out of the Mutual Arbitration Provision, or performed any work on the platform. *Id.*

Although Defendants purportedly retained Keller Lenkner as their counsel, thousands of Defendants waited months after retaining counsel to submit their arbitration demands. For example, 137 Defendants requested "employment records" on March 28, 2019; another 2,107 requested similar records on July 9, 2019; another 829 requested records on August 12, 2019; and another 4,144 requested records on October 3, 2019—yet none filed an arbitration demand until February 2020. *Id.* ¶¶ 4, 12, 13, 17. Instead of filing demands upon retaining counsel, Defendants waited to aggregate their generic claims together with thousands of others in a single filing on the same day.

The Mutual Arbitration Provision requires that demands for arbitration provide "a statement of the legal and factual basis of the claim" and "a description of the remedy

sought," Modlin Decl., Ex. A § 10(B)(i), but Defendants filed virtually identical demands that generically state: "Postmates has misclassified Claimant as an independent contractor instead of an employee. Claimant seeks all available relief under the following provisions, as shown to be applicable following discovery of information exclusively within Postmates's control." Manthripragada Decl. ¶ 43, Exs. AA–CC. The demands then list federal and state statutes and unspecified "Municipal Codes," without explaining how these laws apply to Defendants' claims. *Id.* Each demand also seeks the same exact relief. *Id.* And while each demand states a different "amount of claim" that is "subject to amendment according to proof," the demands do not attempt to explain how the "amount of claim" was calculated or what type of relief it represents. *Id.*

Using the personal identifying information provided by Defendants and Cross-Petitioners, Postmates has been unable to confirm that 208 Cross-Petitioners who now move to compel arbitration ever accepted the Fleet Agreement. Sunga Decl. ¶ 4, 5, Exs. A, B. Postmates' records also show that 25 Cross-Petitioners do not have an agreement to arbitrate with Postmates because they opted out of the Mutual Arbitration Provision; that at least 185 Cross-Petitioners never completed a delivery using Postmates' platform; and that another 54 have released their claims against Postmates in a prior settlement.[3] *Id.* ¶¶ 6–8, Exs. C–E; Manthripragada Decl. ¶ 35. Thus, even the individuals who might have valid arbitration claims chose to aggregate their arbitration demands with the demands of hundreds of individuals who have no claim to pursue in arbitration at all.

On February 24, 2020, AAA notified Postmates of Defendants' filing, and began administering the demands on a non-individual basis. Manthripragada Decl. ¶ 45, Ex. EE at 13–14. AAA titled the action "*10,356 Individuals v. Postmates, Inc.*," and collectively assessed over $4 million in initial administrative filing fees under its "Group Filing Fee[]" schedule, rather than its schedule for truly individual arbitrations. *Id.*

---

[3]  Moreover, 401 Cross-Petitioners have filed arbitration demands against Postmates through counsel other than Keller Lenkner, raising serious questions as to who actually represents them. Manthripragada Decl. ¶ 49, Ex. KK.

AAA stated it would "close the parties' cases" unless all payment was "received by April 15, 2020." *Id.* AAA further "note[d] that these matters are subject to California Code of Civil Procedure 1281.97 and 1281.98," otherwise known as SB 707. *Id.*

After AAA commenced administration, Defendants continued to prosecute their claims as a group rather than individually. Defendants insisted that filing fees for all 10,356 demands be paid up front, that all arbitrations be administered together, and that all arbitrations proceed in lockstep at the exact same time. *Id.* Ex. NN at 3. Defendants also requested that AAA assign multiple arbitrations to a single arbitrator, contrary to the terms of the Mutual Arbitration Provision and AAA's rules. *Id.* Ex. EE at 3, Ex. OO. Although AAA declined to assign multiple arbitrations to a single arbitrator, it continued to communicate with all the parties through a single email chain, held consolidated telephonic conferences, and simultaneously rejected Postmates' request that the matters be temporarily stayed after Postmates initiated this lawsuit. *Id.* ¶¶ 53, 55, Ex. EE at 8. AAA also closed 10,256 cases at the same time in a single transaction. *Id.* Ex. NN at 9.

Postmates filed this action on March 25, 2020, seeking declaratory and injunctive relief to prevent Defendants from impermissibly pursuing arbitration on a non-individual basis or enforcing SB 707. Dkt. 1. Postmates filed an ex parte application for a temporary restraining order on April 8, Dkt. 17, which the Court denied without addressing SB 707, Dkt. 30. On May 22, a Cross-Petition to Compel Arbitration and this Motion to Compel Arbitration were filed on behalf of 4,933 Defendants and 357 individuals who filed demands for arbitration in September 2019. Dkts. 43, 44.

## III. ARGUMENT

Where a "valid arbitration agreement exists," *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019), a claimant may arbitrate their disputes only "in the manner provided for in such agreement," 9 U.S.C. § 4. Here, 233 Cross-Petitioners cannot establish that they have an agreement to arbitrate with Postmates, and those who do have an agreement seek to arbitrate on a non-individual basis, despite agreeing to resolve their disputes "*in individual arbitration.*" Cross-Petitioners' Motion

should therefore be denied.  The Court should also deny the 2020 Cross-Petitioners' request to impose fees and costs under SB 707, because the statute is unenforceable.

### A. Hundreds of Cross-Petitioners Lack an Agreement to Arbitrate and the 2019 Cross-Petitioners Are Not Properly Joined

As a preliminary matter, the Motion should be denied as to the hundreds of individuals who have no right to bring this Motion in the first place, including 233 individuals who have failed to establish they have any agreement to arbitrate with Postmates, and the 2019 Cross-Petitioners who are not properly joined under Rule 20(a).

### 1. Hundreds of Cross-Petitioners Lack an Agreement to Arbitrate

"Arbitration is strictly a matter of consent." *Lamps Plus*, 139 S. Ct. at 1415.  Thus, "before referring a dispute to an arbitrator, the *court*"—not an arbitrator—must "determine[] whether a valid arbitration agreement exists." *Henry Schein*, 139 S. Ct. at 530 (emphasis added) (citing 9 U.S.C. § 2).  As Defendants concede, Dkt. 44 at 16, courts must make this threshold determination even where the parties have delegated other arbitrability questions to the arbitrator, *Henry Schein*, 139 S. Ct. at 530.

Although Cross-Petitioners assert that they are each "subject to an agreement to arbitrate with Postmates," Dkt. 44 at 16, they have not offered any proof of these agreements, and instead rely on their counsel's assumption that because every Cross-Petitioner alleges that she "is a Postmates courier, she also has an agreement to arbitrate." Dkt. 46 ¶ 7.  In fact, Postmates has no record that 233 of the individuals who now seek to compel arbitration have any "valid arbitration agreement" with Postmates whatsoever, *Henry Schein*, 139 S. Ct. at 530, including 208 who never accepted the Fleet Agreement, and an additional 25 who accepted the Fleet Agreement but affirmatively opted out of the Mutual Arbitration Provision, Sunga Decl. ¶ 4–6.

Because "[t]he party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists," *Murray v. Under Armour Inc.*, 2019 WL 9044608, at *2 (C.D. Cal. Feb. 11, 2019), and because Postmates has not been able to confirm the existence of an agreement with certain individuals after conducting a

thorough and good-faith search, the Motion with respect to those individuals should be denied.  To the extent Cross-Petitioners contend that they might be able to provide additional information to establish an agreement to arbitrate with Postmates, the Court should permit discovery into whether an agreement to arbitrate exists before ruling on the Motion.  Indeed, "[i]f the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof," 9 U.S.C. § 4, and courts grant discovery to resolve whether "an agreement to arbitrate . . . was ever formed," *Alvarez v. T-Mobile USA, Inc.*, 822 F. Supp. 2d 1081, 1086 (E.D. Cal. 2011).

### 2. The 2019 Cross-Petitioners Are Not Properly Joined

The Court also should deny the Motion as to the 2019 Cross-Petitioners who filed demands in September 2019.  These individuals have no right to compel arbitration here because they are not named as Defendants in Postmates' operative complaint, and they are not entitled to join this action by filing a "Cross-Petition to Compel Arbitration."

Permissive joinder of non-party defendants is proper only where (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and (2) a "question of law or fact common to all defendants will arise in the action." Fed. R. Civ. Proc. 20(a)(2).  "Rule 20(a) is a rule by which plaintiffs decide who to join as parties and is not a means for defendants to structure the lawsuit."  *Moore v. Cooper*, 127 F.R.D. 422, 422 (D.D.C. 1989); *see also Moss v. Spartanburg Cty. Sch. Dist. No. 7*, 2010 WL 2136642, at *2 (D.S.C. May 25, 2010) ("[A] defendant cannot use rule 20 to join a person as an additional defendant.").  Indeed, Rule 20(a) "does not provide a mechanism for a defendant to join parties" *unless* the defendant "is asserting a crossclaim or counterclaim." *Nixon v. Guzzetta*, 272 F.R.D. 260, 262 (D.D.C. 2011); *see also* 7 Wright & Miller, Federal Practice and Procedure, § 1657 (3d ed. 2002) ("counterclaiming or crossclaiming defendants" may seek joinder).

Here, Postmates has not asserted any "right to relief" against the 2019 Cross-Petitioners—they are not parties to this action, *Adams*, or any other action with

Postmates.  Nor can Defendants join these Cross-Petitioners in Postmates' action simply by filing a "Cross-Petition to Compel Arbitration," because the Cross-Petition does not assert any counterclaims or crossclaims.  *See Nixon*, 272 F.R.D. at 262; Wright & Miller, *supra*, at § 1657.  Defendants have previously argued that filing a petition to compel arbitration allows "individuals [to] join in one action as *plaintiffs*."  Dkt. 39 at 4 (emphasis added).  But filing a Cross-Petition to Compel Arbitration does not transform Defendants into plaintiffs, and Defendants cite no authority for this assertion.  *See id.*

Moreover, Defendants cannot join the 2019 Cross-Petitioners in this action because any claims for relief these two groups have against Postmates do not "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences."  Fed. R. Civ. Proc. 20(a)(1)(A), (a)(2)(A).  This lawsuit is about the conduct of the 10,356 Defendants named in the complaint—namely, their submission of 10,356 arbitration demands in a single email to AAA on February 15, 2020; AAA's administration of those demands in a single proceeding titled "*10,356 Individuals v. Postmates*"; AAA's application of its "Group Administrative Filing Fees" schedule to the demands; and Defendants' request for attorneys' fees and penalties under SB 707.  *See generally* FAC.  But the 2019 Cross-Petitioners had nothing to do with these events.  They have never been subject to AAA's group filing fee schedule, and they are not even eligible to seek penalties under SB 707, because their claims were filed before SB 707 took effect.  Just because Defendants and the 2019 Cross-Petitioners have both sought non-individual arbitration does not mean their conduct was part of the same transaction or occurrence.  *See Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) (the "existence of a common allegation . . . does not suffice to create a common transaction or occurrence").

## B. Cross-Petitioners Seek Non-Individual Arbitration in Violation of the Mutual Arbitration Provision

The Court should deny the Motion as to the individuals who have an arbitration agreement because they seek to arbitrate on a non-individual basis in violation of the parties' agreements and the FAA.  Whether Cross-Petitioners seek non-individual

arbitration is a question for the Court under the plain language of the Mutual Arbitration Provision, which carves out from the delegation clause any disputes relating to the Class Action Waiver—including its individual arbitration requirement.  And even a cursory review of Cross-Petitioners' conduct reveals they have attempted from the beginning to arbitrate their claims in a manner that violates the individual arbitration requirement.  But the Supreme Court has been clear:  where, as here, a party seeks to arbitrate in a manner that "interferes with [the] fundamental attributes" of "the individualized form of arbitration envisioned by the" FAA, courts may not compel arbitration in that manner "in the absence of the parties' consent."  *Lamps Plus*, 139 S. Ct. at 1416, 1418.

### 1. The Court Must Decide Whether Cross-Petitioners Seek Non-Individual Arbitration

The Court has previously stated that whether Defendants seek impermissible non-individual arbitration was "likely delegated to the arbitrator."  Dkt. 30 at 9.  The Court found "persuasive" the reasoning of the district court in *Adams*, which concluded that "the exception to the delegation clause was limited specifically to challenges to 'the *enforceability* of the Class Action and Representative Action Waivers,' rather than more generally to 'any dispute' concerning the waiver."  *Id.* at 9–10 (quoting *Adams v. Postmates, Inc.*, 414 F. Supp. 3d 1246, 1252–55 (N.D. Cal. 2019)).  *Adams*, however, was wrongly decided on this issue and should not be followed.[4]

A question may be delegated to an arbitrator only if "there is clear and unmistakable evidence" that the parties intended to do so.  *First Options*, 514 U.S. at 944–45.  The parties' intent on the scope of the delegation clause must be determined from the "language of [the] contract," as long as "the language is clear and explicit."  Cal. Civ. Code § 1638; *Brandwein v. Butler*, 218 Cal. App. 4th 1485, 1505 (2013).  To the extent there is any doubt or ambiguity as to the appropriate construction of the delegation clause, that doubt must be resolved against delegating the dispute to an

---

[4]  The proper interpretation of the Mutual Arbitration Provision's delegation clause is currently before the Ninth Circuit in *Adams v. Postmates, Inc.*, No. 19-17362.  Briefing is complete, and the parties are waiting for the Court to schedule oral argument.

arbitrator.  *First Options*, 514 U.S. at 944–45.

Here, the Mutual Arbitration Provision's delegation clause provides that "[o]nly an arbitrator . . . shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision."  Modlin Decl. Ex. A, § 10A(ii).  The next sentence contains a broad exception to the delegation clause: "[A]s stated in Section 10B.iv below*, the preceding clause shall not apply to <u>any dispute</u> relating to or arising out of the Class Action Waiver and Representative Action Waiver*, which must proceed in a court of competent jurisdiction and cannot be heard . . . by an arbitrator."  *Id.* (emphasis added).  Section 10B(iv), in turn, states that "any claim that all or part of this Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, void, or voidable shall be determined only by a court of competent jurisdiction and not by an arbitrator."  *Id.*, § 10B(iv).  It further provides that "[a]s stated above, all other disputes regarding interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision shall be determined exclusively by an arbitrator."  *Id.*

Reading "the various terms . . . harmoni[ously]" with each other, *Retsloff v. Smith*, 79 Cal. App. 443, 452 (1926), and "giv[ing] effect to every part," Cal. Civ. Code § 1641; Cal. Code Civ. Proc. § 1858, "*any dispute* relating to or arising out of the Class Action Waiver," *including* "any claim that all or part of this Class Action Waiver . . . is unenforceable, unconscionable, void, or voidable," Modlin Decl. Ex. A, §§ 10A(ii), 10B(iv), must be heard by a court, not an arbitrator.  Here, whether Defendants' approach to arbitration violates the Class Action Waiver's individual arbitration requirement is a "dispute" that falls within Section 10A(ii)'s general carve out, as the phrase "'any dispute' encompasses all claims" and "conflict[s] concerning the effect of the agreement[]" to arbitrate individually and not as a class, collective, or otherwise.  *Maynard v. BTI Grp., Inc.*, 216 Cal. App. 4th 984, 993 (2013).

*Adams* concluded that Section 10B(iv) *limits* the meaning of "any dispute," such that *only* claims that the Class Action Waiver is "unenforceable, unconscionable, void,

or voidable" are excluded from the delegation clause.  414 F. Supp. 3d at 1254.  But Section 10B(iv) does not say that "only" any claim that the Class Action Waiver is "unenforceable, void, or voidable" is exempt from the delegation clause.  And courts may not "rewrite" "the language the contracting parties chose," *London Mkt. Insurers v. Superior Court*, 146 Cal. App. 4th 648, 670 (2007), or "engraft on[to] a contract a limitation or restriction" that does not "express[ly]" appear in the contract itself, 11 Williston on Contracts § 31:6 (4th ed. 2003); *see Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1195 (9th Cir. 2007) (courts may not "rewrite [a] contract").

Moreover, the construction adopted in *Adams* renders the "any dispute" phrase in Section 10A(ii) "nugatory, inoperative [and] meaningless."  *Hemphill v. Wright Family, LLC*, 234 Cal. App. 4th 911, 915 (2015).  Indeed, under that construction, the second sentence of Section 10A(ii) could have simply stated:  "However, as stated in Section 10B.iv, the preceding clause shall not apply."  Or it could have said:  "as stated in Section 10B.iv, the preceding clause shall not apply to [certain] dispute[s] relating to or arising out of the Class Action Waiver."  Or it could have even been scrapped from the Fleet Agreement *altogether*.  But it was not, and to interpret it as if it were violates the principle that courts are to "interpret contractual language in a manner which gives force and effect to *every* provision."  *Hemphill*, 234 Cal. App. 4th at 915.

As for the concern in *Adams* that the list of claims in Section 10B(iv) would be unnecessary if "any dispute" is interpreted as covering "any dispute," *Adams*, 414 F. Supp. 3d at 1254, there is nothing unusual about including a provision out of an "abundance of caution . . . to provide against possibilities and contingencies," *Enos v. Picacho Gold Mining Co.*, 56 Cal. App. 2d 765, 775 (1943), or to remove all doubt that particular claims are to be resolved by a court, not an arbitrator, *see Adv. Thermal Sci. Corp. v. Applied Materials Inc.*, 2009 WL 10671187, at *5 (C.D. Cal. Oct. 2, 2009) ("overlapping definitions are often added in an abundance of caution").  In fact, in the statutory context, the Ninth Circuit has held that "specific examples" may be included "'out of an abundance of caution' or to 'remove any doubt' that certain cases fall within"

the language's scope.  *In re Pangang Grp. Co.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008)).

The Court should therefore construe the delegation clause as requiring a court to resolve *all* disputes "relating to or arising out of the Class Action Waiver"—including whether Cross-Petitioners have sought to arbitrate in a non-individualized manner.  Such an interpretation would comport with Postmates' intent in drafting the Mutual Arbitration Provision and its delegation clause.  *See* Modlin Decl. ¶ 11.  To the extent there is any ambiguity as to the proper construction of the delegation clause, that ambiguity must be resolved against delegation.  *First Options*, 514 U.S. at 944–45.

## 2.  Cross-Petitioners Seek to Arbitrate on a Non-Individual Basis

Since filing their demands for arbitration, Cross-Petitioners have attempted to arbitrate their disputes with Postmates on a non-individual basis, in violation of the FAA and the Class Action and Representative Action Waivers' individual arbitration requirement.  Because Cross-Petitioners do not seek to arbitrate in a "manner provided for in [their] agreement" with Postmates, their Motion to Compel Arbitration should be denied.  9 U.S.C. § 4.[5]

The FAA was enacted in response to the "great variety of devices and formulas" that had been devised by those hostile to arbitration to avoid the terms of individual arbitration agreements.  *Concepcion*, 563 U.S. at 339, 342.  To achieve this purpose, the FAA requires that "arbitration agreements [be] enforced according to their terms," *Concepcion*, 563 U.S. at 344—"including terms providing for individualized proceedings," *Epic Sys.*, 138 S. Ct. at 1619.  Congress recognized that the "traditional individualized arbitration" envisioned by the FAA has much to offer, *id.* at 1623, "not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved," *id.* at 1621.  Accordingly, courts may not—absent express contractual

---

[5]  Postmates focuses its analysis here on the 2020 Cross-Petitioners' conduct, but the same reasoning applies to the 2019 Cross-Petitioners, who similarly sought to arbitrate in a non-individual manner.  Thus, the Court should deny the Motion as to the 2019 Cross-Petitioners for the same reasons it should deny it as to the 2020 Cross-Petitioners.

authorization—compel parties to arbitrate in *any* manner that is "fundamental[ly] differen[t]" from the "individualized form of arbitration envisioned by the FAA," *Lamps Plus*, 139 S. Ct. at 1416, or that otherwise "hinder[s]," "frustrate[s]," or "interferes with [the] fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA," *Concepcion*, 563 U.S. at 344, 346.

The *Concepcion* Court articulated a three-part framework for analyzing whether an approach to arbitration interferes with traditional individual arbitration. Under that framework, courts ask whether an approach to arbitration (1) "makes the process slower" and "more costly" than individual arbitration, (2) "requires procedural formality" that is unnecessary in individual arbitration, and (3) "greatly increases risks to defendants" by imposing "pressure[]" to "settl[e] questionable claims." 563 U.S. at 348–50.

In *Concepcion*, the Court applied that three-part test to class arbitration and held that such arbitration "interferes with fundamental attributes of arbitration." 563 U.S. at 344. "First, the switch from bilateral to class arbitration . . . makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 348. "According to the [AAA], the average consumer arbitration between January and August 2007 resulted in a disposition on the merits in six months," whereas the average class arbitration took "630 days" from "filing to settlement, withdrawal, or dismissal." *Id.* at 348–49. "Second, class arbitration requires procedural formality," as "[t]he AAA's rules governing class arbitrations mimic the Federal Rules of Civil Procedure for class litigation." *Id.* at 349. But it is "unlikely that in passing the FAA Congress meant to leave the disposition of these procedural requirements to an arbitrator. Indeed, class arbitration was not even envisioned by Congress when it passed the FAA in 1925." *Id.* "Third, class arbitration greatly increases risks to defendants" due to the "aggregat[ion]" of "tens of thousands of potential claimants" into one proceeding. *Id.* at 350. And "[f]aced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims." *Id.*

Relying on *Concepcion*, the Supreme Court held in *Lamps Plus* that courts may

not compel parties to class arbitration "in the absence of the parties' consent" because "[c]lass arbitration is . . . markedly different from the traditional individualized arbitration contemplated by the FAA" and "undermines the most important benefits of that familiar form of arbitration."  139 S. Ct. at 1415, 1418.

The reasoning in *Concepcion* and *Lamps Plus* is not limited to formal class action arbitration, but instead applies to any manner of arbitration that also "sacrifices the principal advantage[s]" of traditional individual arbitration.  *Lamps Plus*, 139 S. Ct. at 1416.  Indeed, "*Concepcion* teaches that [courts] must be alert to new devices and formulas that would achieve much the same result today." *Epic Sys.*, 138 S. Ct. at 1623.  Here, Cross-Petitioners' mass arbitration tactic is "such a device," *id.*, and all three *Concepcion* factors demonstrate that Cross-Petitioners' approach fundamentally differs from the individual arbitration envisioned by the parties' agreements and the FAA.

*First*, Cross-Petitioners' chosen method of arbitration has demonstrably made the arbitration process "slower" and "more costly."  *Concepcion*, 563 U.S. at 348.  Rather than file their arbitration demands upon retaining counsel, the 2020 Cross-Petitioners waited months to file their demands so that they could aggregate their claims and file in a single transaction alongside more than 10,000 total individuals.  Manthripragada Decl. ¶ 42.  Waiting to aggregate and file thousands of demands at once predictably delays AAA's processing of the cases.  For example, AAA must sift through thousands of demands to determine which claimant is bound by which version of the Fleet Agreement before assessing any filing fees.  *Id.* ¶ 43.  And AAA must amass a quorum of qualified arbitrators before it can put together arbitrator "strike lists" for the parties to select mutually acceptable arbitrators for each case.  Further, because the Mutual Arbitration Provision does not permit an arbitrator to hear more than one case at any given time, and AAA does not have over 10,000 qualified arbitrators, AAA must put a number of cases "on hold" while the first cases proceed.[6]  The 2020 Cross-Petitioners and other

---

[6] Although data is not available in the employment arbitration context, AAA's

Defendants could have avoided these delays had they not chosen to aggregate their claims with more than 10,000 others before filing their demands.

Cross-Petitioners' mass arbitration tactic also is by design more expensive than traditional individualized arbitration. Ordinarily under AAA's rules, after an arbitration demand is filed, the respondent must pay $1,900 in filing fees before the arbitration may commence. *See* Manthripragada Decl. Ex. Ff at 1–2. Here, after filing over 10,000 arbitration demands at once, the 2020 Cross-Petitioners and AAA insisted that Postmates pay over $4 million in nonrefundable filing fees up front before even a single arbitration could commence. Requiring Postmates to pay over $4 million in up-front fees to commence arbitration is more expensive than requiring Postmates to pay fees on a case-by-case basis as cases are actually able to proceed, even if over $4 million in filing fees are ultimately assessed over time. *See Alt. Mut. Ins. Co. v. C.I.R.*, 523 U.S. 382, 384 (1988) ("[A] dollar today is worth more than a dollar tomorrow[.]").

*Second*, Cross-Petitioners' approach to arbitration "requires procedural formality" to account for the novel challenges associated with it. *Concepcion*, 563 U.S. at 349. Multiple arbitration organizations, including AAA, recently published new protocols in an attempt to grapple with this tactic. *See, e.g.*, Manthripragada Decl. Ex. FF at 3 (AAA fee schedule for when the same counsel files 25 or more "similar claims for arbitration" against the same party); Employment-Related Mass-Claims Protocol, CPR International Institute for Conflict Prevention & Resolution, 2 (Nov. 4, 2019), https://tinyurl.com/ry3rznb (protocol applies "[a]ny time greater than 30 individual employment-related arbitration claims of a nearly identical nature are . . . filed . . . against the same Respondent(s) in close proximity"); FedArb, Framework for Series of Mass Employment Arbitration Proceedings, https://tinyurl.com/yay3ktlc (providing that "[m]ajor issues common to all cases [will be] dealt with in an MDL like court composed of a three judge panel"). But these litigation-style procedures are exactly what

---

Consumer Group administered fewer than 6,000 cases altogether in 2018. *See* AAA, 2018 Annual Report 11 (May 2019), https://tinyurl.com/ycgdwq2r.

arbitration "was meant to displace." *Epic Sys.*, 138 S. Ct. at 1623.  And the development of these protocols nearly 95 years after the FAA's enactment shows that Cross-Petitioners' scheme is a "relatively recent development" that was not "envisioned by Congress when it passed the FAA in 1925." *Concepcion*, 563 U.S. at 349.

*Third*, Cross-Petitioners' tactic "greatly increases risks to defendants" by imposing "pressure[]" on defendants to "settl[e] questionable claims." *Concepcion*, 564 U.S. at 350.  Since deploying this tactic, Cross-Petitioners' counsel has sought to use the collective costs of administering thousands of arbitrations as leverage to extract a settlement, Manthripragada Decl. Ex. A, without the protections that usually accompany such mass settlements, *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–22 (1997); Cal. Labor Code § 2699(*l*).  And counsel has continued its pressure tactics as to Cross-Petitioners' demands for arbitration, even though hundreds do not have an agreement to arbitrate, have never completed a delivery using Postmates' platform, or have released their claims in a prior settlement.  Sunga Decl. ¶¶ 4–8, Exs. A–E.  That counsel has attempted to use this tactic to extract an "'in terrorem' settlement[]," *Concepcion*, 563 U.S. at 350, without regard to the viability of Cross-Petitioners' claims, further shows that the scheme fundamentally differs from truly individual arbitration.

Cross-Petitioners argue their arbitration tactic does not violate the Mutual Arbitration Provision or the FAA because they are not seeking to resolve claims on behalf of absent parties, and thus they are not pursuing "[c]lasswide arbitration."  Dkt. 44 at 18–19.  But Postmates' argument is not that Cross-Petitioners seek to arbitrate as a class under AAA's class arbitration rules; rather, it is that they have sought to resolve their claims in some manner *other than individual arbitration*—the only permissible form of arbitration under the Fleet Agreement—without Postmates' consent.  In addition to prohibiting arbitrations involving absent parties, the Class Action Waiver *affirmatively requires* couriers to resolve their disputes with Postmates only "in individual arbitration."  And the Supreme Court's refusal to force parties into class arbitration absent their agreement stems not from the representation of absent parties,

but from class arbitration's propensity to "sacrifice[] the principal advantage of arbitration," and to "make[] the process slower, more costly, and more likely to generate procedural morass than final judgment." *Lamps Plus*, 139 S. Ct. at 1416.

For that reason, courts may not compel parties to arbitrate in *any* manner (class, collective, or otherwise) that is "markedly different from . . . traditional individualized arbitration," *Lamps Plus*, 139 S. Ct. at 1415, and "interferes with [the] fundamental attributes of arbitration"—unless there is a contractual basis for concluding that the parties "*agreed* to" do so, *id.* at 1418–19. Regardless of the label given to their tactic, Cross-Petitioners' approach to arbitration "fundamental[ly] differ[s]" from the "individualized form of arbitration envisioned by the FAA," *id.*, and "interferes with [the] fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA," *Concepcion*, 563 U.S. at 344, 346; *see also AT&T Mobility LLC v. Bernardi*, 2011 WL 5079549, at *6 (N.D. Cal. Oct. 26, 2011) (examining "substance and function" of over 1,000 arbitration demands "nominally filed . . . as individual[]" demands, and holding that claimants sought de facto class arbitration). Postmates never agreed to arbitrate in that manner, and thus the Court should deny Cross-Petitioners' Motion.

As for Cross-Petitioners' request for an order directing Postmates "to submit fees to commence arbitration," Dkt. 44 at 22, the Court lacks authority to enter such an order because the Mutual Arbitration Provision explicitly incorporates AAA's Commercial Arbitration Rules. *See Adams*, 414 F. Supp. 3d at 1255. The *Adams* court explicitly "decline[d]" to order payment of fees because AAA's rules exclusively govern "the available remedies for non-payment." *Id.* The agreements at issue in *Allemeier v. Zyppah, Inc.*, 2018 WL 6038340 (C.D. Cal. Sept. 21, 2018), and *Halloran v. Davis*, 2013 WL 12153551 (C.D. Cal. 2013), did not incorporate AAA's Commercial Arbitration Rules and are thus not "on all fours" with this case. Dkt. 44 at 22. And in any event, remedies regarding arbitration fees are "a procedural question to be decided by the arbitrator." *Adams*, 414 F. Supp. 3d at 1255 (collecting cases); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (procedural questions are "*not* for the

judge"). The Court should decline to enter the requested order for payment.

## C. SB 707 Is Preempted and Unconstitutional

The Court also should deny the 2020 Cross-Petitioners' request for costs and fees under SB 707, Dkt. 43 ¶ 33; Dkt. 44 at 25, because SB 707 is preempted by the FAA and unconstitutional under the federal and state Contracts Clauses.

### 1.   SB 707 Is Preempted by the Federal Arbitration Act

The FAA provides that arbitration agreements "shall be valid . . . and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2's savings clause "establishes a sort of 'equal-treatment' rule for arbitration contracts," *Epic Sys.*, 138 S. Ct. at 1622, under which courts must "place arbitration agreements on equal footing with other contracts," *Concepcion*, 563 U.S. at 339, and "rigorously . . . enforce arbitration agreements according to their terms," *Epic Sys.*, 138 S. Ct. at 1621. While arbitration agreements may be invalidated by "generally applicable contract defenses," state rules are preempted if they "stand as an obstacle to the accomplishment of the FAA's objectives," *Concepcion*, 563 U.S. at 343, or "single[] out arbitration agreements for disfavored treatment," *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1425 (2017); *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019). SB 707 fails on both counts. *See* Dkt. 17-1 at 14–17; Dkt. 28 at 7–8.

*First*, SB 707 undermines the FAA's objectives. SB 707 provides that a party who drafts an arbitration agreement and fails to pay arbitration fees within 30 days of a due date "is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration." Cal. Code Civ. Proc. § 1281.97(a). SB 707 entitles the non-drafting party to (a) proceed in court, obtain its attorneys' fees and costs, and seek additional sanctions (including default) or (b) compel arbitration and obtain attorneys' fees and costs. *Id.* § 1281.97(b), (d); *id.* § 1281.99.

By engrafting onto arbitration agreements—and no other type of contracts—a specific and highly onerous definition of "material breach," SB 707 effectively rewrites private arbitration agreements and interferes with the FAA's goal that arbitration

agreements be enforced "according to their terms." *Epic Sys.*, 138 S. Ct. at 1619; *Concepcion*, 563 U.S. at 344.  Parties to arbitration agreements agree to certain terms, including, as relevant here, the rules for filing fees and the consequences for failing to pay those fees. *See* AAA Employment Arb. Rules, R-43.  The FAA preempts state laws (as here) that "would impose inconsistent and conflicting procedural rules upon those specifically agreed upon by the parties." *Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1114 (N.D. Cal. 2003).  By overriding the rules to which the parties agreed, SB 707 directly impedes the FAA's command. *Epic Sys.*, 138 S. Ct. at 1619.

*Second*, SB 707 "singles out arbitration" agreements for "unequal treatment." *Chamber of Commerce of the U.S. v. Becerra*, 2020 WL 605877, at *10–11 (E.D. Cal. Feb. 7, 2020).  "[O]n its face," *Kindred*, 137 S. Ct. at 1426, SB 707 applies *only* to arbitration agreements, and provides that *only* the "drafting party" is "in material breach" of the agreement if it fails to pay certain arbitration fees "within 30 days after the due date," Cal. Code Civ. Proc. § 1281.97(a).  In other words, SB 707 permits a non-drafting party to enforce the agreement *any time* the drafting party refuses to pay arbitration fees, even if the non-drafting party is itself in breach of the agreement, and regardless of the reason for nonpayment (including if the drafting party refuses to pay because of the non-drafting party's breach).  Allowing breaching non-drafting parties to arbitration agreements—and no other type of agreement—to enforce the agreement contravenes the "bedrock principle of California contract law" that "he who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005).

SB 707 also "fails to put arbitration agreements on an equal plane with other contracts" by conditioning a drafting party's ability to enforce its agreement on its continued payment of arbitration fees, even if the non-drafting party is in material breach of the agreement. *Kindred*, 137 S. Ct. at 1423–24.  Under ordinary contract law, a drafting party would be "discharged from its duty to perform under the contract" if the other party is in material breach, *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011)—

meaning that it would ordinarily not have to continue paying fees to enforce the agreement against the breaching party.  SB 707 thus subjects arbitration agreements "to uncommon barriers" by requiring the drafting party of an arbitration agreement—and no other type of agreement—to continue performing just to enforce its agreement, or risk having the agreement invalidated.  *Kindred*, 137 S. Ct. at 1427.

Furthermore, SB 707 "singles out arbitration agreements for disfavored treatment" by imposing significant penalties on parties deemed to be in material breach, *Kindred*, 137 S. Ct. at 1425 (2017), including "monetary sanction[s]" and non-monetary sanctions such as "eviden[tiary] sanction[s]," "terminating sanction[s]," or even a "contempt sanction," Cal. Code Civ. Proc. § 1281.99(a)–(b).  These penalties far exceed those available for an ordinary breach of contract under state law, and will "have a deterrent effect on [companies'] use of arbitration agreements given the [significant] sanctions associated with violating the law."  *Chamber of Commerce*, 2020 WL 605877, at \*13 (enjoining AB 51 as preempted by the FAA on the same grounds).

SB 707's legislative history confirms that the statute was in fact *designed* to discourage the use of arbitration agreements.  According to the California Assembly Committee on the Judiciary, SB 707 was enacted to "add some modicum of fairness" to arbitration, which the Committee described as a "controversial form of alternative dispute resolution" that gives businesses "significant advantages."  Cal. Assemb. Jud. Comm., SB 707 at 1, 7 (June 18, 2019), https://tinyurl.com/y8zburq8.  Bill sponsors and co-authors repeatedly explained that the intent behind SB 707 was to "reform . . . [a] rigid arbitration process,"[7] which, in their view, "overwhelmingly favors employers over employees."[8]  Indeed, in its report on SB 707, the Assembly Committee on the Judiciary

---

[7]  Press Release, Sen. Bob Wieckowski, "SB 707 assists California workers, consumers when companies withhold payment to delay arbitration" (June 18, 2019), https://tinyurl.com/ycq469rc.

[8]  Press Release, Sen. Bob Wieckowski, "After forcing workers and consumers into forced arbitration, companies are delaying hearings, leaving victims with no avenue for justice" (Apr. 23, 2019), https://tinyurl.com/ycmj6lqm; *see also* Press Release, Sen. Bob

explicitly encouraged "drafting parties [to] *reconsider their liberal use of binding arbitration provisions in contracts*."  Cal. Assemb. Jud. Comm., *supra*, at 4 (emphasis added).

The 2020 Cross-Petitioners make little effort to defend or explain the anti-arbitration purpose or effects of SB 707, stating only in a footnote that SB 707 is not preempted because it "helps enforce arbitration agreements rather than interfere with them."  Dkt. 44 at 25 n.11.  But in fact, for the reasons stated above, SB 707 would rewrite those contracts and *prevent* parties from enforcing them *as written*.  And on its face, SB 707 appears to permit a non-drafting party to an arbitration agreement to seek penalties even if the non-drafting party is *not a party* to an arbitration agreement.  Cal. Code Civ. Proc. § 1281.97(a).  For example, if a non-drafting party files an arbitration demand, and the drafting party refuses to pay arbitration filing fees based on a good-faith belief that it has no agreement to arbitrate with the non-drafting party, SB 707 still appears to allow the non-drafting party to seek monetary and/or non-monetary penalties within 30 days based on the drafting party's nonpayment.  Such is the case with hundreds of the 2020 Cross-Petitioners who are not bound by the Mutual Arbitration Provision.  Far from "help[ing] [to] enforce arbitration agreements," Dkt. 44 at 25 n.11, SB 707 rewrites arbitration agreements, actively discourages their use, and even creates rights for individuals who are not parties to such agreements to either arbitrate anyway or collect steep penalties.

Courts have been instructed to be wary of "new devices and formulas" that fail to put arbitration agreements on equal footing with other contracts.  *Epic Sys.*, 138 S. Ct. at 1623.  SB 707 is "just such a device," *id.*, and it is therefore preempted by the FAA.

**2.    SB 707 Violates the Federal and State Contracts Clauses**

---

Wieckowski, "Wieckowski, Hertzberg's SB 707 would stop companies from gaming the rules in arbitration" (Sept. 11, 2019), https://tinyurl.com/yah7cte7 ("It's bad enough that companies get away with forcing arbitration on consumers and workers," but SB 707 "will ensure that these cases don't become orphans in a system being gamed by big corporations").

SB 707 also violates the Contracts Clauses of the United States and California Constitutions, both of which prohibit the legislature from enacting a "law impairing the obligation of contracts." Cal. Const. art I, § 9; U.S. Const. art I, § 10, cl. 1.  To determine whether a statute violates the Contracts Clause, courts "appl[y] a two-step test."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  First, courts determine whether the statute has "operated as a substantial impairment of a contractual relationship."  *Id.* at 1821–22.  If there is substantial impairment, "the inquiry turns to . . . whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Id.* at 1822.  Both elements are satisfied here.

**<u>Substantial Impairment</u>.**  The substantial impairment inquiry has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992).  The first component is satisfied if there is an agreement regarding the specific terms at issue.  *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004).  Courts evaluating whether the impairment is substantial consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Sveen*, 138 S. Ct. at 1822.

Here, SB 707 substantially impairs Postmates' arbitration agreements—and, specifically, the requirement that *both* parties abide by their contractual obligations and pay their share of filing fees.  The Mutual Arbitration Provision provides that "Postmates and [courier] shall equally share filing fees and other similar and usual administrative costs, as are common to both court and administrative proceedings."  Modlin Decl. Ex. A, § 10B(vi)(2).  But SB 707 requires *only* Postmates to pay its share of the arbitration fees—even if the courier materially breaches the contract by filing an arbitration demand in contravention of the agreement's individual arbitration mandate, failing to pay its share of the fees, or otherwise.  SB 707 forgives a courier's noncompliance with the parties' agreement, yet requires Postmates to continue performing under the contract

even if the courier has already materially breached. *See* Cal. Code Civ. Proc. § 1281.97(a). SB 707 thus "defeats the expectations of the parties," *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003), both of which entered into the agreement expecting that one party's material breach would excuse the other's continued performance, *Dillard's*, 430 F.3d at 1010; *Grimes*, 192 Cal. App. 4th at 277.

**"Appropriate" and "Reasonable" Tailoring.** SB 707 also is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, 138 S. Ct at 1822. The law purports to ensure that drafting parties pay arbitration fees when individuals "have been *forced* to submit to *mandatory* arbitration" as a condition of employment. Cal. Sen. Rules Comm., Off. of Sen. Floor Analyses, Third Reading of Sen. Bill No. 707, 2019–2020 Reg. Sess., at 4 (2019) (emphases added); Cal. Off. of Legis. Couns., SB 707, Legislative Counsel's Digest, Chapt. 870, at 3 (2019). But targeting and disfavoring arbitration agreements is not a legitimate purpose; it is an *illegal* purpose that violates clearly established federal law. *See Kindred*, 137 S. Ct. at 1427. In addition, SB 707's text goes much further than its stated purpose: it applies to *all* arbitration agreements, including those (like the Fleet Agreement) that do not impose "mandatory" arbitration. Cross-Petitioners do not dispute that every courier may opt out of arbitration by submitting an opt out request within 30 days of signing the Fleet Agreement, Dkt. 46 ¶ 7, and, ironically, 25 Cross-Petitioners *have* opted out. Sunga Decl. ¶ 6. That SB 707 reaches *all* arbitration agreements, not just mandatory ones, further demonstrates that the law was enacted to discourage the use of arbitration agreements altogether. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 243 (1978) ("Even where the public welfare is invoked as an excuse," contracts "cannot be cut down without moderation or in a spirit of oppression").

The 2020 Cross-Petitioners' request for fees and costs under SB 707 should be denied.

## IV. CONCLUSION

The Court should deny Cross-Petitioners' Motion to Compel Arbitration.

Dated:  June 29, 2020

THEANE EVANGELIS
DHANANJAY S. MANTHRIPRAGADA
MICHELE L. MARYOTT
SHAUN A. MATHUR
GIBSON, DUNN & CRUTCHER LLP

By:  /s/ *Theane Evangelis*
Theane Evangelis

Attorneys for Plaintiff POSTMATES INC.