Aaron Zigler (#327318)
 amz@kellerlenkner.com
Ashley Keller (*pro hac vice*)
 ack@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

Warren Postman (*pro hac vice*)
 wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

Keith A. Custis (#218818)
 kcustis@custislawpc.com
CUSTIS LAW, P.C.
1999 Avenue of the Stars
Suite 1100
Los Angeles, California 90067
(213) 863-4276

*Attorneys for Defendants/Cross-Petitioners*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POSTMATES INC., | ) Case No: 2:20-cv-02783-PSG |
| *Plaintiff,* | ) |
| vs. | ) **DEFENDANTS' ANSWER TO** |
| | ) **SECOND AMENDED** |
| | ) **COMPLAINT FOR** |
| 10,356 INDIVIDUALS, | ) **DECLARATORY AND** |
| | ) **INJUNCTIVE RELIEF** |
| *Defendants.* | ) |
| | ) |
| GREENWOOD, et al., | ) |
| *Cross-Petitioners,* | ) |
| vs. | ) |
| POSTMATES INC., | ) |
| *Cross-Respondent.* | ) |

## **INTRODUCTION**

1.      Postmates brings this lawsuit to enforce its contracts with independent couriers to resolve their disputes in individual arbitration, free from interference by preempted and unconstitutional state laws that impermissibly target arbitration agreements for unfavorable treatment.

**Answer:** Defendants admit they are individuals whom Postmates has sued in this action. The remainder of this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

2.      Every independent courier who wishes to access the Postmates platform and begin receiving delivery opportunities must accept Postmates' Fleet Agreement. The Fleet Agreement governs the parties' relationship, and contains a Mutual Arbitration Provision that requires couriers to resolve all disputes with Postmates in individual arbitration. Couriers are free to opt out of the Mutual Arbitration Provision, but those who do not opt out expressly agree to waive their right to resolve disputes as a class, collective, or in any other non-individualized manner. Indeed, the Mutual Arbitration Provision explicitly states that all disputes must be resolved in individual arbitration.

**Answer:** Defendants lack sufficient personal information and knowledge to answer allegations regarding whether "[e]very independent courier who wishes to access the Postmates platform and begin" making deliveries "must accept Postmates' Fleet Agreement." Defendants admit that they have asserted claims in individual arbitration against Postmates under the Fleet Agreement. Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement. Defendants deny all remaining allegations.

3.     Defendants are 10,356 individuals who assert that they have used the Postmates platform, and that they have been misclassified as independent contractors rather than employees. Defendants contend that they have executed the Fleet Agreement, that that they have not opted out of the Mutual Arbitration Provision, and that their claims fall within the scope of the Mutual Arbitration Provision.

**Answer:** Defendants admit they are 10,356 individuals who have asserted misclassification claims against Postmates in individual demands for arbitration that they filed with the AAA pursuant to the Fleet Agreement. Defendants deny all remaining allegations.

4.     But instead of attempting to resolve their disputes individually according to the Mutual Arbitration Provision's individual arbitration requirement, Defendants have sought to circumvent it by coordinating with each other and collectively filing thousands of boilerplate arbitration demands in the same transaction, and then insisting that all the arbitrations move in lockstep, that all arbitration filing fees be paid up front, and that all the arbitrations be administered together and proceed at the same time.

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement. Defendants deny that they have sought to circumvent the Fleet Agreement. Defendants deny all remaining allegations.

5.     All 10,356 Defendants purportedly retained Keller Lenkner LLC as their counsel for the purpose of filing an arbitration demand against Postmates alleging misclassification-based minimum wage and overtime claims. Upon information and belief, individual Defendants retained Keller Lenkner at various times throughout the last 18 months or so. For instance, to support claims for failure to provide "employment records," 183 Defendants requested such records through Keller

2

Lenkner on March 28, 2019, another 2,107 requested similar records on July 9, 2019, another 829 requested records on August 12, 2019, and another 4,144 requested records on October 3, 2019. But instead of filing individual arbitration demands upon retaining counsel or individually at some other time, all 10,356 individuals waited to aggregate their near- identical claims together in a single, collective filing.

**Answer:** Defendants admit they retained Keller Lenkner LLC and that they each did not retain Keller Lenkner LLC on the same day. Defendants admit that they each have requested records, including employment records, starting on March 28, 2019 and continuing on July 9, 2019, August 12, 2019, October 3, 2019, and February 19, 2019, with each defendant having requested their employment records at least once on one of those dates. Defendants deny all remaining allegations in this paragraph.

6.     On Saturday, February 15, 2020, Defendants initiated a single arbitration proceeding against Postmates by submitting 10,356 boilerplate arbitration demands to the American Arbitration Association ("AAA") at the same time and, upon information and belief, in the same transaction (the "AAA Arbitration").

**Answer:** Defendants admit they each filed a demand for individual arbitration with AAA on February 15, 2020 in single email sent by Defendants' counsel. Defendants deny all remaining allegations in this paragraph.

7.     Defendants' counsel then sent Postmates a single email that contained a link to 10,356 virtually identical arbitration demands alleging generic claims under federal, state, and local law. The demands provide no individualized information about the work the individuals purportedly performed while using the Postmates platform. Based on Postmates' investigation to date and the information provided to Postmates by Defendants and their counsel, thousands of these demands are patently invalid—but Defendants nonetheless lumped them together as part of this non-individualized action. For example, according to Postmates' records, at least 696 Defendants have no right to arbitration—at least 657 Defendants never signed up to

use the Postmates platform at all, at least 4 Defendants started to sign up to use the Postmates platform but never accepted the Fleet Agreement, and at least 35 Defendants opted out of the Mutual Arbitration Provision. Exs. B–D. Moreover, an additional 607 Defendants have no viable claims—at least 453 Defendants never completed a single delivery using the Postmates platform, and at least 154 Defendants released their claims in a prior settlement. Exs. E–F. In total, at least 1,303 Defendants do not have any viable or arbitrable claims at all. Further, approximately 671 Defendants have filed arbitration demands asserting misclassification-based claims against Postmates through counsel separate from Keller Lenkner, raising questions as to who actually represents these individuals, and whether these Defendants are seeking to recover twice on the same claims through non- individualized arbitration filings. Ex. G.

**Answer:** Defendants admit they filed 10,356 individual arbitration demands against Postmates. Defendants state that the demands for arbitration speak for themselves, and incorporate by reference an example demand for arbitration, which is attached as Exhibit WP0014–15 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations inconsistent with the demands for arbitration. Defendants lack sufficient knowledge and information to answer the remaining allegations in this paragraph regarding what Postmates's records show.

8.   Over a week later, on February 24, 2020, AAA notified Postmates that 10,356 arbitration demands had been filed against it, and began collectively administering the demands on a non-individualized basis. AAA titled the action "*10,356 Individuals v. Postmates, Inc.*," and collectively assessed, in a single invoice, over $4 million in initial administrative filing fees under its "Group Administrative Filing Fee Schedule" (as opposed to its fee schedule for truly individual arbitrations). AAA assessed $3,048,000 in fees relating to the 7,620 individuals purportedly subject to the 2019 version of the Fleet Agreement, and $1,641,600 in fees relating to the 2,736 individuals purportedly subject to the 2017 and 2018 versions of the

1   Fleet Agreement. AAA also stated that it would "close the parties' cases" unless all
2   payment for all demands is "received by April 15, 2020." AAA further "note[d] that
3   these matters are subject to California Code of Civil Procedure 1281.97 and
4   1281.98," otherwise known as "SB 707."

5         **Answer:** Defendants state that the quoted email speaks for itself, and
6   incorporate by reference a true and correct copy of the email, attached as Exhibit A,
7   pages 1–2, to this Answer. Defendants deny any allegations to the extent they are
8   inconsistent with the text of that email. Defendants further state that AAA's rules and
9   fee schedules speak for themselves, and incorporate by reference AAA's Commercial
10  Rules (available at https://kl.link/2XlxHks) and AAA's Employment/Workplace Fee
11  Schedule (available at https://kl.link/3cpkr2H). Defendants deny any allegations to
12  the extent they are inconsistent with AAA's Commercial Rules and
13  Employment/Workplace Fee Schedule. Defendants state that the text of SB 707
14  speaks for itself. Defendants deny any allegations to the extent they are inconsistent
15  with the text of that provision.

16        9.    After AAA commenced administration of the matters, Defendants
17  continued to prosecute their claims as a group rather than individually. Defendants
18  insisted that arbitration filing fees for all 10,356 demands be paid up front, that all
19  arbitrations be administered together, and that all arbitrations proceed in lockstep at
20  the exact same time. Defendants also specifically requested that AAA assign multiple
21  arbitrations to a single arbitrator, contrary to the terms of the Mutual Arbitration
22  Provision and AAA's rules.

23        **Answer:** Defendants state that the correspondence between the parties and
24  AAA regarding the administration of Defendants' arbitrations speaks for itself, and
25  incorporate by reference a true and correct copy of that correspondence, attached as
26  Exhibit A and B to this Answer. Defendants deny any allegations to the extent they
27  are inconsistent with the text of that email.

28        10.   AAA declined to assign multiple arbitrations to a single arbitrator, but

it continued to communicate with all 10,357 parties through a single email chain, held consolidated telephonic conferences, and simultaneously rejected Postmates' request that the matters be temporarily stayed for 60 days after Postmates initiated this lawsuit. And AAA closed 10,256 demands at the same time in a single transaction.

**Answer:** Defendants state that the correspondence between the parties and AAA regarding the administration of Defendants' arbitration speaks for itself, and incorporate by reference a true and correct copy of that correspondence, attached as Exhibit A and B to this Answer. Defendants deny any allegations to the extent they are inconsistent with the text of that email.

11.     "[A]rbitration is a matter of contract," *AT&T Techs., Inc. v. Comm's Workers of Am.*, 475 U.S. 643, 648 (1986), so "federal courts [must] enforce arbitration agreements according to their terms—including terms providing for individualized proceedings," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018). The Supreme Court has recognized that individual arbitration offers many benefits, "not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved." *Id*. at 1621, 1623. Where, as here, parties have agreed to resolve disputes in individual arbitration, courts may not compel them to arbitrate in any other manner that "interferes with [the] fundamental attributes" of "the individualized form of arbitration envisioned by the" Federal Arbitration Act ("AAA") "in the absence of the parties' consent." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416, 1418 (2019).

**Answer:** Defendants state that the text in the quoted cases speaks for itself. The remaining allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

12.     The Mutual Arbitration Provision expressly provides "that any and all disputes or claims" between the contracting parties shall be "resolved" only "in

6

1   individual arbitration," yet Defendants have sought to arbitrate in a manner that

2   violates the individual arbitration requirement. Their so-called "mass arbitration"

3   tactic "fundamental[ly] differ[s]" from the "individualized form of arbitration

4   envisioned by the FAA" and the Mutual Arbitration Provision, *Lamps Plus*, 139 S.

5   Ct. at 1416, and "interferes with [the] fundamental attributes of arbitration and thus

6   creates a scheme inconsistent with the FAA," *AT&T Mobility LLC v. Concepcion*,

7   563 U.S. 333, 344, 346 (2011). Like class arbitration, Defendants' chosen manner of

8   arbitration "makes the [arbitration] process slower" and "more costly" than

9   individual arbitration, as the number of demands Defendants collectively and

10  simultaneously filed far exceeds AAA's capacity; "requires procedural formality"

11  that is unnecessary in individual arbitration, as evidenced by the fact that numerous

12  arbitration providers (including AAA) have rolled out new protocols and procedures

13  in an attempt to address the inefficiencies and increased costs generated by

14  Defendants' mass arbitration tactic; and "greatly increases risks to [Postmates]" by

15  imposing "pressure[]" on Postmates to "settl[e] questionable"—and outright

16  frivolous—"claims" on behalf of individuals who never entered into a contractual

17  relationship with Postmates, who never completed any deliveries on the platform,

18  who already released their claims in a prior settlement, and/or opted out of the Mutual

19  Arbitration Provision. *Id.* at 348–50.

20  **Answer:** Defendants state that the text in the quoted case speaks for itself.

21  Defendants state the text of the Mutual Arbitration Agreement speaks for itself.

22  Defendants deny any allegations to the extent they are inconsistent with the text of

23  the Mutual Arbitration Agreement. Defendants admit that some arbitration forums

24  have created new protocols and procedures for when multiple claimants file demands

25  for arbitration against the same respondent. Defendants state the text of those new

26  protocols and procedures speaks for itself. Defendants deny any allegations to the

27  extent they are inconsistent with the text of those protocols and procedures.

28  Defendants lack sufficient information and knowledge to answer the allegation

regarding the motivations of the various arbitration forums that devised these new protocols and procedures. The remaining allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

13.     Neither Postmates nor any individual Defendant ever agreed to resolve disputes in this manner. In fact, mass arbitrations did not even exist at the time the Mutual Arbitration Provision was drafted, and thus there could not have been a meeting of the minds that arbitrations could or would proceed in this manner.

**Answer:** Defendants deny the allegations in this paragraph.

14.     Because courts may not compel parties to arbitrate in any manner other than the manner provided for in the arbitration agreement, 9 U.S.C. § 4, Postmates respectfully requests that the Court enter declaratory judgment that Postmates may not be compelled to arbitrate Defendants' claims in the non-individualized manner in which they have sought to arbitrate, and enjoin Defendants from proceeding with the AAA Arbitration.

**Answer:** The allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

15.     The Court also should enjoin Defendants from enforcing SB 707 against Postmates because SB 707 is preempted by the FAA and unconstitutional under the federal and state contracts clauses.

**Answer:** The allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

16.     SB 707 applies only to arbitration agreements and penalizes only drafting parties of such agreements. It states that a drafting party's failure to pay arbitration fees—either the initial fees or any other fees that come due during arbitration—"within 30 days after the due date" is "in material breach of the

arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration." Cal. Code Civ. Proc. §§ 1281.97(a), 1281.98(a). And it provides that a party who drafts an arbitration agreement places itself at risk of severe punishment by courts—including evidentiary sanctions, case terminating sanctions, and even contempt sanctions—for failing to pay these fees, irrespective of the amount of the unpaid fee, the extent of the delay in paying, or even the reason for the nonpayment.

**Answer:** Defendants state that the text of SB 707 speaks for itself. The remainder of this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

17.   By its terms, SB 707 even applies when a drafting party declines to pay arbitration fees in response to an arbitration demand filed by an individual who never entered into an arbitration agreement with the drafting party at all. Here, that means SB 707 essentially creates contractual rights for the approximately 696 Defendants who never entered into an arbitration agreement with Postmates—forcing Postmates to either pay over a million dollars in administrative filing fees that it does not owe, or face an array of sanctions under SB 707 if it does not pay the arbitration fees demanded by AAA.

**Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants lack sufficient information and knowledge to answer the allegation regarding whether what Postmates's records show. The remainder of this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

18.   SB 707 is preempted by the FAA because it is motivated by animus toward individual arbitration as a manner of dispute resolution, and stands as an obstacle to the FAA's objectives. The California Legislature enacted SB 707 to, according to the California Assembly Committee on the Judiciary, "add some modicum of fairness" to arbitration proceedings, which the Committee described as

1  a "controversial form of alternative dispute resolution" that gives businesses
2  "significant advantages." California Assembly Committee on Judiciary, June 18,
3  2019 Analysis at 1, 7 ("Judiciary Committee Analysis"). There is no question that
4  the Legislature intended to discourage the use of arbitration agreements by
5  companies. Indeed, the Assembly Committee on the Judiciary explicitly encouraged
6  "drafting parties [to] reconsider their liberal use of binding arbitration provisions in
7  contracts." *Id*. at 4.

8      **Answer**: Defendants state that the text of the California Assembly Committee
9  on the Judiciary Analysis speaks for itself. Defendants deny any allegations to the
10 extent they are inconsistent with the text of the California Assembly committee on
11 the Judiciary analysis.

12     19.   SB 707 directly targets and discourages the drafting of arbitration
13 agreements by engrafting onto arbitration agreements—and no other type of
14 contract—a highly restrictive and onerous definition of material breach applicable to
15 only one party of bilateral arbitration contracts, and then punishes that breach by
16 mandating cost- and fee-shifting and permitting default, sanctions, waiver of
17 arbitration, and even contempt of court without any opportunity to justify the breach
18 or argue its non-materiality. SB 707 singles out drafting parties of arbitration
19 agreements for unequal treatment by conditioning a drafting party's ability to enforce
20 an arbitration agreement on its continued payment of arbitration fees (i.e., its
21 continued performance under the contract), even if the non-drafting party has
22 materially breached the arbitration agreement by, for example, seeking to arbitrate in
23 a contractually forbidden manner. And it permits a non-drafting party who has
24 breached an arbitration agreement to nevertheless enforce the agreement.

25     **Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants
26 deny any allegations to the extent they are inconsistent with the text of SB 707. The
27 remainder of this paragraph consists of legal conclusions to which no response is
28 required. To the extent a response is required, Defendants deny all remaining

allegations.

20.    SB 707 also violates the United States and California Constitutions' Contracts Clauses. By rewriting the parties' contracts, such that only *one* party's failure to pay filing fees constitutes a material breach, SB 707 substantially impairs the parties' expectations that *both* parties be required to comply with the Mutual Arbitration Provision before seeking to enforce it. Furthermore, SB 707 is neither an appropriate nor reasonable way to achieve a legitimate public purpose. SB 707 purports to ensure that parties to *mandatory* arbitration agreements pay their arbitration filing fees.[1] But by its terms, SB 707 is both overinclusive and underinclusive. It is overinclusive because it applies to all arbitration agreements, including those that are not mandatory because they allow parties to opt out of arbitration. And it is underinclusive because it applies only to drafting parties, and does not punish non-drafting parties for not paying their arbitration filing fees.

**Answer:** Defendants state that the text of the United States and California Constitutions and SB 707 speaks for itself. Defendants state that the text of the legislative history of SB 707 cited in footnote one also speaks for itself. Defendants deny any allegations to the extent they are inconsistent with those texts. The remainder of this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations, including those in footnote one.

21.    Accordingly, Postmates respectfully requests that the Court enter declaratory judgment that Postmates cannot be compelled to arbitrate the parties' disputes in a non-individualized manner, that SB 707 is preempted by the FAA, and that SB 707 is unconstitutional. Postmates also requests that the Court enjoin

---

[1] *See* California Legislative Information, SB-707 Arbitration Agreements: enforcement, 6/19/19 - Assembly Floor Analysis, https://tinyurl.com/vb34m7g (last visited Apr. 2, 2020) (explaining that SB 707 is meant to protect "individuals who have been forced to submit to *mandatory* arbitration" (emphasis added)); *see also* Judiciary Committee Analysis at 7 (same).

1  Defendants from pursuing the AAA Arbitration and enforcing SB 707 against
2  Postmates.

3      **Answer:** The allegations in this paragraph are legal conclusions to which no
4  response is required. To the extent a response is required, Defendants deny all
5  remaining allegations.

6                                **THE PARTIES**

7      22.    Plaintiff Postmates is a corporation organized under the laws of the State
8  of Delaware, with its principal office located in San Francisco, California. Postmates
9  operates an online marketplace and mobile platform, through which consumers
10 connect with local merchants and (if consumers request delivery) independent
11 couriers to facilitate the purchase, fulfillment, and (when applicable) local delivery
12 of purchased products from merchants to customers.

13     **Answer:** Defendants admit that "Postmates is a corporation organized under
14 the laws of the State of Delaware, with its principal office located in San Francisco,
15 California." Defendants admit that as part of Postmates's delivery business it
16 operates an online and mobile-app based platform, through which customers can
17 purchase products from merchants and through which Defendants carry out any
18 requested deliveries. Defendants deny the remaining allegations in this paragraph.

19     23.    Defendants are 10,356 individuals who assert that they executed the
20 Fleet Agreement, that they agreed to and did not opt out of the Fleet Agreement's
21 Mutual Arbitration Provision, that their claims fall within the scope of the Mutual
22 Arbitration Provision, and that they used Postmates' platform to identify delivery
23 opportunities and make deliveries in California. All 10,356 individuals are
24 purportedly represented by Keller Lenkner. Details for each of the 10,356 individuals
25 are listed at Exhibit A.

26     **Answer:** Defendants admit they 10,356 individuals who have retained Keller
27 Lenkner and asserted misclassification claims against Postmates in individual
28 demands for arbitration that they filed with the AAA pursuant to the Fleet Agreement.

1    Defendants deny all remaining allegations.

2                            **JURISDICTION AND VENUE**

3        24.    This civil action arises under the United States Constitution, 9 U.S.C. §

4    1 *et seq.*, 28 U.S.C. § 2201, and 29 U.S.C. §§ 206, 207.

5        **Answer:** The allegations in this paragraph are legal conclusions to which no

6    response is required.

7        25.    This Court has subject matter jurisdiction over this action pursuant to 9

8    U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1367 because the underlying controversy

9    involves claims arising under federal law.

10       **Answer:** The allegations in this paragraph are legal conclusions to which no

11   response is required.

12       26.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well

13   as Federal Rule of Civil Procedure 57.

14       **Answer:** The allegations in this paragraph are legal conclusions to which no

15   response is required.

16       27.    Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

17       **Answer:** The allegations in this paragraph are legal conclusions to which no

18   response is required.

19       28.    Venue is proper in this district under 28 U.S.C. § 1391(b).

20       **Answer:** The allegations in this paragraph are legal conclusions to which no

21   response is required.

22       29.    Joinder is proper under Federal Rule of Civil Procedure 20(a) because

23   the 10,356 Defendants have filed non-individual arbitration demands against

24   Postmates in a single transaction or occurrence.

25       **Answer:** The allegations in this paragraph are legal conclusions to which no

26   response is required.

27       30.    This Court has personal jurisdiction over the 10,356 individuals because

28   they are domiciled in California and/or claim to have used the Postmates platform in

1   California.

2        **Answer:** Defendants admit that this Court has personal jurisdiction.

3   **FACTS**

4   **A.    Postmates' Platform Connects Consumers, Merchants, And Couriers.**

5        31.    Postmates' innovative online marketplace and mobile platform connects

6   consumers and merchants to facilitate the purchase, fulfillment, and (when

7   applicable) local delivery of goods from merchants to consumers. When consumers

8   place orders through Postmates' platform, they can decide whether to pick up an

9   order in person or have it locally delivered. If consumers choose delivery, nearby

10   independent couriers receive a notification through the app and can choose whether

11   to accept the consumer's offer and pick up and complete the requested delivery.

12        **Answer:** Defendants admit that as part of Postmates's delivery business it

13   operates an online and mobile-app based platform, through which customers can

14   purchase products from merchants and through which Defendants carry out any

15   requested deliveries. Defendants deny they are "independent" couriers and deny that

16   they can freely decide whether to accept a consumer's offer. Defendants lack

17   sufficient knowledge and information to answer the remaining allegations in this

18   paragraph.

19        32.    The service that Postmates provides is access to its app. Postmates is not

20   a delivery company and does not hire delivery persons; it creates technology and

21   operates an online marketplace and mobile platform. Postmates has about 1,200

22   actual employees. These employees are dedicated to sales, engineering, analytics,

23   strategy, design, support (of consumers, merchants, and couriers who use the

24   platform), and other functions.

25        **Answer:** Defendants lack sufficient information and knowledge to answer the

26   allegation regarding whether certain Postmates employees "are dedicated to sales,

27   engineering analytics, strategy, design, support (of consumers, merchants, and

28   couriers who use the platform), and other functions." Defendants deny all remaining

allegations in this paragraph.

**B.    Under the Fleet Agreement, Couriers Agree to Resolve Disputes in Individual Arbitration.**

33.    Anyone can sign up to be a courier, and all new couriers must accept Postmates' Fleet Agreement before they may access the Postmates platform to receive delivery opportunities. The Fleet Agreement governs the relationship between Postmates and independent contractor couriers. It expressly provides that couriers are independent contractors and contains a conspicuous Mutual Arbitration Provision, which couriers may opt out of if they choose. *See Lee v. Postmates Inc.*, 2018 WL 6605659, at *6 (N.D. Cal. Dec. 17, 2018) (Postmates' Fleet Agreement provides reasonable notice of the Mutual Arbitration Provision).

**Answer:** Defendants lack sufficient personal information and knowledge to answer allegations regarding whether "[a]nyone can sign up to be a courier," "all new couriers must accept Postmates's Fleet Agreement," and the "Fleet Agreement governs the relationship between Postmates" and all couriers. Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

34.    Arbitration is not a mandatory condition of couriers' contractual relationship with Postmates, as couriers may opt out of the Mutual Arbitration Provision by submitting an opt-out notice within thirty days of accepting the Fleet Agreement. The Fleet Agreement expressly states that "[a]rbitration is not a mandatory condition of [couriers'] contractual relationship with Postmates, and therefore [couriers] may opt out of this Mutual Arbitration Provision." May 11, 2019 Fleet Agreement § 10B(ix). The Mutual Arbitration Provision states that a courier who opts out of arbitration will not be subject to any adverse action as a result of that decision.

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

35.     Couriers who accept the Fleet Agreement and do not exercise their right to opt out of the Mutual Arbitration Provision agree to resolve any disputes with Postmates in individual arbitration. In fact, the first page of the Fleet Agreement states in all-caps text that "unless [couriers] opt out of arbitration," they must resolve disputes "on an individual basis" through "final and binding arbitration."

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

36.     The "Mutual Arbitration Provision is governed exclusively by the Federal Arbitration Act (9 U.S.C. §§ 1–16)." May 11, 2019 Fleet Agreement § 10A(i).

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants admit the Fleet Agreement is governed by the FAA. Defendants deny it is governed exclusively by the FAA. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

37.     The Mutual Arbitration Provision contains an express Class Action Waiver and Representative Action Waiver. The Class Action Waiver states:

**CLASS ACTION WAIVER—PLEASE READ**. Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in *individual arbitration*. The Parties further agree that

> by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a class and/or collective action, or to participate in any class and/or collective action, and an arbitrator shall not have any authority to hear or arbitrate any class and/or collective action ("Class Action Waiver").

*Id.* § 10B(ii) (emphasis added).

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5.

38.    The Mutual Arbitration Provision also contains a delegation clause and an express carve out for all disputes relating to or arising out of the Class Action Waiver, including its individual arbitration requirement. The delegation clause provides that:

> Only an arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision, including without limitation any dispute concerning arbitrability. However, as stated in Section 10B.iv below, *the preceding clause shall not apply to <u>any dispute</u> relating to or arising out of the Class Action Waiver and Representative Action Waiver*, which must proceed in a court of competent jurisdiction and cannot be heard or arbitrated by an arbitrator.

*Id.* § 10A(ii) (emphasis added).

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

39.    Section 10B(iv) of the Fleet Agreement provides that:

> [A]ny claim that all or part of this Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, void, or voidable shall be determined only by a court of competent jurisdiction and not by an arbitrator. As stated above, all other disputes regarding interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision shall be determined exclusively by an arbitrator.

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5.

40.     Thus, an arbitrator must resolve all disputes relating to the interpretation, applicability, enforceability, or formation of the Mutual Arbitration Provision, except that a court must resolve all disputes relating to the Class Action Waiver and Representative Action Waiver—including claims alleging that either waiver is unenforceable, unconscionable, void, or voidable. Consistent with the plain language of the delegation clause, Postmates' intent at the time of drafting was that all disputes relating to or arising out of the Class Action Waiver—including whether a courier sought to arbitrate in a manner that violates the Class Action Waiver's individual arbitration requirement—would be resolved by a court, not an arbitrator.

**Answer:** Defendants lack sufficient information and knowledge to answer the allegation regarding Postmates's intent at the time of drafting. The remaining allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

41.     Defendants contend that they signed the Fleet Agreement and are bound to arbitrate with Postmates on an individual basis.

**Answer:** Defendants admit the allegations in this paragraph.

42.     The Mutual Arbitration Provision provides that Postmates and couriers "shall equally share filing fees and other similar and usual administrative costs, as are common to both court and administrative proceedings." *Id.* § 10B(vi).

**Answer:** Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

43.     Postmates and couriers have used the arbitration procedures set forth in

1  the Fleet Agreement to resolve numerous disputes, and Postmates is currently
2  engaged in at least 90 arbitrations under the Fleet Agreement.

3      **Answer:** Keller Lenkner LLC is counsel for approximately 150 Postmates
4  couriers currently proceeding in arbitrations before the AAA under the Fleet
5  Agreement. Defendants lack sufficient knowledge and information to answer the
6  remaining allegations in this paragraph.

7  **C.   Claimants Begin Pursuing A New Tactic for Arbitrating in A De Facto**
8      **Class Manner.**

9      44.   In response to the recent wave of Supreme Court decisions affirming the
10 enforceability of class action waivers in arbitration agreements, e.g., *Epic Sys. Corp.*
11 *v. Lewis*, 138 S. Ct. 1612 (2018), many putative arbitration claimants—including
12 Defendants—are now attempting to use arbitration agreements to coerce settlements
13 from defendants who are faced with massive filing fees generated by the collective
14 and simultaneous submission of thousands of generic arbitration demands.

15     **Answer:** Defendants admit that they, through their counsel, Keller Lenkner
16 LLC, have each sought to individually arbitrate their misclassification claims against
17 Postmates. Defendants lack sufficient knowledge and information to answer
18 allegations regarding other claimants' lawyers. Defendants deny all remaining
19 allegations.

20     45.   This scheme often begins with counsel using social media to
21 indiscriminately recruit workers who say they are bound by individual arbitration
22 agreements. *See In re: CenturyLink Sales Practices & Sec. Litig.*, 2020 WL 869980,
23 at *2 (D. Minn. Feb. 21, 2020). Rather than file individual arbitration demands upon
24 retaining counsel, claimants wait until their counsel has amassed a long list of clients
25 who claim to work for the same company. The claimants then threaten to
26 simultaneously file thousands of arbitration demands against the company—at a cost
27 of more than $2,000 per claimant to the company simply to initiate the proceeding—
28 unless the company agrees to a multi-million-dollar settlement resolving all

claimants' claims collectively, without any of the protections that typically accompany mass settlements. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–22 (1997); Cal. Labor Code § 2699(l).

**Answer:** Defendants admit that they, through their counsel, Keller Lenkner LLC, have each sought to individually arbitrate their misclassification claims against Postmates. Defendants state that the briefing in the *CenturyLink* matter speaks for itself, and includes briefs filed by both Defendants' counsel and counsel for the class representatives in that case, refuting CenturyLink's accusations. *See CenturyLink*, Dkts. 714, 726; *see also* Mem. of Law & Order, ECF No. 758. Defendants otherwise lack sufficient knowledge and information to answer allegations regarding other cases brought by other claimants against other companies. Defendants deny all remaining allegations.

46.    When the companies decline to submit to the claimants' demands, claimants simultaneously file thousands of generic arbitration demands and insist that they all be administered together and proceed at the exact same time. Although claimants proclaim that they each seek "individual" arbitration, they take steps to ensure that the demands are administered as a group for all practical purposes. For instance, Defendants' counsel has previously filed a single arbitration demand on behalf of thousands of claimants, attaching a spreadsheet of the claimants' names that is hundreds of pages long. The demand, which makes only boilerplate assertions on behalf of all "Claimants" (e.g., "Postmates frequently pays Claimants less" than "[t]he minimum wages in Los Angeles and San Francisco, which apply to most Claimants"), fails to describe the "nature of the claim[s]" or state "the amount involved" (AAA Commercial Arb. Rules, R-4(e)(iv))—preventing the company from evaluating whether any individual claimant has nonfrivolous claims, and whether the company should arbitrate on the merits, enter settlement discussions with the claimant, or allow a default judgment. AAA also assesses fees for all the demands in one lump sum in a single invoice, assigns a single administrator to oversee all the

demands, collectively discusses how they will proceed, and resolves all administrative disputes across the board.

**Answer:** Defendants admit that Defendants' counsel, on behalf of certain non-Defendant couriers, have a "single arbitration demand" applicable to "thousands of claimants," attaching a spreadsheet of the claimants' names that" was "hundreds of pages long." Defendants state the demand for arbitration speaks for itself, and incorporates by reference that demand for arbitration, which is attached as Exhibit B to the Declaration of Theane Evangelis ISO Postmates's *Ex Parte* Application for TRO, ECF No. 17-7. Defendants deny any allegations to the extent they are inconsistent with that demand for arbitration. Defendants admit that when multiple demands for arbitration are filed on the same day against the same defendant and alleging similar claims, AAA has assessed fees for all the demands in one lump sum, assigned a single administrator to oversee the initial administration of the arbitrations prior to being assigned to individual arbitrators, has collectively discussed how initial administration will proceed, and has resolved across the board threshold administrative disputes about how initial administration should proceed. Defendants deny all remaining allegations.

47. When Postmates drafted the Mutual Arbitration Provision of the Fleet Agreement, this mass arbitration tactic did not yet exist in its current form. Thus, Postmates neither contemplated nor agreed to arbitrate in this non-individualized manner. Instead, Postmates agreed only to resolve disputes with couriers "in *individual arbitration*." May 11, 2019 Fleet Agreement § 10B(ii) (emphasis added).

**Answer:** Defendants deny that so-called "mass arbitration" did not exist when Postmates drafted the Mutual Arbitration Provision. Most Defendants are subject to a Fleet Agreement version that Postmates drafted in May 2019, at which point Defendants' counsel had already pursued arbitration against Postmates on behalf of thousands of individuals. Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are

attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

**D.    Defendants Threaten to Commence Non-Individual Arbitration.**

48.    Certain Defendants began deploying their mass arbitration scheme against Postmates more than a year ago. On March 6, 2019, Defendants' counsel wrote to Postmates stating that it "represents more than 3,000" couriers in California and Illinois, and threatening to "proceed with every arbitration simultaneously" unless Postmates agreed to resolve the purported couriers' claims through some undefined, nonindividualized "alternative process." Defendants' counsel attached a list of purported clients—approximately 91 of whom are Defendants in this action—and two draft arbitration demands—one designed to collectively apply to each purported California claimant, and a second designed to collectively apply to each purported Illinois claimant. Counsel also posited that AAA likely would assess "more than $20 million" in "arbitration retainers and filing fees" alone if arbitrations commenced, and insisted that agreeing to "an alternative process" would be desirable because "roughly 500 additional drivers engage [the law firm] each week."

**Answer:** Defendants state that the March 2019 letter speaks for itself, and incorporate by reference the complete March 2019 letter, which is attached as Exhibit WP009 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations to the extent they are inconsistent with the text of the March 2019 letter. Defendants deny all remaining allegations.

49.    On March 28, 2019, 183 Defendants wrote to Postmates demanding that Postmates provide them with "access to . . . employment records" pursuant to California Labor Code § 226(b) and (c). Defendants submitted their request for employment records via a single email to Postmates' counsel, which attached a spreadsheet listing 5,000 purported couriers who purportedly have claims against Postmates. Postmates declined to provide the requested records because couriers are

independent contractors, not employees, and the requirements of Labor Code § 226(b) and (c) are therefore inapplicable.

**Answer**: Defendants state that the March 28, 2019 correspondence speaks for itself. Defendants deny any allegations to the extent they are inconsistent with the text of that correspondence. Defendants deny all remaining allegations.

50.    In April and May 2019, 5,693 individuals also represented by Defendants' counsel simultaneously filed arbitration demands against Postmates. The 183 Defendants sought "employment records" from Postmates in March 2019 could have filed arbitration demands at this time too but did not.

**Answer**: Defendants admit that "[i]n April and May 2019, 5,693 individuals also represented by Defendants' counsel simultaneously filed arbitration demands against Postmates." Defendants deny all remaining allegations in this paragraph.

51.    Most of the 5,693 individuals claimed to have used the Postmates app in California, but about 400 claimed to have used the app in Illinois. The California claimants alleged various federal, state, and local claims arising out of their alleged misclassification as independent contractors rather than employees. Like Defendants in this case, these claimants sought to commence arbitration in a manner other than the individual arbitration required under the Mutual Arbitration Provision. Postmates thus explained to AAA that no arbitration proceedings had actually begun, and requested that AAA assess administrative filing fees as cases are individually administered and prosecuted, rather than up front regardless of when the cases could actually proceed. AAA rejected Postmates' argument and request, and instead assessed over $11 million in filing fees against Postmates, due before even a single arbitration could proceed. Despite assessing all filing fees upfront, AAA never offered any assurance or explanation regarding whether or how it could simultaneously administer 5,693 arbitrations.

**Answer**: Defendants state the demands for arbitration speak for themselves. Defendants deny any allegations to the extent they are inconsistent with the demands

for arbitration. Defendants admit that Postmates sought to treat the individual non-parties' arbitration demands collectively, for purposes of entering into a payment plan with AAA. Defendants admit that AAA assessed more than $11 million in filing fees against Postmates before any of the arbitrations for the 5,693 individuals could proceed. Defendants deny all remaining allegations.

52.     In June 2019, 5,257 of the individuals alleging to be California couriers who previously submitted arbitration demands filed a petition to compel arbitration in federal court, seeking an order requiring Postmates to "pay all arbitration filing fees" associated with their demands. *Adams v. Postmates Inc.*, No. 3:19-cv-03042, Dkt. 1 (N.D. Cal. June 3, 2019). Postmates argued that the petitioners sought to compel arbitration in a manner that violated the individual arbitration requirement in the Mutual Arbitration Provision's Class Action Waiver, and filed a cross-motion to compel individual arbitrations. *Adams*, Dkt. 228.

**Answer**: Defendants state that the petition to compel arbitration and cross motion to compel arbitration in the *Adams* matter speak for themselves. Defendants deny any allegations to the extent they are inconsistent with those documents.

53.     On July 9, 2019, the 183 Defendants who had demanded employment records from Postmates renewed their request and added 2,107 Defendants to their request. They sent Postmates a single email restating their request for employment records, and added 3,609 names to the spreadsheet representing additional purported couriers for whom they were requesting records.

**Answer**: Defendants state that the July 9, 2019 correspondence speaks for itself. Defendants deny any allegations to the extent they are inconsistent with the text of the July 2019 letter. Defendants deny all remaining allegations.

54.     On August 12, 2019, the 2,290 Defendants who had demanded employment records from Postmates renewed their request and added 829 Defendants to their request. Again, they sent Postmates a single email asking for employment records, and attached a single spreadsheet. This spreadsheet listed

"9,180 California couriers to whom this email applies." Of the purported couriers listed in the spreadsheet, 3,119 are Defendants in this action.

**Answer**: Defendants state that the August 12, 2019 correspondence speaks for itself. Defendants deny any allegations to the extent they are inconsistent with the text of that correspondence. Defendants deny all remaining allegations.

55.   While *Adams* was pending, 200 of the individuals alleging to be Illinois couriers who previously submitted arbitration demands filed a petition to compel arbitration in the Northern District of Illinois, asserting that Postmates had failed to pay arbitration filing fees and seeking an order requiring Postmates to "pay all arbitration filing fees" associated with their demands. *McClenon v. Postmates Inc.*, No. 1:19-cv-06415, Dkt. 1 (N.D. Ill. Sept. 26, 2019). Postmates again argued that the petitioners improperly sought to compel non-individual arbitration, and filed a cross-motion to compel individual arbitration. *McClenon*, Dkt. 18.

**Answer**: Defendants state that the petition to compel arbitration and cross motion to compel arbitration in the *McClenon* matter speak for themselves. Defendants deny any allegations to the extent they are inconsistent with those documents.

56.   On September 24, 2019, 1,250 individuals also represented by Defendants' counsel filed another set of generic arbitration demands against Postmates, claiming to have performed delivery services using the Postmates app in California and Illinois. AAA eventually closed those cases. The 3,119 Defendants who had demanded employment records in August 2019 could have filed arbitration demands at this time, too, but did not.

**Answer**: Defendants admit that Defendants' counsel filed demands for arbitration on behalf of 1,250 individual non-Defendants to this action in September 2019, consisting of California and Illinois couriers. Defendants state that the California couriers' demands for arbitration speak for themselves, and incorporate by reference an example demand for arbitration, which is attached as Exhibit WP012–

1    13 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations to
2    the extent they are inconsistent with the demands for arbitration. Defendants admit
3    that "AAA eventually closed those cases." Defendants deny all remaining
4    allegations.

5         57.    On October 3, 2019, the 3,119 Defendants who had previously
6    requested employment records from Postmates renewed their request. Again, they
7    collectively sent Postmates a single email asking for employment records, and
8    attached a single spreadsheet. This spreadsheet listed "13,974 California couriers to
9    whom this e-mail applies." Of the individuals on the spreadsheet, 7,263 are
10   Defendants in this action.

11        **Answer:** Defendants state that the October 3, 2019 correspondence speaks for
12   itself. Defendants deny any allegations to the extent they are inconsistent with the
13   text of that correspondence. Defendants deny all remaining allegations.

14   **E.    Postmates and the *Adams* Claimants Commence Individual Arbitrations.**

15        58.    On October 22, 2019, the *Adams* court entered an order granting in part
16   and denying in part the parties' cross-motions to compel arbitration. *Adams*, Dkt.
17   253. The court ordered the parties to arbitrate "in accordance with the Mandatory
18   Arbitration Provision contained in the applicable Fleet Agreement," but it declined
19   to issue an order "compelling Postmates to pay outstanding and future arbitration
20   fees" or to order couriers "to refile their demands and to proceed in a specific
21   manner." *Id*. Postmates appealed that decision to the Ninth Circuit, and the matter is
22   now fully briefed. *Adams v. Postmates Inc.*, No. 19-17362.

23        **Answer:** Defendants state that the court's order in *Adams* speaks for itself.
24   Defendants deny any allegations to the extent they are inconsistent with the order in
25   *Adams*. Defendants admit that Postmates has appealed the *Adams* order to the Ninth
26   Circuit and that the matter is not fully briefed.

27        59.    The same day the *Adams* court issued its order, the *Adams* claimants
28   refiled 5,255 virtually identical arbitration demands. Of those claimants, 715 never

accepted the Fleet Agreement; another 480 did no work on Postmates' platform; and an additional 95 released their claims in the settlement approved in *Singer v. Postmates, Inc.*, No. 4:15-cv-01284-JSW, Dkt. 98 (N.D. Cal. Apr. 25, 2018). Moreover, multiple other law firms claim to represent about 586 of the *Adams* claimants in separate proceedings against Postmates. *See Rimler v. Postmates, Inc.*, No. CGC-18-567868 (S.F. Super. Ct. July 5, 2018). Two claimants represented by other counsel filed arbitration demands against Postmates more than a year ago, and those arbitrations have commenced. And a separate law firm informed Postmates that it represents 8,964 claimants—584 of whom are claimants in *Adams*, and 1,368 of whom appear on a client list that Keller Lenkner provided in October 2019.

**Answer**: Defendants admit that the *Adams* couriers reopened their demands for arbitration in light of the *Adams* order compelling arbitration. Defendants lack sufficient knowledge and information to answer allegations regarding other law firms that claim also to represent couriers represented by Defendants' counsel. Defendants deny all remaining allegations.

60.     Postmates proposed that 50 arbitrations proceed at a time on a rolling basis, but the *Adams* claimants insisted that Postmates pay all arbitration filing fees up front before even one arbitration could commence. The *Adams* claimants refused to permit even one arbitration to commence until the filing fees for all arbitrations were paid, arguing that they could not possibly choose which claimants' arbitrations should proceed and which should wait (even though AAA had never explained whether it could or how it would administer all 5,255 arbitrations simultaneously). Thus, the *Adams* claimants insisted that the 5,255 arbitration demands proceed all together or not at all. Postmates declined to pay filing fees because the *Adams* claimants refused to arbitrate individually in accordance with the terms of the Fleet Agreement.

**Answer:** Defendants admit that "Postmates proposed that 50 arbitrations proceed at a time on a rolling basis." Defendants admit that Postmates did not pay

1   the filing fees necessary to commence the *Adams* claimants' arbitrations beyond the
2   50 chosen arbitrations. Defendants deny all remaining allegations.

3        61.   On November 27, 2019, the *Adams* claimants filed a motion for an order
4   to show cause, arguing that Postmates should be held in civil contempt because it had
5   not paid filing fees for all 5,255 claimants—even though the court had expressly
6   declined to order Postmates to do so. *Adams*, Dkt. 256. The court issued an order to
7   show cause on December 3, 2019. *Adams*, Dkt. 258. Postmates responded on
8   December 11, 2019, explaining that it was prepared to arbitrate on a truly individual
9   basis, and that it could not be held in contempt for not paying fees where the court
10  had expressly declined to order Postmates to pay fees. *Adams*, Dkt. 262.

11       **Answer**: Defendants state that *Adams* Dkts. 256, 258, and 262 speak for
12  themselves. Defendants deny any allegations to the extent they are inconsistent with
13  those documents.

14       62.   In December 2019, after further negotiations, the parties agreed to
15  proceed with 50 arbitrations under a full reservation of rights. Postmates paid filing
16  fees for the arbitrations of those individuals and answered those individuals'
17  demands. In February 2020, AAA sent an aggregated list of over 100 arbitrators
18  applying across-the-board to all 50 of the arbitrations, and requested that the parties
19  submit arbitrator strike lists to be applied uniformly to all 50 arbitrations. AAA then
20  began assigning arbitrators to the 50 individuals' claims, with a different arbitrator
21  assigned to each claim.

22       **Answer:** Defendants admit that Postmates paid filing fees for 50 arbitrations
23  of its choosing. Defendants admit that, after a telephonic conference in which all
24  parties agreed to a process for ranking and striking arbitrators, "AAA sent an
25  aggregated list of over 100 arbitrators applying across-the-board to all 50 of the
26  arbitrations, and requested that the parties submit arbitrator strike lists to be applied
27  uniformly to all 50 arbitrations. AAA then began assigning arbitrators to the 50
28  individuals' claims, with a different arbitrator assigned to each claim." Defendants

1   deny all remaining allegations.

2   63.   In March 2020, as individual arbitrators were confirmed, the parties

3   began participating in preliminary hearings and briefing motions. It took months for

4   arbitrations to begin. Although Postmates paid filing fees for 50 arbitrations in

5   December 2019, as of June 22, 2020, 10 arbitrators (20 percent) still had not

6   conducted preliminary hearings.

7   **Answer**: Defendants admit that, "[i]n March 2020, as individual arbitrators

8   were confirmed, the parties began participating in preliminary hearings and briefing

9   motions." Defendants admit that Postmates has disqualified numerous appointed

10   arbitrators, and therefore, "as of June 22, 2020, 10 arbitrators (20 percent) still had

11   not conducted preliminary hearings." Defendants deny any remaining allegations.

12   64.   When Postmates has asked individual arbitrators for relief based on

13   claimants' non-individual arbitration tactics, arbitrators have determined that such

14   issues are "beyond the scope" of their authority. For instance, when claimant Nichole

15   Davis abruptly withdrew her claim shortly after Postmates paid AAA's filing fee, the

16   arbitrator denied Postmates' request for cost-shifting based on the claimant's

17   involvement in a scheme of "pressing and handling numerous identical Demands for

18   Arbitration," concluding that "[w]hether or not the claims made by [Postmates] are

19   true and accurate, they are beyond the scope of the current individual arbitration" and

20   are "well beyond the scope of this Arbitrator's authority." Order, *Davis v. Postmates*,

21   AAA Case No. 01-19-0004-6396 (May 15, 2020). Thus, both the *Adams* court and

22   arbitrators have refused to entertain Postmates' assertion that claimants' tactics

23   violate the Fleet Agreement's individual arbitration requirement.

24   **Answer:** Defendants deny that, for a claimant represented by Defendants'

25   counsel, Postmates has ever asked an arbitrator to determine whether that claimant's

26   demand for arbitration was not properly filed because it violated the class and/or

27   representative action waivers. Defendants admit that when Postmates has asked an

28   arbitrator to shift costs onto an individual claimant because that claimant withdrew

her demand that arbitrators have denied Postmates's request. Defendants deny all remaining allegations.

**F.    California Enacts SB 707.**

65.    SB 707, signed by Governor Newsom on October 13, 2019, went into effect on January 1, 2020.

**Answer:** Defendants admit the allegations in this paragraph.

66.    SB 707 specifically targets arbitration agreements for special treatment, and is designed to discourage companies from using arbitration agreements as a form of dispute resolution.

**Answer:** The allegations in this paragraph are legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny all remaining allegations.

67.    According to the California Assembly Committee on the Judiciary, SB 707 is designed to change the dynamics of arbitration, which the Committee described as "a controversial form of alternative dispute resolution held outside of courts where a thirdparty, typically a retired judge, makes a binding determination in favor of one party to the arbitration." Judiciary Committee Analysis at 1, 2. The Committee expressed that arbitration agreements provide "significant advantages" to the companies that use them, in part because "[i]t's easy to predict the calls if you can hire the umpire." *Id*. at 7. The Committee further expressed that SB 707 was designed with the hope that it would cause "drafting parties [to] reconsider their liberal use of binding arbitration provisions in contracts, or at a minimum, consider drafting these agreement[s] in a manner that provides all parties increased access to the court system in the event circumstances arise that warrant adjudicating disputes in court." *Id*. at 4.

**Answer**: Defendants state that the text of the Judiciary Committee Analysis speaks for itself. Defendants deny any allegations to the extent they are inconsistent with the text of the Judiciary Committee Analysis.

68.    Public statements by California Senators Bob Wieckowski and Bob Hertzberg, SB 707's co-authors, confirm that the law targets arbitration agreements and is intended to discourage companies from using mandatory arbitration agreements as a form of dispute resolution.

   a. On April 23, 2019, Senator Wieckowski made clear in a press release that SB 707 targets arbitration, which, in his view, "overwhelmingly favors employers over employees" and permits companies "to game the system."[2]

   b. On May 28, 2019, Senator Wieckowski stated on Twitter that SB 707 "will crack down on companies that force workers and consumers into arbitration and then stop or obstruct the process."[3]

   c. On June 1, 2019, Senator Wieckowski stated on Twitter that "SB 707 will deter companies from abusing the arbitration process."[4]

   d. On June 18, Senator Hertzberg stated in a press release that "SB 707 is a critical reform to California's rigid arbitration process, which too often gives companies an advantage over individuals locked into binding arbitration agreements."[5]

   e. That same day, Senator Wieckowski stated on Twitter that SB 707 will "help workers and consumers who are seeing their rights obstructed by

---

[2] Press Release, Senator Bob Wieckowski, After forcing workers and consumers into forced arbitration, companies are delaying hearings, leaving victims with no avenue for justice (April 23, 2019), https://tinyurl.com/ycmj6lqm.

[3] @BobWieckowskiCA, Twitter (May 28, 2019, 8:50 p.m.), https://tinyurl.com/y8skwxcs.

[4] @BobWieckowskiCA, Twitter (June 1, 2019, 3:47 p.m.), https://tinyurl.com/ydbhntgj.

[5] Press Release, Senator Bob Wieckowski, SB 707 assists California workers, consumers when companies withhold payment to delay arbitration (June 18, 2019), https://tinyurl.com/ycq469rc.

firms manipulating arbitration."[6]

    f.   On August 27, 2019, Senator Wieckowski stated in a blog that "[m]any are laboring in a work environment where they must literally sign away some of their rights as a condition of employment," but SB 707 "will help stop a growing practice where employers require their employees to sign an arbitration agreement that denies them their day in court, then obstruct the arbitration process when it benefits the companies' bottom line."[7]

**Answer:** Defendants state that the quoted texts speak for themselves. Defendants deny any allegations to the extent they are inconsistent with the entirety of the quoted texts. The remainder of this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

69.   Statements by the Consumer Attorneys of California ("CAOC"), one of the co-sponsors of SB 707, and its President Mike Arias likewise demonstrate that SB 707 is intended to single out arbitration agreements for disfavored treatment and to discourage companies from using arbitration agreements.

    a.   On May 28, 2019, CAOC stated on Twitter that SB 707 "will prevent businesses from gaming the forced arbitration system to delay and deny consumers and workers a shot at justice."[8]

---

[6]  @BobWieckowskiCA, Twitter (June 18, 2019, 8:01 p.m.), https://tinyurl.com/yc8ujo7s.

[7] Bob Wieckowski, Time to Stop Abuses, Increase Diversity in Arbitration System, Labor's Edge: Views From the California Labor Movement (Aug. 27, 2019), https://tinyurl.com/ydy98j59; see also Protecting Workers & Consumers When Companies Withhold Payments (June 1, 2019), https://tinyurl.com/y29bbt83 (Senator Wieckowski explaining at the five-minute mark that SB 707 is designed to force companies into court).

[8]  @ConsumerAttysCA, Twitter (May 28, 2019, 2:27 p.m.), https://tinyurl.com/yay7mhof.

b. In a September 11, 2019 press release, Arias stated that "[i]t's bad enough that companies get away with forcing arbitration on consumers and workers," but SB 707 "will ensure that these cases don't become orphans mired in a system being gamed by big corporations."[9]

**Answer:** Defendants state that the quoted texts speak for themselves. Defendants deny any allegations to the extent they are inconsistent with the entirety of the quoted texts. The remainder of this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

70.     Moreover, SB 707's stated purpose is to ensure that drafting parties of mandatory arbitration agreements pay their filing fees, so that individuals who have been forced to submit to mandatory arbitration to resolve employment or consumer disputes are able to have their disputes resolved in a timely manner. Judiciary Committee Analysis at 7. Yet SB 707 applies to both mandatory and permissive arbitration agreements.

**Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants deny any allegations to the extent they are inconsistent with SB 707. The remaining allegations in this paragraph are legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny all remaining allegations.

71.     SB 707 provides that a party who drafts an arbitration agreement and fails to pay its arbitration fees "within 30 days after the due date" set by the arbitration provider is in "material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration." Cal. Code Civ. Proc. § 1281.97(a). By its terms, SB 707 permits a non-drafting party to seek penalties under SB 707 even if the nondrafting party fails to pay arbitration fees or otherwise comply

---

[9] Press Release, Senator Bob Wieckowski, Wieckowski, Hertzberg's SB 707 would stop companies from gaming the rules in arbitration (Sept. 11, 2019), https://tinyurl.com/yah7cte7.

1   with the arbitration agreement.

2   **Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants

3   deny any allegations to the extent they are inconsistent with SB 707. The remaining

4   allegations in this paragraph are legal conclusions to which no answer is required. To

5   the extent an answer is required, Defendants deny all remaining allegations.

6   72.   On its face, SB 707 also appears to permit a non-drafting party to an

7   arbitration agreement to seek penalties if the drafting party does not pay the

8   arbitration fees—even if the non-drafting party is not a party to an arbitration

9   agreement. Cal. Code Civ. Proc. § 1281.97(a). In other words, SB 707 essentially

10  creates contractual rights for non-parties to a company's arbitration agreement—such

11  as the approximately 696 Defendants who are not bound by the Mutual Arbitration

12  Provision—and permits them to force the company to choose between paying

13  millions of dollars in administrative filing fees that it does not owe, or face an array

14  of sanctions under SB 707 if it does not pay the filing fees demanded.

15  **Answer**: Defendants state that the text of SB 707 speaks for itself. Defendants

16  deny any allegations to the extent they are inconsistent with SB 707. The remaining

17  allegations in this paragraph are legal conclusions to which no answer is required. To

18  the extent an answer is required, Defendants deny all remaining allegations.

19  73.   If the drafting party fails to pay arbitration fees, then the non-drafting

20  party may proceed with its claim in court or compel arbitration. *See id*. § 1281.97(b).

21  If the non-drafting party elects to proceed in court, then the non-drafting party is

22  entitled to recover attorney's fees and costs incurred as a result of the breach and may

23  recover additional non-monetary sanctions—including evidentiary sanctions, default

24  on the underlying claims, and contempt of court. *See id*. § 1281.99. If the non-drafting

25  party seeks to compel arbitration, then the non-drafting party is entitled to recover

26  attorney's fees and costs related to the arbitration. *See id.* § 1281.97(b). "The FAA

27  was designed to promote arbitration," *Concepcion*, 563 U.S. at 345–46, and requires

28  courts to "place [arbitration] agreements on an equal footing with all other contracts,"

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1429 (2017). SB 707, however, singles out arbitration agreements for special treatment, and has the intent and effect of discouraging parties from drafting arbitration agreements.

**Answer**: Defendants state that the text of SB 707 and the quoted cases speaks for itself. Defendants deny any allegations to the extent they are inconsistent with SB 707 and the quoted cases. The remaining allegations in this paragraph are legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny all remaining allegations.

**G.**  **Defendants File 10,356 Arbitration Demands Simultaneously, and AAA Begins Administering the Demands on a Non-Individual Basis.**

74.    On February 15, 2020, after SB 707 had gone into effect, Defendants simultaneously filed 10,356 arbitration demands against Postmates. The claims concern alleged worker misclassification and, among other things, alleged violations of the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207 ("FLSA"), California wage and hour laws, California's Unfair Competition Law, and unspecified "applicable Municipal Codes."

**Answer:** Defendants admit that, on February 15, 2020, they filed individual demands for arbitration against Postmates. Defendants state that the demands for arbitration speak for themselves, and incorporate by reference an example demand for arbitration, which is attached as Exhibit WP0014–15 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations inconsistent with the demands for arbitration.

75.    Defendants filed their demands against Postmates on the same day, at the same time, and, upon information and belief, in the same email. They notified Postmates of the filing via a single email sent by their counsel to Postmates' counsel. That email contained a link to a Dropbox folder that contained 10,356 demands and three versions of the Fleet Agreement, titled Exhibits A, B, and C. Each of the demands referenced one of the exhibits in the Dropbox folder, but no Defendant

provided any proof that they ever actually accepted the Fleet Agreement and did not opt out of the Mutual Arbitration Provision, or ever performed any work on the Postmates platform.

**Answer:** Defendants deny that "no Defendant provided any proof that they ever actually accepted the Fleet Agreement and did not opt out of the Mutual Arbitration Provision, or ever performed any work on the Postmates platform." Defendants admit the remaining allegations in this paragraph.

76.   Defendants' 10,356 demands were virtually identical. Where the demand forms instruct claimants to "describe the nature of each claim" "in detail," the demands read:

> Claimant has been a courier for Postmates. Postmates has misclassified Claimant as an independent contractor instead of an employee. Claimant seeks all available relief under the following provisions, as shown to be applicable following discovery of information exclusively within Postmates's control: California Labor Code, Wage Order No. 9 (Minimum Wage & Overtime); Applicable Municipal Codes (Minimum Wage, Overtime, Sick Time, & Notice Violations); California Labor Code § 226 (Wage Statement & Records Access); and Cal. Bus. & Prof. Code § 17200 (Unfair & Unlawful Business Practices).

**Answer:** Defendants state that the demands for arbitration speak for themselves, and incorporate by reference an example demand for arbitration, which is attached as Exhibit WP0014–15 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations inconsistent with the demands for arbitration.

77.   Some demands also include a claim under the FLSA, 29 U.S.C. §§ 206, 207. Those demands read:

> Claimant has been a courier for Postmates. Postmates has misclassified Claimant as an independent contractor instead of an employee. Claimant seeks all available relief under the following provisions, as shown to be applicable following discovery of information exclusively within Postmates's control: 29 U.S.C. §§ 206, 207 (Minimum Wage & Overtime); California Labor Code, Wage Order No. 9 (Minimum Wage & Overtime); Applicable Municipal Codes (Minimum Wage, Overtime, Sick Time, & Notice Violations); California Labor Code § 226 (Wage Statement & Records Access); and Cal. Bus. & Prof. Code § 17200 (Unfair & Unlawful Business Practices).

**Answer:** Defendants state the demands for arbitration speak for themselves,

and incorporate by reference an example demand for arbitration, which is attached as Exhibit WP0014–15 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations inconsistent with the demands for arbitration.

78.     Each of the 10,356 demands seeks the same type of relief: interest; arbitration costs; punitive or exemplary damages; "[d]eclaratory relief; appropriate individual relief, damages; penalties; and restitution." Each demand states a different "amount of claim" that is "subject to amendment according to proof." The demands do not attempt to explain how the "amount of claim" was calculated or what type of relief it represents.

**Answer:** Defendants state that the demands for arbitration speak for themselves, and incorporate by reference an example demand for arbitration, which is attached as Exhibit WP0014–15 to the Postman Declaration, ECF No. 45-1. Defendants deny any allegations inconsistent with the demands for arbitration.

79.     According to Postmates' records and the information that Defendants and their counsel have provided to Postmates, at least 696 Defendants have no right to arbitration—at least 657 Defendants never signed up to use the Postmates platform, at least 4 Defendants started to sign up to use the platform but never accepted the Fleet Agreement, and at least 35 Defendants opted out of the Mutual Arbitration Provision. Exs. B–D. Moreover, an additional 607 Defendants have no viable claims—at least 453 Defendants never completed a single delivery using the Postmates platform, and at least 154 Defendants released their claims in the Singer settlement. Exs. E–F. In other words, even the individuals who may have valid arbitration claims chose to aggregate their arbitration demands with the demands of 1,303 individuals who have no viable or arbitrable claims whatsoever.

**Answer**: Defendants lack sufficient knowledge and information to answer the allegations in this paragraph regarding what information is in Postmates's records.

80.     Further, approximately 671 Defendants have filed duplicative arbitration demands against Postmates through counsel separate from Keller

Lenkner. Ex. G. As with the demands filed by Keller Lenkner, the arbitration demands filed by separate counsel also assert misclassification-based wage and hour claims—raising questions as to who actually represents these individuals, and whether they are seeking to recover twice on the same claims through non-individualized arbitration.

**Answer:** Defendants lack sufficient knowledge and information to answer the allegations in this paragraph regarding what information is in Postmates's records relating to Defendants who retained other counsel.

81.     On February 19, 2020, the Defendants who had previously demanded employment records from Postmates renewed their requests for records. Again, they sent Postmates a single email asking for employment records, and attached a single spreadsheet. This spreadsheet added 3,074 couriers to the records request and listed "16,875 California couriers to whom this e-mail applies." Of the purported couriers who were listed on the spreadsheet, 10,330 are Defendants in this action.

**Answer**: Defendants state that the February 2020 correspondence speaks for itself. Defendants deny any allegations to the extent they are inconsistent with the text of that correspondence. Defendants deny all remaining allegations.

82.     On February 24, 2020, AAA notified Postmates of Defendants' filing. AAA made clear that it intended to administer the 10,356 demands collectively. Its email to Postmates regarding the demands bore the subject line "*10,356 Individuals v. Postmates, Inc.*" AAA also explained that the cases would "be administered in accordance with the 'Administrative Group Filing Fees' section" of the AAA Employment/Workplace Fee Schedule (as opposed to its fee schedule for individual arbitration demands), and stated that Postmates must pay $4,689,000 in initial filing fees by March 16, 2020. Under the "Administrative Group Filing Fees" plan, once initial filing fees are paid, AAA will then charge Postmates another $18,123,000 in fees "prior to the arbitrator selection process."

**Answer:** Defendants state that the quoted email speaks for itself, and

incorporate by reference a true and correct copy of the email, attached as Exhibit A, pages 1–2, to this Answer. Defendants deny any allegations to the extent they are inconsistent with the text of that email. Defendants further state that AAA's rules and fee schedules speak for themselves, and incorporate by reference AAA's Commercial Rules (available at https://kl.link/2XlxHks) and AAA's Employment/Workplace Fee Schedule (available at https://kl.link/3cpkr2H). Defendants deny any allegations to the extent they are inconsistent with AAA's Commercial Rules and Employment/Workplace Fee Schedule.

83. The AAA recently adopted the "Group Administrative Filing Fee Schedule," which applies whenever 25 or more "similar claims for arbitration" are filed against the same party and "[c]ounsel for the parties is consistent or coordinated across all cases." AAA Employment/Workplace Fee Schedule 3, https://tinyurl.com/yx7hxyaa. On information and belief, AAA implemented the "Group Administrative Filing Fee Schedule" in an attempt to address the inefficiencies and increased cost created by mass arbitration tactics like those pursued by Defendants here.

**Answer**: Defendants state that AAA's fee schedules speak for themselves, and incorporate by reference AAA's Employment/Workplace Fee Schedule (available at https://kl.link/3cpkr2H). Defendants deny any allegations to the extent they are inconsistent with AAA's Employment/Workplace Fee Schedule. Defendants lack sufficient information and knowledge to answer the allegation regarding the AAA's motivations for creating the "Group Administrative Filing Fee Schedule." Defendants deny all remaining allegations.

84. AAA's email also explicitly stated that the purported couriers' claims were "subject to California Code of Civil Procedure 1281.97 and 1281.98," and therefore "payment must be received by April 15, 2020 or the AAA may close the parties' cases."

**Answer:** Defendants state that the quoted email speaks for itself, and

1    incorporate by reference a true and correct copy of the email, attached as Exhibit A,

2    pages 1–2, to this Answer. Defendants deny any allegations to the extent they are

3    inconsistent with that email.

4         85.    The same day, AAA sent Postmates a single invoice for $4,689,000 in

5    filing fees for the 10,356 arbitrations.

6    **Answer:** Defendants admit that AAA informed Postmates in its February

7    24, 2020 (attached to this Answer as Exhibit A, pages 1–2), "Respondent's invoice

8    will follow under separate cover." Defendants lack sufficient knowledge and

9    information to answer the allegation of whether AAA did in fact send "Postmates a

10   single invoice for $4,689,000 in filing fees for the 10,356 arbitrations."

11        86.    On March 25, 2020, Postmates filed its original complaint in this action.

12   **Answer:** Defendants admit the allegations in this paragraph.

13        87.    On March 26, 2020, Postmates provided AAA with a copy of the

14   complaint and asked AAA to suspend administration of the AAA Arbitration under

15   AAA Employment Arbitration Rule 1.

16   **Answer:** Defendants state that the email referred to above speaks for itself,

17   and incorporate by reference a true and correct copy of the email, attached as Exhibit

18   A, page 3, to this Answer. Defendants deny any allegations to the extent they are

19   inconsistent with the text of that email.

20        88.    On March 27, 2020, AAA rejected Postmates' request. It announced that

21   Postmates could not invoke Employment Rule 1 because "administration of these

22   cases has not commenced" because Postmates has not paid filing fees. It stated:

23   "Please be reminded that these matters are subject to California Code of Civil

24   Procedure 1281.97 and 1281.98. As such, payment must be received by April 15,

25   2020 or the AAA may close the cases." It also stated that "AAA will not grant any

26   extensions to this payment deadline."

27   **Answer:** Defendants state that the quoted email speaks for itself, and

28   incorporate by reference a true and correct copy of the email, attached as Exhibit A,

page 12, to this Answer. Defendants deny any allegations to the extent they are inconsistent with the text of that email.

89.     On April 2, 2020, 100 Defendants informed Postmates and AAA that they were advancing "Postmates'[] share of the filing and administrative fees" so that their arbitrations could commence. Those 100 Defendants informed Postmates and AAA that they were advancing fees in a single email, but neither the 100 Defendants nor their counsel explained why fees were advanced for them but not any other Defendants. The 100 Defendants paid the advanced fees via a single wire transaction. And they all simultaneously requested that AAA strip Postmates of its substantive rights under the AAA Rules by "assign[ing] these matters to arbitrators immediately"—including by requesting that AAA assign multiple arbitrations to the same arbitrator—and refusing "to give Postmates the opportunity to review strike lists for these matters." AAA denied both of these requests.

**Answer**: Defendants state that the correspondence between the parties speaks for itself, and incorporate by reference a true and correct copy of the correspondence between the parties, attached as Exhibit B to this Answer. Defendants deny any allegations to the extent they are inconsistent with the correspondence between the parties.

90.     On May 1, 2020, the 100 Defendants whose arbitrations were proceeding filed amended demands on the same day, at the same time, and via a single email. That email included a link to a single Dropbox folder where Postmates and AAA could access the 100 amended demands and three versions of the Fleet Agreement, labeled Exhibits A, B, and C. Each of the amended demands referred to one of the exhibits when identifying the applicable arbitration agreement, but no Defendant provided any proof that they ever actually accepted the Fleet Agreement and did not opt out of the Mutual Arbitration Provision, or ever performed any work on the Postmates platform.

**Answer**: Defendants deny that "no Defendant provided any proof that they

1   ever actually accepted the Fleet Agreement and did not opt out of the Mutual
2   Arbitration Provision, or ever performed any work on the Postmates platform.
3   Defendants admit the remaining allegations in this paragraph.

4        91.    As with the original demands, each of the amended demands was
5   virtually identical. Each amended demand included an identical Exhibit A, which
6   listed seven individual defendants, all of whom are Postmates officers and directors.
7   Each amended demand also included an identical Exhibit B titled "Nature of the
8   Claim." Exhibit B for each demand provides general background on the couriers'
9   arguments, but no individualized information whatsoever—*not even the claimant's*
10  *name*. For example, each Exhibit B begins, "Claimant was a delivery courier for
11  Respondent Postmates Inc., an on-demand delivery business. Under California law,
12  Claimant was a Postmates employee." The exhibit does not describe when or where
13  each claimant purportedly used the Postmates platform or even specify which
14  municipal codes apply to the courier's claims. Instead, each Exhibit B repeats the
15  exact same allegations made in the Exhibit B submitted with the other 99 amended
16  demands.

17       **Answer**: Defendants state that the amended demands for arbitration speak for
18  themselves. Defendants deny any allegations to the extent they are inconsistent with
19  the amended demands for arbitration.

20       92.    The 100 Defendants whose claims are proceeding have continued to
21  pursue their demands on a non-individual basis. They have communicated with AAA
22  and Postmates as a unified group rather than as individuals. And AAA has likewise
23  administered the cases on a non-individualized basis, sending single emails and
24  letters that communicate information about all 100 cases and applying the same
25  deadlines to all 100 cases.

26       **Answer**: Defendants state that the correspondence between the parties speaks
27  for itself, and incorporate by reference a true and correct copy of the correspondence
28  between the parties, attached as Exhibit B to this Answer. Defendants deny any

allegations to the extent they are inconsistent with the correspondence between the parties. Defendants further deny that AAA has solely relied on "single emails and letters that communicate information about all 100 cases and apply the same deadlines to all 100 cases." AAA has begun on a rolling basis appointing individual arbitrators to those arbitrations, and each arbitrator appointment is communicated in an individual email.

93.    On May 22, 2020, 4,933 Defendants filed a Cross-Petition to Compel Arbitration and Motion to Compel Arbitration against Postmates in this action. Dkt. 43. They joined as cross-petitioners 357 individuals who filed arbitration demands against Postmates on September 24, 2019. Again, Defendants acted on a non-individual basis, filing a single petition to compel and motion to compel that made the same arguments on behalf of themselves and 357 other individuals who had filed purportedly individual demands five months before Defendants filed their demands.

**Answer**: Defendants state that the Cross-Petition to Compel Arbitration and Motion to Compel Arbitration speak for themselves. Defendants deny any allegations to the extent they are inconsistent with the Cross-Petition to Compel Arbitration and/or Motion to Compel Arbitration.

94.    Postmates is ready and willing to arbitrate with individual couriers on an individual basis—as it has done in the past and continues to do—but it will not arbitrate in any manner other than the one set forth in the parties' agreement.

**Answer:** Defendants deny that Postmates has shown any readiness or willingness to arbitrate with them on an individual basis in the manner required by the parties' agreement. Defendants lack sufficient knowledge and information to answer the remaining allegations.

## <u>COUNT I</u>

**(Declaratory Judgment: Postmates Cannot Be Compelled to Arbitrate on A Non-Individual Basis)**

95.     Postmates repeats and realleges paragraphs 1 through 94 as though fully set forth herein.

**Answer**: Defendants repeat the answers to paragraphs 1 through 94 as though fully set forth herein.

96.     Postmates and the 10,356 individuals contractually agreed to resolve disputes in binding individual arbitration. Couriers expressly waived their right to arbitrate disputes with Postmates in any manner other than individual arbitration.

**Answer:** Defendants admit that they are 10,356 individuals who have asserted misclassification claims against Postmates in individual arbitration. Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant versions of the Fleet Agreement, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement.

97.     Despite this agreement, these individuals have sought to arbitrate in a nonindividualized manner in violation of the parties' agreement.

**Answer:** The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

98.     Postmates is compelled to seek relief in this Court because arbitration is a matter of contract, AAA has no authority to administer a non-individual arbitration between the 10,356 individuals and Postmates, and courts may not compel Postmates to arbitrate in that manner. See 9 U.S.C. § 4. Postmates has not consented to any form of arbitration aside from traditional individual arbitration, and for good reason—Defendants' tactic sacrifices the principal advantages of arbitration by making the process more formal, less efficient, and more expensive than traditional individual arbitration.

**Answer:** The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all

1  allegations.

2  99.   Individual arbitration is intended to reduce the cost and increase the

3  speed of dispute resolution, but Defendants' approach is specifically designed to be

4  more expensive and less efficient than individual arbitration. Requiring Postmates to

5  pay over $4 million in filing fees up front is more expensive than requiring it to pay

6  fees as services are actually provided—and no arbitration organization is capable of

7  handling thousands of individual arbitrations at the exact same time. Indeed, while

8  data is not available in the employment arbitration context, AAA's Consumer Group

9  administered fewer than 6,000 cases altogether in 2018. See AAA, 2018 Annual

10  Report 11 (May 2019), https://tinyurl.com/ycgdwq2r.

11  **Answer:** Defendants admit that "[i]ndividual arbitration is intended to reduce

12  the cost and increase the speed of dispute resolution." Defendants state that the

13  quoted Annual Report speaks for itself. Defendants deny any allegations to the extent

14  they are inconsistent with the quoted Annual Report. Defendants deny the remaining

15  allegations.

16  100.   Defendants' non-individual arbitration tactic requires procedural

17  formality to account for the years it would otherwise take to conduct each arbitration

18  on a truly individual basis. In fact, multiple arbitration organizations recently

19  published protocols in an attempt to address that approach—demonstrating that

20  Congress never envisioned that arbitrations would proceed in that manner when it

21  enacted the FAA in 1925. For example, in the past year, AAA introduced an

22  "Employment/Workplace Group Administrative Filing Fee Schedule,"

23  https://tinyurl.com/ya5vh9db, FedArb debuted a "Framework for Series of Mass

24  Employment Arbitration Proceedings," https://tinyurl.com/yay3ktlc, and the

25  International Institute for Conflict Prevention and Resolution developed an

26  "Employment-Related Mass Claims Protocol," https://tinyurl.com/ry3rznb.

27  **Answer:** Defendants, through their counsel, Keller Lenkner LLC, are aware

28  of three arbitration organizations, including AAA, that have devised new rules and

protocols for situations where multiple individuals file demands for arbitration against the same company. Defendants state that those new rules and protocols speak for themselves. Defendants deny any allegations to the extent they are inconsistent with those new rules and protocols. Defendants deny the remaining allegations.

101.    Unlike individual arbitration, Defendants' approach to arbitration is driven by a "strength in numbers" approach, and is explicitly intended to impose substantial settlement pressure by aggregating thousands of claims, some of which may be questionable, if not frivolous. Indeed, at least 1,303 Defendants do not have any viable or arbitrable claims at all because they have never accepted the Fleet Agreement or used the Postmates platform, have already released their claims in a prior settlement, have never even *signed up* to use the platform, and/or have opted out of the Fleet Agreement's Mutual Arbitration Provision.

**Answer:** Defendants deny the allegations in this paragraph.

102.    The Fleet Agreement's Mutual Arbitration Provision requires all controversies related to the Class Action Waiver to be adjudicated by a court, not an arbitrator, and Postmates' intention in drafting the Fleet Agreement was that a court would resolve all disputes related to the Class Action Waiver—including its express requirement that parties to the Mutual Arbitration Provision resolve all disputes in individual arbitration.

**Answer**: Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant Fleet Agreement versions, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement. Defendants further deny the remaining allegations in this paragraph.

103.    Declaratory relief from this Court will resolve this controversy.

**Answer**: The allegation in this paragraph is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation.

104.  As alleged herein, a real, substantial, and immediate controversy is presented regarding the rights, duties, and liabilities of the parties. 4,933 Defendants have cross-petitioned for an order compelling Postmates to arbitrate with them on a nonindividual basis. The remaining 5,423 Defendants may do so at any time, and have expressly declined to waive their right to move to compel arbitration. Moreover, Defendants' counsel has in the past divided a single batch of aggregated claimants by petitioning to compel arbitrations via separate actions or motions. *See Adams*, Dkt. 1; *McClenon*, Dkt. 1. These attempts to compel non-individual arbitration are contrary to the FAA, which permits courts to issue orders directing that "arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4.

**Answer:** Defendants admit that "4,933 Defendants have cross-petitioned for an order compelling Postmates to arbitrate with them." Defendants admit that "[t]he remaining 5,423 Defendants may do so at any time, and have expressly declined to waive their right to move to compel arbitration." Defendants admit that "Defendants' counsel has in the past," for other courier clients, petitioned "to compel arbitrations via separate actions or motions." Defendants deny that they or any of Defendants' counsel's courier clients have sought to arbitrate in a "nonindividual" or "aggregate" manner. The remaining allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

105.  Postmates respectfully requests that the Court enter declaratory judgment under 28 U.S.C. § 2201 *et seq*. and Federal Rule of Civil Procedure 57 that Postmates cannot be compelled to arbitrate Defendants' claims on a non-individualized basis, and that couriers who wish to bring claims must do so by initiating and prosecuting arbitrations on an individual basis.

**Answer:** The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

## COUNT II

### (Declaratory Judgment: FAA Preemption Of SB 707)

106.   Postmates repeats and realleges paragraphs 1 through 105 as though fully set forth herein.

**Answer:** Defendants repeat the answers to paragraphs 1 through 105 as though fully set forth herein.

107.   Under the Supremacy Clause of the Constitution, the "laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, any state law that "conflicts with § 2 of the Federal Arbitration Act . . . violates the Supremacy Clause." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Indeed, state laws that "single[] out arbitration agreements for disfavored treatment" are preempted by the FAA, *Kindred*, 137 S. Ct. at 1425, as are state laws that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives" of the FAA, *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

**Answer:** Defendants state that the United States Constitution, statutes, and cases quoted and cited above speak for themselves. Defendants deny any allegations to the extent they are inconsistent with the above cited and quoted United States Constitution, statutes, and cases. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

108.   SB 707 is preempted because it singles out arbitration agreements for disfavored treatment, and discourages companies from drafting arbitration agreements, as the Legislature acknowledged when it stated that SB 707 would cause companies to reconsider their use of arbitration agreements. See *Chamber of Commerce of the U.S. v. Becerra*, 2020 WL 605877, at *10–13 (E.D. Cal. Feb. 7,

2020). SB 707 applies *only* to arbitration agreements, even though "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable only to arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (emphasis in original).

**Answer:** Defendants state that the text of SB 707 and the cases quoted and cited above speak for themselves. Defendants deny any allegations to the extent they are inconsistent with SB 707 and the above cited and quoted cases. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

109.   SB 707 further provides that *only* a drafting party of an arbitration agreement is in material breach for not paying arbitration fees, regardless of the reason for the nonpayment. For instance, SB 707 conditions a drafting party's ability to enforce an arbitration agreement on its continued payment of arbitration fees (*i.e.*, its continued performance under the contract), even if the non-drafting party has materially breached the arbitration agreement by, for example, seeking to arbitrate in a contractually forbidden manner. And it permits a non-drafting party who has breached an arbitration agreement to nevertheless enforce the agreement.

**Answer**: Defendants state that the text of SB 707 speaks for itself. Defendants deny any allegations to the extent they are inconsistent with SB 707. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

110.   SB 707 also singles out arbitration agreements for disfavored treatment and discourages the drafting of arbitration agreement. On its face, SB 707 appears to permit non-parties to a company's arbitration agreement to require the company to arbitrate with them under the agreement even though the company never assented to do so, and to seek penalties if the company declines to do so. In this proceeding, for example, Postmates' records indicate that 661 Defendants never entered into an agreement to arbitrate with Postmates, yet each of those Defendants has filed an

1   arbitration demand against Postmates and may seek to invoke SB 707 against
2   Postmates at any time. SB 707, though, purports to deny Postmates the right to assert
3   generally-applicable contracts defenses, such as lack of formation, to defend against
4   SB 707's draconian penalties.

5       **Answer**: Defendants state that the text of SB 707 and the cases quoted and
6   cited above speak for themselves. Defendants deny any allegations to the extent they
7   are inconsistent with SB 707 and the above cited and quoted cases. Defendants lack
8   sufficient information and knowledge to answer the allegation regarding what
9   Postmates's records show. The remaining allegations are legal conclusions to which
10  no response is required. To the extent a response is required, Defendants deny all
11  remaining allegations.

12      111.   Similarly, SB 707 purports to apply even to individuals who opt out of
13  an arbitration agreement. According to Postmates' records, 35 Defendants have opted
14  out of arbitration with Postmates, but have filed arbitration demands against
15  Postmates and may seek to invoke SB 707 against Postmates at any time.

16      **Answer**: Defendants state that the text of SB 707 and the cases quoted and
17  cited above speak for themselves. Defendants deny any allegations to the extent they
18  are inconsistent with SB 707 and the above cited and quoted cases. Defendants lack
19  sufficient information and knowledge to answer the allegation regarding what
20  Postmates records show. The remaining allegations are legal conclusions to which
21  no response is required. To the extent a response is required, Defendants deny all
22  remaining allegations.

23      112.   The law engrafts onto arbitration agreements—and no other type of
24  contract—a highly restrictive and onerous definition of material breach, and then
25  punishes that breach by mandating attorney's fees and costs, and permitting default,
26  sanctions, waiver of arbitration, and even contempt of court without any opportunity
27  to justify the breach or argue its non-materiality.

28      **Answer**: Defendants state that the text of SB 707 speaks for itself. Defendants

deny any allegations to the extent they are inconsistent with SB 707. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

113.   SB 707 discourages the drafting of arbitration agreements, contrary to the FAA's goal of promoting arbitration. SB 707 is therefore preempted because it stands as an obstacle to Congress's objectives in enacting the FAA.

**Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants deny any allegations to the extent they are inconsistent with SB 707. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

114.   Declaratory relief from this Court will resolve this controversy.

**Answer:** The allegation in this paragraph is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation.

115.   As alleged herein, a real, substantial, and immediate controversy is presented regarding the rights, duties, and liabilities of the parties. Postmates therefore requests a declaratory judgment from this Court under 28 U.S.C. § 2201 *et seq*. and Federal Rule of Civil Procedure 57 that the FAA preempts SB 707 as applied to arbitration agreements within the scope of the FAA.

**Answer:** The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

## <u>COUNT III</u>

### (Declaratory Judgment: SB 707 Violates United States and California Constitutions)

116.   Postmates repeats and realleges paragraphs 1 through 115 as though fully set forth herein.

**Answer:** Defendants repeat the answers to paragraphs 1 through 115 as though

51

1   fully set forth herein.

2       117.   The Contracts Clause of the United States Constitution prohibits states

3   from passing any "law impairing the obligation of contracts." U.S. Const. art. I, sec.

4   X, cl. 1.

5       **Answer:** Defendants state that the United States Constitution speaks for itself.

6   Defendants deny any allegations to the extent they are inconsistent with the United

7   States Constitution.

8       118.   Similarly, the California Constitution prohibits the Legislature from

9   enacting any "law impairing the obligation of contracts." Cal. Const. art. I, § 9.

10      **Answer:** Defendants state that the California Constitution speaks for itself.

11  Defendants deny any allegations to the extent they are inconsistent with the

12  California Constitution.

13      119.   SB 707 substantially impairs the parties' contractual relationship and

14  undermines the parties' reasonable expectations. The Mutual Arbitration Provision

15  provides that each party shall equally share arbitration filing fees, but SB 707

16  substantially impairs the parties' agreement by requiring only Postmates to pay its

17  share of the filing fees—even if the courier materially breached the contract by, for

18  example, filing an arbitration demand in contravention of the parties' agreement. SB

19  707 forgives a courier's noncompliance with the parties' agreement, while also

20  requiring Postmates to continue to perform under the contract even if the courier has

21  already materially breached the contract in some way.

22      **Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants

23  deny any allegations to the extent they are inconsistent with SB 707. The remaining

24  allegations are legal conclusions to which no response is required. To the extent a

25  response is required, Defendants deny all remaining allegations.

26      120.   SB 707 is not a reasonable or appropriate method of advancing a

27  legitimate public purpose. SB 707 is designed to ensure that parties to mandatory

28  arbitration agreements pay their arbitration filing fees. But by its terms, SB 707 is

both overinclusive and underinclusive. It is overinclusive because it applies to all drafting parties, including companies like Postmates that indisputably do not force individuals to submit to mandatory arbitration as a condition of employment. And it is underinclusive because it applies only to drafting parties, and does not penalize non-drafting parties for failing to pay their arbitration filing fees.

**Answer:** Defendants state that the text of SB 707 speaks for itself. Defendants deny any allegations to the extent they are inconsistent with SB 707. Defendants state that the Fleet Agreement speaks for itself, and incorporate by reference the relevant versions of the Fleet Agreement, which are attached as Exhibits B–E to the Cross-Petition to Compel Arbitration, ECF Nos. 43-2–43-5. Defendants deny any allegations to the extent they are inconsistent with the Fleet Agreement. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

121.   Declaratory relief from this Court will resolve this controversy.

**Answer:** The allegation in this paragraph is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation.

122.   As alleged herein, a real, substantial, and immediate controversy is presented regarding the rights, duties, and liabilities of the parties. Postmates therefore respectfully requests that the Court enter declaratory judgment under 28 U.S.C. § 2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure that SB 707 violates the Contracts Clauses of the United States Constitution and California Constitution.

**Answer:** The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

## <u>COUNT IV</u>

### (Injunctive Relief: Enjoining the AAA Arbitration)

123.   Postmates repeats and realleges paragraphs 1 through 122 as though fully set forth herein.

**Answer**: Defendants repeat the answers to paragraphs 1 through 122 as though fully set forth herein.

124.   Defendants have asserted claims for compensatory damages, punitive damages, declaratory relief, injunctive relief, penalties, and restitution against Postmates in the AAA Arbitration and, on information and belief, will continue to pursue such claims unless enjoined.

**Answer:** Defendants admit the allegations in this paragraph.

125.   Unless Defendants are enjoined from pursuing their claims on a non-individual basis, Postmates will suffer a constitutional violation as a result of the application of SB 707, in addition to the severe penalties imposed by SB 707. Thus, the balance of equities weighs heavily in favor of an injunction.

**Answer:** The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

126.   The public interest would be served by enjoining Defendants from pursuing their claims against Postmates in a non-individual arbitration because the parties' agreement precludes non-individualized resolution of their disputes.

**Answer:** The allegation in this paragraph is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation.

127.   Postmates respectfully requests that the Court enjoin the AAA Arbitration and require Defendants who wish to pursue arbitration against Postmates to proceed individually as required by the Mutual Arbitration Provision.

**Answer**: The allegation in this paragraph is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation.

## <u>COUNT V</u>

### (Injunctive Relief: Enjoining Enforcement of SB 707)

128.   Postmates repeats and realleges paragraphs 1 through 127 as though fully set forth herein.

**Answer:** Defendants repeat the answers to paragraphs 1 through 127 as though fully set forth herein.

129.   For the reasons explained above, SB 707 is preempted by the FAA and unconstitutional under the federal and state constitutions.

**Answer:** The allegation in this paragraph is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation.

130.   AAA has stated that the 10,356 individuals' demands are subject to SB 707 and has closed the arbitrations.

**Answer:** Defendants state that the email referenced above speaks for itself, and incorporate by reference a true and correct copy of the email, attached as Exhibit A, to this Answer. Defendants deny any allegations to the extent they are inconsistent with the text of that email.

131.   4,933 Defendants have cross-petitioned for an order compelling Postmates to arbitrate with them on a non-individual basis and to impose penalties under SB 707. The remaining 5,423 Defendants may do so at any time, and have expressly declined to waive their right to move to compel arbitration. Moreover, Defendants' counsel has in the past divided a single batch of aggregated claimants by petitioning to compel arbitrations via separate actions or motions. *See Adams*, Dkt. 1; *McClenon*, Dkt. 1.

**Answer**: Defendants admit that "4,933 Defendants have cross-petitioned for an order compelling Postmates to arbitrate with them." Defendants admit that "[t]he remaining 5,423 Defendants may do so at any time, and have expressly declined to waive their right to move to compel arbitration." Defendants admit that "Defendants'

counsel has in the past," for other courier clients, petitioned "to compel arbitrations via separate actions or motions." Defendants deny that they or any of Defendants' counsel's courier clients have sought to arbitrate in a "non-individual" or "aggregate" manner. Defendants deny all remaining allegations.

132.    For the reasons stated above, unless SB 707 is enjoined, Postmates faces irreparable harm. First, its constitutional rights will be violated, and even an alleged constitutional violation constitutes irreparable harm. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Second, it will incur severe sanctions. Specifically, SB 707 would give Defendants their choice of either: (1) compelling Postmates to arbitrate their non-individual demands notwithstanding the parties' agreement to only arbitrate individually, pay filing fees, and pay Defendants' costs and attorney's fees, Cal. Code Civ. Proc. § 1281.97(b)(2), or (2) proceeding with their claims directly in court notwithstanding the parties' arbitration agreement, *id.* § 1281.97(b)(1). In addition, SB 707 would subject Postmates to further penalties including evidentiary sanctions, terminating sanctions, and contempt sanctions. *Id.* § 1281.99.

**Answer**: Defendants state that the text of SB 707 and the case cited above speak for themselves. Defendants deny any allegations to the extent they are inconsistent with SB 707 and the above cited case. The remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

133.    The balance of equities weighs heavily in favor of an injunction. In the absence of an injunction, Postmates will be irreparably harmed. If an injunction issues, Defendants will not be harmed by the lack of enforcement of SB 707. Rather, they will continue to be free to pursue their claims in individual arbitration, as required by their contractual agreements with Postmates (to the extent one exists).

**Answer**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, Defendants deny all remaining allegations.

1      134.   The public interest would be served by enjoining the enforcement of SB

2   707 because the statute is preempted by the FAA and unconstitutional.

3      **Answer**: The allegation in this paragraph is a legal conclusion to which no

4   response is required. To the extent a response is required, Defendants deny the

5   allegation.

**PRAYER FOR RELIEF**

WHEREFORE, Postmates respectfully requests that this Court enter an order:

    1.  Declaring that Postmates cannot be compelled to arbitrate with Defendants on a non-individual basis;

    2.  Permanently enjoining Defendants from pursuing any non-individual arbitrations against Postmates;

    3.  Declaring that SB 707 is preempted by the FAA and therefore may not be enforced against Postmates;

    4.  Declaring that SB 707 is unconstitutional under the United States Constitution and California Constitution;

    5.  Permanently enjoining Defendants from enforcing SB 707 against Postmates;

    6.  Awarding Postmates' costs of suit; and

    7.  Granting such other relief as may be just and proper.

**Answer:** The remainder of Plaintiff's Second Amended Complaint contains Plaintiff's prayer for relief, which consists of conclusions of law for which no responsive pleading is required, and which are therefore denied. To the extent the allegations are deemed in whole or in part to be factual, Defendants deny them.

**DEFENDANTS' ADDITIONAL ALLEGATIONS AND GENERAL DENIAL**

Except as otherwise expressly recognized in the foregoing Answer, Defendants deny each and every allegation set forth in Paragraphs 1 through 134, including, without limitation, the headings, subheadings, and footnotes in the Second Amended Complaint.  Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, averments in the Second Amended Complaint to which no responsive pleading is required shall be deemed denied. Defendants expressly reserve the right to amend and/or supplement their Answer.

**DEFENDANTS' AFFIRMATIVE DEFENSES**

Defendants assert the following affirmative defenses based on Defendants' knowledge, information, and belief at this time.  Without admitting any of the facts alleged in the Second Amended Complaint, Defendants assert and allege the following separate and additional affirmative defenses.

1.     Counts I, II, III, IV, and V are subject to an arbitration agreement such that they can only be heard in individual arbitration.

2.     The Amended Complaint fails to state a claim upon which relief can be granted.

3.     The Amended Complaint improperly joins the Defendants.

4.     The Court lacks subject matter jurisdiction to decide the issues raised in the Amended Complaint for all Defendants who are not also Cross-Petitioners.

5.     The Counts and allegations in the Second Amended Complaint do not give rise to a justiciable controversy.

1
2   Dated: July 15, 2020
3
4   Keith A. Custis (#218818)
5     kcustis@custislawpc.com
    CUSTIS LAW, P.C.
6   1999 Avenue of the Stars
    Suite 1100
7   Los Angeles, California 90067
8   (213) 863-4276
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

/s/ Warren Postman
Warren Postman (*pro hac vice*)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

Aaron Zigler (#327318)
  amz@kellerlenkner.com
Ashley Keller (*pro hac vice*)
  ack@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

*Attorneys for Defendants/Cross-Petitioners*